1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

Criminal Case No. 20-po-07016-GPG
3    _____

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    DAVID LESH,

8         Defendant.

9    _____

10             Proceedings before GORDON P. GALLAGHER, United

11   States Magistrate Judge, United States District Court for

12   the District of Colorado, commencing at 9:01 a.m., August 5,

13   2021 in the United States Courthouse, Grand Junction,

14   Colorado.

15   _____

16             WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18   _____

19                       APPEARANCES

20             PETER HAUTZINGER, Assistant United States Attorney

21   appearing for the Plaintiff.

22             ERIC FADDIS, Attorney at Law, appearing for the

23   Defendant.

24   _____

25                       BENCH TRIAL

2

```
 1                    I N D E X

 2     WITNESS                                 PAGE

 3     CHRISTOPHER INGHAM
         Direct Examination by Mr. Hautzinger      13, 26
 4       Cross-Examination by Mr. Faddis          42
         Redirect Examination by Mr. Hautzinger    53
 5       Voir Dire Examination by Mr. Faddis       26

 6     BENJAMIN LEACH
         Direct Examination by Mr. Hautzinger      55
 7       Cross-Examination by Mr. Faddis          120
         Redirect Examination by Mr. Hautzinger   179, 225
 8
       JAMES EMME
 9       Direct Examination by Mr. Faddis         217

10     B DEVINE
         Direct Examination by Mr. Faddis         221
11
       CLOSING ARGUMENTS
12       By Mr. Hautzinger                        227, 239
         By Mr. Faddis                            228
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

3

1                    E X H I B I T S

2     Plaintiffs:                          PAGE

3     1                                    26

4     2                                    28

5     3                                    30

6     4                                    36

7     5                                    37

8     6                                    38

9     7                                    39

10    8                                    41

11    9                                    88

12    10                                   118

13    11                                   81

14

15    Defendant:

16    A                                    214

17    B                                    223

18    C                                    224

19

20

21

22

23

24

25

4

```
 1              P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3     proceedings are herein transcribed, pursuant to order of

 4     counsel.)

 5              THE COURT:  We're here this morning in the United

 6     States vs. David Lesh.  This is 20-po-7016.  Mr. Lesh is

 7     here out of custody with his attorney, Mr. Faddis.  Mr.

 8     Hautzinger is here for the Government.  We're set to start

 9     our two-day trial today.

10              Mr. Hautzinger, is the Government ready to

11     proceed?

12              MR. HAUTZINGER:  Yes, Your Honor, the Government

13     is.

14              THE COURT:  And who do you have with you?

15              MR. HAUTZINGER:  This is Special Agent Benjamin

16     Leach with the US Forest Service.  I would ask that he serve

17     as my advisory witness.

18              THE COURT:  Any objection to that, Mr. Faddis?

19              MR. FADDIS:  None.  Thank you, Your Honor.

20              THE COURT:  Okay.  So ordered.

21              And, Mr. Hautzinger, any pretrial issues that you

22     think we need to address?

23              MR. HAUTZINGER:  Just in terms of logistics with

24     witnesses testifying by VTC.  As the Court knows, I think

25     the parties worked out a stipulation that several witnesses
```

 1    will be appearing virtually.  I had asked Ms. Barnes to

 2    direct the courtroom camera at the screen so the exhibits

 3    can be displayed by the Elmo and direct the witness'

 4    attention there.

 5            I don't know if the Court's comfortable with that

 6    setup or if the Court has something you'd prefer.  It seemed

 7    to me as long as you can see, you -- as the finder of fact,

 8    as long as you can see the witness' face on this screen, it

 9    doesn't really matter what they're seeing on their screen,

10    but --

11            THE COURT:  Yeah, I mean, I think that works fine.

12    I -- you know, I guess we'll have to play it a little bit by

13    ear, mostly because we've never done that before.  And if a

14    witness can't see an exhibit, we may have to do something a

15    little different.  But that's fine with me, as long as it's

16    fine with everybody else.

17            MR. HAUTZINGER:  For my witness at least, I've

18    already e-mailed him all of the exhibits --

19            THE COURT:  Okay.

20            MR. HAUTZINGER:  -- so he'll have those --

21            THE COURT:  Okay.

22            MR. HAUTZINGER:  -- in front of him in real-time

23    there, or I could walk closer to the lectern and hold them

24    up the old-fashioned way.

25            THE COURT:  Sure.  Well, I think that's going to

6

1   work.  I guess let's -- when we get to one of those, we'll

2   wait and see and everybody's technology might be a little

3   different on their end.  So we'll see if it works.

4           Anything else the Government thinks we need to

5   address?

6           MR. HAUTZINGER:  That was the only preliminary

7   matter I had, Your Honor.

8           THE COURT:  Okay.  Mr. Faddis, how about from your

9   perspective?  Anything we need to address?

10          MR. FADDIS:  Thank you, Your Honor.  Just two

11  matters briefly:

12          One, defense would request an order of

13  sequestration; however, we have no objection to Special

14  Agent Leach sitting as advisory witness.

15          THE COURT:  Okay.  I guess let's find out first:

16  Do we have any witnesses in the courtroom that make it an

17  issue?

18          MR. HAUTZINGER:  I don't believe so, Your Honor.

19          MR. FADDIS:  Not from defense, Your Honor.

20          THE COURT:  Okay.  All right.  Well, I am ordering

21  a sequestration order, pursuant to the Rules, and --

22  everybody knows their witnesses.  I don't know who they are.

23          So if somebody shows up and we need to briefly

24  pause to make sure that somebody doesn't come in who's a

25  witness, then we will address that at that point in time.

7

1           MR. FADDIS:  Thank you, Your Honor.

2           THE COURT:  Yeah.  With the video witnesses,

3   that's probably a little bit easier.

4           I guess one thing, Mr. Barnes, we probably need to

5   watch for on the feed is making sure that a witness doesn't

6   pop on during another witness' testimony.  So if you see

7   somebody get on early or something like that, let us know

8   and we'll take a break and figure out who that is.

9           Okay.  Go ahead.

10          MR. FADDIS:  Very well, Your Honor.

11          There was just one other matter and it is somewhat

12   private in nature.  Is there any chance we could approach

13   and just briefly to discuss that?

14          THE COURT:  Sure.  Let's step back here and we'll

15   do it (inaudible).

16          MR. FADDIS:  Very well.  Thank you, Your Honor.

17          THE COURT:  If we need to put it on the record, we

18   will.

19          MR. FADDIS:  Understood.

20          (Side bar off the record.)

21          THE COURT:  All right.  That raised nothing that

22   needed repeating for the record that has anything to do with

23   the facts of this matter.

24          All right.  Mr. Hautzinger, do you have a desire

25   to have an opening statement, or do you want to go right

1    into evidence?

2            MR. HAUTZINGER:  Very briefly, Your Honor.

3            THE COURT:  Okay, go ahead.

4            MR. HAUTZINGER:  I think the Court probably knows

5    this case as well as I do at this point, but it is the

6    Government's intent to present evidence that on or about

7    April 24, 2020, in the District of Colorado, the defendant,

8    David Lesh, did operate a snowmobile within the boundaries

9    of Keystone Ski area, off of a designated route, at a time

10   that the area was closed and members of the public were

11   prohibited to be there.

12           We'll be presenting evidence, both in terms of

13   Instagram postings that the defendant put up himself and

14   observations of Chris Ingham, who's the Operations Manager

15   at Keystone, who went out the next day and made numerous

16   observations and recorded photographs showing snowmobile

17   tracks, et cetera, et cetera.

18           We'll also be presenting evidence that from that

19   date, April 24 through October 21st of 2020, the defendant

20   used National Forest Lands without authorization and --

21   within the Keystone Ski area to promote his business, to

22   promote for sale merchandise and conducting work activities

23   without proper authorization.  And we'll present that

24   evidence through testimony from Special Agent Leach, and

25   perhaps others, about a pattern of conduct that the

1    defendant engaged in over that summer using National Forest

2    Lands to promote his business.  And then we'll be

3    introducing the article that the defendant -- of the

4    interview with the defendant that the New Yorker magazine

5    published in January or this year, which contains many

6    direct statements from the defendant that the Government

7    contends are germane and relevant to these two counts.

8             Aside from that, I'm ready to put on my first

9    witness, Your Honor.

10            THE COURT:  All right.  Thank you, Mr. Hautzinger.

11            And before we have Mr. Faddis go, we had another

12    individual walk in.  I just want to make sure that that's

13    not a witness.

14            So let me ask -- for the CSOs, if you all don't

15    mind just inquiring if somebody is a witness or not?  If

16    they're not, they can come on in and have it.  If they are,

17    then we'll need to delay them out in the hall until it's

18    their turn.

19            Thank you very much.

20            Mr. Faddis?

21            MR. FADDIS:  Thank you, Your Honor.

22            So despite everything that's gone on with this

23    case, the issues for this Court to decide are actually very

24    limited.

25            The first issue is whether the Government has

1    proof beyond a reasonable doubt that Mr. Lesh was at the

2    Keystone area operating a snowmobile on April 24, 2020.

3            The second issue is whether David Lesh sold or

4    offered for sale any merchandise, or conducted any work

5    activity while upon the lands of the Keystone Ski area,

6    which is how the statute reads.

7            I anticipate the Government will present several

8    photos depicting multiple people.  From those photos, it

9    would be impossible for anyone to ascertain the identities

10   of the individuals depicted therein.

11           The Government, through their witnesses, will

12   concede that they have no idea who the other individuals

13   are, but will swear that the third individual must be David

14   Lesh.  To do this, they may try to present ambiguous

15   statements and ask this Court to adopt their strained

16   interpretation of those.  They may also try to present

17   irrelevant evidence as to why they think Mr. Lesh is a bad

18   person.

19           But what's undisputed, that there's no physical

20   evidence placing Mr. Lesh at the Keystone area on April 24,

21   2020.  There is no GPS evidence.  There is no cellphone

22   evidence.  There is not a single witness who will testify

23   that they saw him there.  There is no evidence that Mr. Lesh

24   was ever -- or has ever been in possession of the snowmobile

25   depicted in the photos, and none of the items depicted in

1    the photos were found in Mr. Lesh's possession throughout

2    the duration of the investigation.

3            The evidence will show that the Government doesn't

4    like Mr. Lesh, but a disdain for a controversial figure does

5    not equate to proof beyond a reasonable doubt that that

6    person committed a crime.

7            Thankfully, even controversial figures are

8    afforded the protections of the United States Constitution.

9    And when Your Honor gives effect to those protections and

10   holds the Government to its burden, and faithfully applies

11   the law to the facts, that will dictate only one possible

12   conclusion.  And that is that Mr. Lesh is not guilty of all

13   offenses.

14           Thank you.

15           THE COURT:  All right.  Thank you, Mr. Faddis.

16           Mr. Hautzinger, your first witness?

17           MR. HAUTZINGER:  Your Honor, the People -- the

18   Government would call Chris Ingham of Keystone.  I have just

19   texted him to connect by video, and we tested this last

20   week --

21           THE COURT:  Sure.

22           MR. HAUTZINGER:  -- and he connected within a

23   minute or two --

24           THE COURT:  Okay.

25           MR. HAUTZINGER:  -- so . . .

1          THE COURT:  And for the record, I will note that a

2    document was filed at Document 82.  It's a Proposed Joint

3    Stipulation Regarding Witnesses tele- -- and hold on just a

4    moment, Mr. Ingham, and we'll get to you -- the document is

5    a Proposed Joint Stipulation Regarding Witnesses Testifying

6    Via Videoconferencing.

7          The parties agree that each party may call two

8    witnesses via a video conference during the trial.  The

9    Government is exercising that as to Chris Ingham and Karen

10   Teeg, and the defense as to James Emme, and B -- the letter

11   B -- Devine.

12         Mr. Hautzinger, is the Government still intending

13   to enter into that stipulation?

14         MR. HAUTZINGER:  We are, Your Honor.

15         THE COURT:  And is the defense, Mr. Faddis?

16         MR. FADDIS:  Yes, Your Honor.

17         THE COURT:  All right.  That stipulation is

18   adopted and approved by the Court.  And I'll say,

19   anecdotally, I appreciate the parties' willingness to work

20   out a bit of an unusual circumstance with that.  It is

21   appreciated.

22         And let's turn to the video.

23         Are you Mr. Ingham, sir?

24         MR. INGHAM:  Yes, sir.

25         THE COURT:  All right.  Let me have you state your

13

1    first name and your last name, and spell both of them,

2    please.

3            MR. INGHAM:  Legal name:  Christopher Ingham,

4    C-H-R-I-S-T-O-P-H-E-R.  Last name, Ingham, I-N-G-H-A-M.

5            THE COURT:  All right.  Mr. Ingham, if you could

6    raise your right hand, please.

7                        CHRISTOPHER INGHAM,

8    called as a witness, having first been duly sworn, testified

9    as follows:

10           THE COURT:  All right.  The record will reflect

11   that Mr. Ingham has been sworn and identified.  Mr.

12   Hautzinger, your witness.

13                      DIRECT EXAMINATION

14   BY MR. HAUTZINGER:

15       Q    Good morning, sir.  Thank you for being here

16   virtually.

17           Just logistically, can you tell us what you see on

18   your screen.

19       A    It looks like I'm looking at a -- a TV panel.

20       Q    And if I put my hand here, can you see that on the

21   panel?  And is that relatively clear?

22       A    Yes, sir.

23       Q    Will you be able to recognize documents or photos

24   that way?

25       A    I believe so, yeah.

14

1       Q     Okay.  Can you please tell the Court what your

2   occupation is.

3       A     I am the Director of Mountain Operations for

4   Keystone Resort.

5       Q     How long have you been so?

6       A     Since July of 2019.

7       Q     And what are your responsibilities as the Director

8   of Mountain Operations?

9       A     Oversight of the grooming team, the terrain parks

10  team, our competition -- competition services, which is our

11  race team, and our snowmaking team.

12      Q     You made reference to the "terrain parks team."

13  Can you go into a little more detail about that.

14      A     Sure.  Yeah, I have oversight of the terrain parks

15  team insofar as the terrain park manager reports directly up

16  to me.

17      Q     What is the terrain park at Keystone?

18      A     It's a series of constructed snow features for

19  people to jump off of, onto.

20      Q     And is that terrain park designed to accommodate

21  skiers, snowboarders, snowmobiles, snowcats?

22      A     To my recollection, I believe the NSAA signage

23  that we have at our entrances is specific to --

24            MR. FADDIS:  I'm going to object to hearsay.

25            THE COURT:  Hold on just a moment, Mr. Ingham.

1              MR. FADDIS:  I would object to hearsay as to what

2    the signage reads.

3              THE COURT:  Mr. Hautzinger?

4         Q    (By Mr. Hautzinger)  Is the terrain park designed

5    to be used by snowmobiles?

6         A    No, sir.

7              THE COURT:  Okay.  The objection is sustained.

8    But the next question is -- was a good question.  Go ahead,

9    Mr. Hautzinger.

10             And we heard some beeping.  Was that somebody

11   signing on?

12             MR. INGHAM:  That was my --

13             THE COURT:  Ah.

14             MR. INGHAM:  -- reminders on my computer.

15             THE COURT:  Thank you.

16             All right, Mr. Hautzinger?

17        Q    (By Mr. Hautzinger)  Mr. Ingham, what was the

18   status of the Keystone Resort as of April 24, 2020?

19        A    Closed.

20        Q    And why was that?

21        A    Both an internal decision from Vail Resorts and a

22   directive from Governor Polis that all ski resorts be closed

23   as a result of the COVID-19 pandemic.

24        Q    Who was allowed onto the property, legally, in

25   late April of 2020?

16

1     A   We had authorized personnel access only, and that

2  was relegated to a small handful of Keystone employees.

3  We've -- less than ten in total, myself included, and then

4  any US Forest Service personnel that needed access.

5     Q   Was the area roped off or marked as closed in any

6  manner?

7     A   We did have two ski area closure signs at both

8  base areas of Keystone, and our --

9          MR. FADDIS:  I object to --

10    A   -- boundary line --

11        THE COURT:  Hold on, Mr. Ingham.  There was an

12  objection.  Go ahead.

13        MR. FADDIS:  I would object to whatever the

14  signage reads is hearsay.

15        THE COURT:  Mr. Hautzinger?

16        MR. HAUTZINGER:  I didn't understand the

17  objection.  Could you --

18        THE COURT:  It was a hearsay objection based on

19  the signage -- what the signage said.

20        MR. HAUTZINGER:  I don't think that is hearsay,

21  Your Honor.

22        THE COURT:  Yeah.

23        MR. HAUTZINGER:  It's not offered for the truth of

24  the matter asserted.  It's offered to demonstrate that the

25  area was closed and that was communicated.

1          THE COURT:  Yeah.  Mr. Faddis, how is somebody --

2     well, if there's a sufficient foundation, how is that

3     hearsay?

4          MR. FADDIS:  So it -- there was certainly a

5     declarant who authored that sign in some fashion.  We don't

6     know who that person is.  It's a statement asserted for the

7     matter of truth, because the press -- or the Government is

8     trying to say that this sign prohibited people from going

9     there.

10          So it's -- it is asserted for the truth of the

11     matter.  And so for those reasons, we believe it's hearsay.

12          THE COURT:  Well, I find that there isn't a

13     sufficient foundation laid yet.  I'm not finding that saying

14     what a sign reads is hearsay.

15          So the objection is overruled, but modified at

16     this juncture.

17     Q     (By Mr. Hautzinger)  Mr. Ingham, you knew for

18     yourself, from your own personal knowledge, that the entire

19     area was closed as of April 24, 2020, correct?

20     A     That's correct.

21     Q     Did you personally witness the signage that you

22     are about to describe?

23     A     Yeah.  That was part of my, you know, regular -- I

24     guess you can say "surveillance of the mountain" when we

25     would get on site.

1       Q    Were you involved in actually putting up the

2   signage?

3       A    I believe our ski patrol team did that initially,

4   but I would ensure that it was in good standing every time I

5   came to the resort.

6       Q    And did -- did you personally witness the signage

7   on multiple occasions?

8       A    Yes, sir.

9       Q    Would you please tell Judge Gallagher -- or just

10  describe the signage to Judge Gallagher.

11      A    I believe it just said, "Ski Area Closed."  It was

12  orange signage.

13      Q    Were there other efforts made to -- well, how is

14  the -- the -- the area designated throughout -- all around

15  the area?

16      A    Could you be a little bit more specific with your

17  question?

18      Q    Is there boundary delineation around Keystone

19  Resort?

20      A    Yeah.  So there is a clear boundary delineation

21  around our entire operating department area.  High alpine

22  areas have signage every hundred feet, with a ski area

23  boundary demarcation signage.  And then below the -- the

24  treeline, we actually have rope lines extending,

25  essentially, to the base area.  And then at that time in the

1    River Run base area, we actually had a rope line across the

2    -- the bridge that would provide access from the River Run

3    base with quite a bit of signage in the Mountain House.

4          There was two signs:  One located going towards

5    the east, and then one on the western side of the Mountain

6    House area.

7    Q    In late April of 2020, was the operations team

8    actively patrolling the entire area?

9    A    I wouldn't say we were actively patrolling the

10   area.  We -- we had a weekly inspection of the entire area

11   to ensure that all of our buildings were still secure and

12   hadn't been broken into, and that all of our signage was in

13   place.  And then there was another weekly voyage to the

14   summit area from our base area operations team to inspect

15   our (inaudible - voice drops).

16   Q    You said it was weekly?  That means once a week,

17   correct?  Now --

18   A    Yeah.  On occasion twice a week, but yeah.

19   Generally not more than the one time.

20   Q    If your operations team had observed somebody

21   within the boundaries of the area, what would you have done?

22         MR. FADDIS:  Object.  Calls for speculation.

23         THE COURT:  Hold on, Mr. Ingham.  And are you able

24   to hear Mr. -- let's just -- from a technological point of

25   view, when defense counsel objects, are you able to hear him

1    do so?

2           Okay.  So what I'll need --

3           MR. INGHAM:  A little bit (inaudible -

4    muffled)  --

5           THE COURT:  Okay.  So what I'll do, Mr. Faddis, is

6    first ask:  When you object, just do it into the microphone.

7           MR. FADDIS:  Yes, sir.

8           THE COURT:  And then, Mr. Ingham, on your end:  If

9    there is an objection, if you hear that occur, I'll just

10   need you to immediately stop talking, and then I'll rule on

11   the objection.  And based on what I rule, you can finish or

12   not.

13          Mr. Faddis, go ahead and repeat the objection

14   again.

15          MR. FADDIS:  Yes, Your Honor.  The objection is

16   the question calls for speculation.

17          THE COURT:  Mr. Hautzinger?

18          MR. HAUTZINGER:  I disagree.  It's not calling for

19   speculation.  He's the Operations Manager.  He knows

20   perfectly well what would have happened if they observed

21   somebody within the boundaries of the area.

22          THE COURT:  Yeah.  Based off the foundation that's

23   laid, the objection is overruled.

24       Q   (By Mr. Hautzinger)  Again, Mr. Ingham, the

25   question was:  If you or your team had observed citizens,

1   members of the public, within the boundaries of the Keystone

2   area in late April 2020, what would you have done?

3        A    So it did happen on a number of occasions.

4   Typically, we would advise the individuals that the ski area

5   was closed and politely ask them to leave.

6        Q    And you said that did happen on a number of

7   occasions?

8        A    Yes, sir.

9        Q    But again, as far as the patrol was concerned,

10  there was just the weekly check-over, correct?

11       A    Essentially.  We were inspecting our facilities

12  and ensuring the integrity of all of our property.  That was

13  about it.

14       Q    Is it possible that someone could have gone into

15  the area and left the area without you or your team knowing

16  it?

17            MR. FADDIS:  I would object to calls for

18  speculation, and also vagueness and ambiguity with respect

19  to the specific area to which the question refers.

20            THE COURT:  Overruled.

21       A    Yeah.  It's absolutely possible someone could have

22  entered and exited the ski resort area without our knowledge

23  and without us being there to deter them.

24       Q        (By Mr. Hautzinger) I want to direct your

25  attention a little bit more specifically to the terrain

1  park.  You've already testified somewhat about it, but were

2  there any other steps taken by you and your team to

3  safeguard the jumps in the terrain park because of the

4  closure?

5        A    Yep.  So a couple of days following the initial

6  closure, some time in the week of March 15th, we had entered

7  the terrain park and pushed snow barriers in front of all of

8  the terrain park features to make them inaccessible.

9        Q    And what do you mean by a "snow barrier"?

10        A    A large pile of snow.

11        Q    Can you tell the Court how big of a pile we're

12  talking about.

13        A    Yeah.  I mean, probably in the -- at least one

14  cubic yard up to, you know, 4 or 5, depending on the size of

15  the feature, but typically sufficient to essentially deny

16  any access to those features without some sort of --

17        Q    And was that done with snowplow, or by hand, or --

18        A    Yeah, we used a snowcat for that.

19        Q    You said a snowcat?

20        A    Yes, sir.

21        Q    Okay.  As of late April 2020, were you aware of

22  David Lesh?

23        A    Yep.

24        Q    And how did you know him?

25        A    I mean, I've been a member of the, I guess,

1   freestyle skiing and snowboarding community for a long time

2   as a result of my involvement with the terrain park world,

3   and so he's a fairly well-known member of that community.

4         Q     Were you also familiar with his company, Virtika?

5         A     Yes, sir.

6         Q     And what is Virtika?

7         A     It's an outerwear company.

8         Q     So that is a manufacturer of outdoor clothing,

9   equipment, et cetera?

10        A     Yeah.  And it's my knowledge it's freestyle skiing

11  outerwear.

12        Q     Like parkas, or jackets, or pants, stuff like

13  that?

14        A     I believe so.  They have jackets and pants

15  primarily, but I'm certainly not an expert.

16        Q     On the morning of April 25, 2020, were you alerted

17  that David Lesh had posted certain photographs on his

18  Instagram account?

19              MR. FADDIS:  I would object to hearsay at this

20  time.

21              THE COURT:  What's the reason you're offering it,

22  Mr. Hautzinger?

23              MR. HAUTZINGER:  To explain why the witness went

24  on to Instagram and made observations of photos that David

25  Lesh had posted.

1          THE COURT:  All right.  Given that it's not

2     offered for the truth of the matter asserted, but for -- as

3     a foundational matter, it will be allowed.

4          Q    (By Mr. Hautzinger)  Do you need me to repeat the

5     question, Mr. Ingham?

6          A    No.  I -- I -- I was made aware on the morning of

7     April 25th of the post.

8          Q    And how were you made aware?

9          A    I believe my boss, Julie Rust, who's the Senior

10    Director of Operations, sent me a text with a screen capture

11    of that image.

12         Q    And did you, in fact, then go to Instagram and

13    make observations yourself, directly?

14         A    I did, yes.

15         Q    And you and I were in contact by e-mail and by

16    phone last week, correct?

17         A    That is correct.

18         Q    And did I send you a number of proposed exhibits

19    for you to observe and describe to me?

20         A    You did, yes.

21         Q    I'm going to put up on the screen what's been

22    marked as Government's Exhibit 1, and I sent it to you as

23    Exhibit 1.  Do you recognize that?

24         A    I do.

25         Q    And what is Government's Exhibit 1?

1      A    It is an image depicting a snowmobile in the air

2  off what appears like the first jump in the lower jump line

3  at Keystone in April of 2020.

4      Q    And as the Operations Manager at Keystone, do you

5  recognize that jump as being the lower jump in the terrain

6  park?

7      A    Yeah.  Yep.

8      Q    Okay.  And was this posted under the account of

9  @davidlesh?

10     A    Yes, sir.

11     Q    Is Government's Exhibit 1 a fair and accurate

12  rendition of what you observed yourself on the morning of

13  April 25, 2020?

14     A    It is.

15          MR. HAUTZINGER:  I would move for the admission of

16  Government's 1, Your Honor.

17          THE COURT:  Mr. Faddis?

18          MR. FADDIS:  Your Honor, I would object to

19  authenticity and foundation.  The question was:  Was this

20  what you observed on, I believe, the morning of April 25,

21  2020?  But I think the allegation is that this photo was

22  taken and posted on April 24th, and so I don't think

23  adequate foundation has been laid, and I don't believe that

24  this witness can authenticate the details within this

25  photograph.

1             THE COURT:  Do you have any voir dire you want to

2    do on this photograph at this point?

3             MR. FADDIS:  Sure.  Yes, Your Honor.

4                       VOIR DIRE EXAMINATION

5    BY MR. FADDIS:

6         Q    Mr. Ingham, you weren't present at this location

7    of the Keystone Ski Resort on April 24, 2020, correct?

8         A    That's correct.

9         Q    Okay.  And you haven't spoken with anyone who was

10   purportedly depicted in -- in the Government's Exhibit 1,

11   correct?

12        A    No, sir.  I -- I was not.

13        Q    Okay.

14        A    That's correct.

15            MR. FADDIS:  Your Honor, I would renew my

16   objection at this time.

17            THE COURT:  Okay.  Objection's overruled.  The

18   photograph is admitted.  It speaks for itself under the

19   circumstances, and there is an adequate foundation and

20   adequate authenticity.

21            (Exhibit 1 admitted.)

22            Ms. Barnes, Government's Exhibit 1 was entered.

23            Mr. Hautzinger?

24            MR. HAUTZINGER:  Thank you, Your Honor.

25                     DIRECT EXAMINATION (continued)

1   BY MR. HAUTZINGER:

2       Q    Mr. Ingham, I'm now -- I'm now going to put up

3   what's been marked as Government's Exhibit 2.  Can you take

4   a look at that and tell me if you also recognize it.

5       A    Yes, sir.  That appears to be the same photograph.

6       Q    Does Government's Exhibit 2, though, have some

7   commentary on the side?

8       A    Sure.  Yeah.  There's, I guess, a comment string

9   from Instagram.

10      Q    And does it specifically say:  David Lesh, solid

11  park sesh, no lift ticket needed?

12      A    It's not legible from my current perspective.  I

13  can't actually read that, unfortunately.

14      Q    But is this Government's Exhibit 2 a fair and

15  accurate rendition of what you actually observed yourself on

16  the morning of April 25, 2020?

17      A    Yes, sir.

18           MR. HAUTZINGER:  I'd move for the admission of

19  Government's 2, Your Honor.

20           THE COURT:  Just so we're clear for the record:

21  Mr. Ingham, do you have a copy of Government's Exhibit 2

22  there so that you don't have to necessarily be looking at

23  what's up on the screen as, obviously, the print there is

24  fairly small?

25           MR. INGHAM:  I believe I do.

       1            THE COURT:  Okay.  And why don't you go ahead and

       2    pull that up and let us know when you can see that.

       3            MR. INGHAM:  Okay.  I'm actually struggling to

       4    find it in the string of e-mails that we shared.

       5            Oh, nevermind.  I got it.

       6            THE COURT:  All right.  So the question Mr.

       7    Hautzinger had asked you was about the text in the Instagram

       8    string on the side.  Can you see that text that he referred

       9    to?

      10       A    Yes, sir.  "Solid park sesh, no lift ticket

      11    needed."

      12            THE COURT:  All right, Mr. Faddis?

      13            MR. FADDIS:  Yes, Your Honor.  Nothing at this

      14    time.  The -- the exhibit has been offered.

      15            THE COURT:  Okay.  Exhibit 2 is admitted.

      16            Mr. Hautzinger?

      17            (Exhibit 2 admitted.)

      18            MR. FADDIS:  Oh, and I'm -- my apologies, Your

      19    Honor.  I did not hear the Government offer --

      20            THE COURT:  Oh, I'm sorry.  Mr. Hautzinger did

      21    offer it.  I thought you'd stood up to object.

      22            MR. FADDIS:  And I did, my apologies.  I had

      23    missed the fact that he had offered.  I do have an

      24    objection --

      25            THE COURT:  Okay.  Then I will withdraw the

1    admittance and hear the objection, Mr. Faddis.

2         MR. FADDIS:  Sure.  And so for the record, Your

3    Honor, I would object on grounds of authenticity and

4    foundation, as well as hearsay.  There appears to be

5    multiple declarants, multiple statements within this

6    photograph.  Nothing is redacted.  And I don't think it is

7    competent to be admitted.

8         Thank you.

9         THE COURT:  Mr. Hautzinger?

10        MR. HAUTZINGER:  Well, as far as the hearsay

11   objection is concerned, the one statement that was testified

12   to was attributed to David Lesh.  That's a statement of a

13   party opponent and, therefore, not hearsay.  None of the

14   other statements are offered for the truth of the matter

15   asserted at all, and I think an adequate foundation has been

16   laid.

17        THE COURT:  All right.  The Court finds there has

18   been an adequate foundation, and the objection on those

19   bases is overruled for the same reasons with regard to

20   Exhibit Number 1 with regard to the hearsay.  If those

21   statements were made by Mr. Lesh, which I suspect we'll be

22   hearing a lot about as we go through this trial, the

23   Government's entirely correct, that those would be

24   statements by a party opponent, or by the defendant, and

25   would be admissible on that basis.

1          So it is admitted.  Mr. Hautzinger?

2          (Exhibit 2 re-admitted.)

3          MR. HAUTZINGER:  Thank you.

4     Q    (By Mr. Hautzinger)  Finally, along this vein, Mr.

5     Ingham, I'm putting up Government's Exhibit Number 3.  Can

6     you either look at that on your computer, or on the screen

7     and tell the Judge what that depicts.

8     A    Number 3?  That appears to be the same text, but

9     it's a -- a -- a different perspective of the snowmobile

10    leaving the takeoff of the jump headings towards the

11    landing.

12    Q    And again, as Operations Manager at Keystone

13    Resort, do you recognize that jump as being at Keystone's

14    terrain park?

15    A    Yes, sir.

16         MR. HAUTZINGER:  Your Honor, I'd move for the

17    admission of Government's 3.

18         THE COURT:  Mr. Faddis?

19         MR. FADDIS:  Your Honor, noting my prior

20    objections for the record, but nothing beyond that.

21         THE COURT:  All right.  Prior objections are

22    noted, but overruled.  Exhibit 3's admitted.

23         (Exhibit 3 admitted.)

24         Mr. Hautzinger?

25    Q    (By Mr. Hautzinger)  After you had observed --

1    made these observations on Instagram, Mr. Ingham, what did

2    you do?

3        A    I spoke with my direct supervisor, the Senior

4    Director of Operations, as well as our General Manager, and

5    informed them that I would go onto Keystone property with a

6    snowcat and take a look to see if I could verify snowmobile

7    tracks and be sure that what we had observed in the images

8    was, in fact, what (inaudible - voice dropped).

9        Q    And did you, in fact, do that?

10       A    Yes, sir.  Early that morning, I believe around

11   9:00, I ventured up Keystone, straight up to the terrain

12   park, pretty immediately found the snowmobile tracks that

13   were looping around.  There had been a -- trenched up

14   through the snow pile for that takeoff that we had observed

15   in the Instagram post, and it appeared that somebody had

16   been jumping a snowmobile off of that jump.

17       Q    You said you were operating a snowcat in making

18   these observations, correct?

19       A    That's correct.

20       Q    Can you explain to Judge Gallagher exactly what a

21   snowcat is, as opposed to a snowmobile.

22       A    So a snowcat is a utility vehicle.  It has two

23   large tracks.  Its purpose is to maintain the -- the slopes

24   and so it has a plow blade on the front and a finishing

25   implement on the back so that snow can be moved and it can

1    be groomed afterwards.

2         Q    A snowcat is a utility vehicle, though, correct?

3         A    That's correct.

4         Q    Not a recreational vehicle that you would ride

5    around for fun?

6              MR. FADDIS:  I would object to leading.

7         A    No.  I mean, snowcats have --

8              THE COURT:  Hold on, Mr. Faddis.

9         A    I'm sorry.

10             THE COURT:  The objection's overruled in this

11   foundational matter.

12        Q    (By Mr. Hautzinger)  You can go ahead, Mr. Ingham.

13        A    Okay.  A snowcat, excuse me, is a -- a -- you

14   know, a nearly 20,000-pound vehicle.  It's about, you know,

15   20-feet-by-30-feet in overall footprint.  So it's quite a

16   bit larger than a snowmobile.  And it's not recreational.

17   It's entirely for utility.

18        Q    Does the Keystone operation staff use snowmobiles?

19        A    Yes, sir.

20        Q    Were they using them during the closure in late

21   April 2020?

22        A    To my knowledge, we were not using any snowmobiles

23   during that period of time.

24        Q    At that period of time, were you relying

25   exclusively on snowcats for operations travel?

1    A    Yeah.  So the team that was investigating the

2  mountain on a weekly basis was using snowcats and the base

3  operations team was using what would be a tractor -- utility

4  vehicle.  Essentially, a -- like a side-by-side type vehicle

5  with four tracks on it.

6    Q    Is there any legitimate explanation for there

7  being snowmobile tracks in -- within the area on or about

8  April 25, 2020?

9         MR. FADDIS:  I would object to argumentative.

10        THE COURT:  Overruled.

11   A    Not to my knowledge, no.

12   Q    (By Mr. Hautzinger)  That notwithstanding, did

13  you, in fact, observe snowmobile tracks in the terrain park,

14  and really around the whole area, on the morning of April

15  25, 2020?

16   A    Yes, sir.

17   Q    What else did you observe there at the terrain

18  park?

19   A    It appeared that a utility shed that we had about

20  a hundred yards above the jump had been entered.  There was

21  a shovel leaning up against the outside of the shed.  And

22  the snow pile that we had pushed to eliminate access to the

23  jump had been shoveled out and a channel had been created in

24  it to provide access to that jump takeoff.

25   Q    How wide was the channel that had been created?

1          A     Maybe 5 feet.

2          Q     Wide enough for a snowmobile to get through?

3          A     Yes, sir.

4          Q     What else did you observe there at the jump site?

5          A     It appeared as though there were a few separate

6    tracks looping around more than once.  But other than that,

7    it just looked like someone had been hitting the jump and

8    that they had been snowmobiling around the resort property.

9          Q     Did it appear that more than one jump had been

10   taken?

11         A     Sorry, you cut out for a moment there.  Could you

12   repeat yourself?

13         Q     Did it appear that more than one jump had been

14   taken?

15         A     Yes, sir.

16         Q     Multiple jumps?

17         A     It was hard to tell how many, but it did -- it did

18   appear like someone had hit the jump more than one time.

19         Q     And did you take any steps to document the

20   observations that you were making that morning?

21         A     I believe I took three or four photos.

22         Q     And again, you may want to pull these up on your

23   computer:  Did I e-mail you Government's Exhibits 4, 5, 6,

24   and 7 last week and asked you look at them?

25         A     That's correct.

1        Q    I'm going to put up on the screen here in the

2   courtroom Government's Exhibit 4.  Can you see that well

3   enough, comparing it to what you have on your computer

4   screen, to identify it for the Judge?

5        A    Yes, sir.

6        Q    Can you tell Judge Gallagher what he's seeing in

7   Government's Exhibit 4.

8        A    Yep.  So to the right of the photo, there is the

9   jump takeoff with snowmobile tracks looking like they are

10  exiting the top of that jump takeoff.  Leading into that

11  jump takeoff on the left, there is the, kind of, pile of

12  rubble or snow that was pushed up to limit access to the

13  jump.  And it looks as though there's been a channel dug

14  between that pile of snow, and that snowmobile tracks travel

15  through that channel.

16       Q    In the bottom portion of the photograph, there

17  appears to be machinery, or -- is that part of the snowcat

18  itself?

19       A    Yes, sir.  That is the blade -- or plow, however

20  you'd like to refer to it, of the snowcat.

21       Q    So you took this photograph from inside the

22  snowcat?

23       A    That's correct.

24       Q    Looking out over the front -- over the blade,

25  correct?

1        A    Yes, sir.

2        Q    Is Government's Exhibit 4, in fact, a photograph

3   you yourself personally took?

4        A    Yes, sir.

5        Q    And is it a fair and accurate depiction of what

6   you observed yourself on April 25, 2020?

7        A    Yes, sir.

8             MR. HAUTZINGER:  I'd move for the admission of

9   Government's 4, Your Honor.

10            THE COURT:  And Mr. Faddis?

11            MR. FADDIS:  No objection.  Thank you.

12            THE COURT:  Government's 4 is admitted.

13            (Exhibit 4 admitted.)

14        Q    (By Mr. Hautzinger)  Now, putting up Government's

15   Exhibit 5, again, Mr. Ingham, can you tell Judge Gallagher

16   what is depicted in this photograph.

17        A    It's just another angle of that same snow pile and

18   that same jump that had the channel dug through it, and it

19   was to provide, I think, just a better light or better

20   perspective of the same thing.

21        Q    And it also shows the chairlift at the top of the

22   photograph as well, right?

23        A    That's correct.

24        Q    Did you personally take the photograph that's in

25   Government's Exhibit 5?

1          A    Yes, sir.

2          Q    And is that a fair and accurate depiction of what

3     you observed yourself on the morning of April 25, 2020?

4          A    It is, yes.

5               MR. HAUTZINGER:  We'd move for the admission

6     Government's 5, Your Honor.

7               THE COURT:  Mr. Faddis?

8               MR. FADDIS:  No objection.

9               THE COURT:  So admitted.

10              (Exhibit 5 admitted.)

11         Q    (By Mr. Hautzinger)  And we now have up

12    Government's 6.  Again, Mr. Ingham, can you tell the Judge

13    what we're seeing here.

14         A    Yep.  This is an image of the same jump, different

15    perspective.  This is actually from the staging area for the

16    line of jumps in the terrain park, but looking down from the

17    staging area, you can see the track going through that same

18    channel, off that same jump takeoff.

19         Q    And then right in the middle of this photograph,

20    where I'm pointing my pen, is -- is that probably the best

21    depiction of the channel that was dug so the snowmobile

22    could go through it?

23         A    Yeah.  I mean, that -- I would say it's a good

24    depiction of the channel.

25         Q    Again, not to beat a dead horse, but did you take

1    this photograph yourself?  And is it a fair and accurate

2    depiction of what you saw that morning?

3        A    I did take the photo, and -- and yes, it's an

4    accurate depiction.

5            MR. HAUTZINGER:  We'd move for the admission of

6    Government's 6, Your Honor.

7            MR. FADDIS:  No objection.

8            THE COURT:  So admitted.

9            (Exhibit 6 admitted.)

10       Q    (By Mr. Hautzinger)  And, finally, along this

11   time, I'm putting up Government's 7.  What do you see there,

12   Mr. Ingham?

13       A    That is taken from just above the landing of that

14   same jump, looking down at the next jump, where it looked

15   like the snowmobile was using that as a turnaround.  We can

16   see a couple of different tracks going away from the jump

17   landing towards the -- the next jump in the line.

18       Q    So using my pen, going along the left of the next

19   jump, and then coming around behind it, then back up; is

20   that what you're describing?

21       A    Yes, sir.

22       Q    Is Government's Exhibit 7 a photograph that you,

23   yourself, took and a fair and accurate depiction of what you

24   observed on April 25, 2020?

25       A    I did take the photo, yes, it's accurate.

 1          MR. HAUTZINGER:  We'd move for the admission of

 2    Government's 7, Your Honor.

 3          MR. FADDIS:  No objection. Your Honor.

 4          THE COURT:  7 is admitted.

 5          (Exhibit 7 admitted.)

 6     Q    (By Mr. Hautzinger)  After you made these

 7    observations -- is that your computer again?

 8     A    Yeah, sorry.

 9     Q    After you made these observations and took these

10    photographs, what did you do next?

11     A    I believe I then followed up with both the Senior

12    Director of Operations and our Chief Operating Officer to

13    let them know what I observed.  And then I followed the

14    tracks kind of around the mountain a little bit, just to see

15    if I could identify where they went.

16     Q    I'm going to put up Government's Exhibit 8 now.

17    Let's see if I can zoom in on that a bit.  Do you recognize

18    what that is, Mr. Ingham?

19     A    Yes, sir.

20     Q    What is Government's Exhibit 8?

21     A    It's a Google Earth image of Keystone Resort with

22    a -- a small area at the bottom of Erickson Bowl -- the run

23    out of Erickson Bowl into the Keystone property, highlighted

24    to show where I chased the tracks back to.

25     Q    Is that the sort of blue mark in the upper

1    right-hand corner of the aerial photograph?

2         A    That's correct.

3         Q    And did you place that mark there yourself?

4         A    I did, yes.

5         Q    So -- and that's the Erickson Bowl, correct?

6         A    It is the run out of both North Bowl and Erickson

7    Bowl, but yeah, it's -- it's a -- you know, we call it the

8    -- Coyote Caper kind of the -- or sorry, Mr. Toad's Wild

9    Ride is the access -- or no, sorry.  Coyote -- Coyote Caper,

10   it's a -- it's a trail on Keystone.  But I didn't -- I

11   didn't actually follow them all the way to termination.

12   Just to where I could easily access them.

13        Q    Okay.  Where is the terrain park in this aerial?

14        A    So on the bottom left of the image -- it's

15   actually what I can kind of see best there.  But, yeah, just

16   kind of down to the right from where your pen is at, along

17   the boundary line there.

18             Yeah, that general area is the terrain park.

19             MR. HAUTZINGER:  And, Your Honor, I'd ask the

20   record reflect that my pen is just at the edge of the

21   developed area that the ski resort, Mr. Ingham's testified

22   that that's the approximate location of the terrain park.

23             THE COURT:  It does.

24        Q    (By Mr. Hautzinger)  Is Government's Exhibit 8 an

25   accurate depiction of the Keystone Ski area with the marking

1   you've put in to demonstrate where Erickson Bowl is?

2        A    Yes.  It -- it's not necessarily Erickson Bowl in

3   the demarcation, but it -- it is where we found --

4        Q    And -- and you did --

5        A    It was as far as we could follow the tracks.

6        Q    You put that mark on the aerial photograph, right?

7        A    Yes.

8             MR. HAUTZINGER:  We'd move for the admission of

9   Government's 8, Your Honor.

10            THE COURT:  And Mr. Faddis?

11            MR. FADDIS:  No objection.

12            THE COURT:  Government's 8 is admitted.

13            (Exhibit 8 admitted.)

14        Q    (By Mr. Hautzinger)  Finally, Mr. Ingham, did you

15   provide all of this evidence in your observations and your

16   statements to the US Forest Service law enforcement

17   personnel?

18        A    Yes, sir.

19        Q    Is the Keystone Ski area on National Forest

20   Service lands?

21        A    It is, yes.

22        Q    And is it within the state and district of

23   Colorado?

24        A    It is, yes.

25            MR. HAUTZINGER:  I have nothing further, Your

1    Honor.

2          THE COURT:  All right.  Mr. Faddis,

3    cross-examination?

4          MR. FADDIS:  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6    BY MR. FADDIS:

7        Q    Good morning, Mr. Ingham.

8        A    Morning.

9        Q    So during your direct examination, you discussed a

10   shed, correct?

11       A    That's correct, yes.

12       Q    And you discussed that a channel was created, in

13   your opinion, correct?

14       A    Yes, sir.

15       Q    And you provided all of this information to the

16   United States Forest Service, correct?

17       A    That is correct, yes.

18       Q    Did you also provide it directly to Mr.

19   Hautzinger?

20       A    No, I did not.  I believe that was -- I don't know

21   where that came from.  But, no, I did not provide it

22   directly to Mr. Hautzinger.

23          MR. FADDIS:  Your Honor, if I may?  At this time,

24   it appears that there may have been a discovery violation.

25   I have no information regarding any of these details that

1   the Government seems to know.  That ought to have been

2   disclosed to the defense so that we could prepare and

3   investigate, and it appears that wasn't done.

4           THE COURT:  Well, go ahead and make your record.

5           MR. FADDIS:  That's the entirety of my record.

6           THE COURT:  Okay.  So what is it that you believe

7   should have been disclosed that wasn't?

8           MR. FADDIS:  So these details about a shed being

9   opened, and a channel being dug, that was never disclosed to

10  the defense, and -- and it appears the prosecution is well

11  aware of it.  And so if that was disclosed in a writing,

12  then I believe that that had to be disclosed to the defense,

13  and it wasn't.

14          THE COURT:  Okay.  Mr. Hautzinger?

15          MR. HAUTZINGER:  First off, it's clearly

16  demonstrated in the photographs that have been provided and

17  if the defense had looked at the photographs carefully, the

18  defense could have realized there was a channel dug there.

19          Second off, Mr. Ingham would have been available

20  to the defense to interview, just as I interviewed him last

21  week.  There is no written documentation about a shovel, or

22  a shed.

23          Everything that is in written reports has been

24  provided to the defense.

25          I learned about it in my own pretrial interview

1   with Mr. Ingham last week.  That's attorney privilege.  I

2   don't have to turn that over, and I don't think there's been

3   any discovery violation.  Due diligence would have easily

4   found this out.

5          THE COURT:  Mr. Faddis?

6          MR. FADDIS:  I would just respond that a

7   prosecutor discussing information with a witness is not

8   attorney/client privilege, the witness is not his client,

9   and the defense has no knowledge of these details.  I think

10  when you look at those photos, it's not clear at all that a

11  channel was dug, nor is there any shed depicted in any of

12  those photos.

13         This is information the defense should have to be

14  able to investigate, and we were never provided them.

15         THE COURT:  Okay.  Well, as to the proposition

16  that there's no written report, Mr. Faddis, and that you

17  would have had an equal opportunity to speak with Mr. Ingham

18  if you wished, any response on that point?

19         MR. FADDIS:  If the Government is representing

20  that none of these facts are in e-mails that he received

21  from Mr. Ingham, then I will, of course, take the Government

22  at its word.

23         But with respect to investigative measures on

24  behalf of defense, it's not our burden nor our duty to try

25  and learn all of the information that the prosecution

1   already has, and which it intends to use in a federal

2   criminal trial.

3           THE COURT:  And, normally, the circumstance would

4   be that in many of these situations, if the Government calls

5   a witness, it has to provide the written statement at the

6   time or after calling the witness, which is not necessarily

7   how the Government often proceeds in federal cases, but

8   that's generally the burden.

9           So here, with no written statement, what burden

10  would the Government have had to have given you anything?

11          MR. FADDIS:  Well, I just think that the

12  Government is in possession of material facts that they're

13  using against the defendant.  And I think, if for nothing

14  else, on fundamental fairness grounds, that that ought to

15  have been disclosed so we could investigate that.  And that

16  never happened.

17          THE COURT:  All right.  I find no discovery

18  violation here.  The Government asserts, unrebutted, that it

19  has provided all written statements that have -- it has

20  received from the witness to the defense, the fact that

21  potentially exceeds the Government's discovery obligations

22  in this type of a circumstance, but it at least meets those

23  obligations.

24          As to the ability to discuss this matter with Mr.

25  Ingham, the Government asserts that it had a phonecall with

1    Mr. Ingham, I believe Mr. Hautzinger said, in the week

2    leading up to the trial and discussed these matters with

3    him.  I've heard nothing to indicate that the defense either

4    tried or was rebutted -- rebuffed in the ability to have

5    that discussion.  Even if it had been, that would not

6    necessarily rise to the level of a discovery violation.

7              But, here, I've heard nothing that the Government

8    -- or that the defense has even attempted to discuss any of

9    these matters with this witness to the extent that that's

10   relevant at all.  But I find no discovery violation.

11             Go ahead with your cross-examination.

12             MR. FADDIS:  Understood.  Thank you, Your Honor.

13   May I make a quick note for the record?

14             THE COURT:  May you make a what?

15             MR. FADDIS:  I just want to place something on the

16   record, if I may.

17             THE COURT:  Sure.  Sure.

18             MR. FADDIS:  I just wanted to be clear that we

19   never received any of the e-mails that Mr. Ingham apparently

20   sent to the prosecutor in discovery.  I have to presume that

21   those e-mails contained a discussion about the facts of the

22   case, and so I just want to make that clear for the record.

23             Thank you, Your Honor.

24             THE COURT:  All right.  It is noted.

25             All right, go ahead.

1       Q    (By Mr. Faddis)  Mr. Ingham, you said that this

2  kind of thing has happened on multiple occasions, correct?

3       A    I'm sorry.  What kind of thing has happened on

4  multiple occasions?

5       Q    Individuals operating vehicles, like snowmobiles,

6  on prohibited areas within the Keystone Ski Resort.

7       A    That's correct, yes.

8       Q    Okay.  And -- and you said, When that happens,

9  your response is to politely ask them to leave, correct?

10      A    Sorry, no.  If we're referring to the discussion

11  from earlier, trespassing individuals -- those were all

12  ski-skinning -- so people skiing up and skiing back down.

13      Q    I see.  So when those individuals --

14      A    (Inaudible) --

15      Q    -- are on a prohibited area at the Keystone Ski

16  Resort, you would politely ask them to leave, correct?

17      A    Correct, yes.

18      Q    Okay.  Did you personally report any of those

19  individuals to the United States Forest Service?

20      A    No, sir.

21           THE COURT:  Hold on a second, Mr. Faddis.  Just so

22  we're clear for the record, Mr. Ingham, are you referring

23  what might be called or considered AT skiers or telemark

24  skiers, who are using the resort to ski up and then come

25  back down, either through the resort or somewhere else

1   versus snowmobilers?  Is that the distinction you're making?

2            THE WITNESS:  That is correct, yes.

3            THE COURT:  All right.  Go ahead, Mr. Faddis.

4            MR. FADDIS:  Thank you, Your Honor.

5       Q    (By Mr. Faddis)  And for those individuals who are

6   on prohibited areas, whether it be skiing, or snowmobiling,

7   or something else, did you report them to the Senior

8   Director of Operations as well?

9       A    We did make discussion of that, but we did not

10   have the specific details of the individuals.

11      Q    Okay.  But -- but you did report whom you believe

12   to be David Lesh when you claim that -- that he was on a

13   prohibited area of the ski resort, correct?

14      A    Sorry.  Are we referring to me speaking to the US

15   Forest Service or to internal leadership at the resort?

16      Q    Both.

17      A    So, yeah.  I -- I guess I didn't make any

18   assumption of knowing who it was.  We just alerted the

19   Forest Service to the post that we saw and the images that I

20   took.

21      Q    Understood.  So you said that you got to this area

22   of the ski -- Keystone Ski Resort, near the runs about which

23   you've testified, using a snowcat, correct?

24      A    That is correct, yes.

25      Q    And -- and I think you said that snowcats are not

1  recreational, right?

2      A    Not in our use of them, no.

3      Q    Not in whose use?  I'm sorry.

4      A    The ski resort or the company.

5      Q    Okay.

6      A    We don't use them for recreational purposes.

7      Q    But -- okay.  But other -- other individuals can

8  use those for recreational purposes, correct?

9      A    They do exist for that purpose elsewhere, yes.

10      Q    And -- and that vehicle makes impressions in the

11  snow as it travels, doesn't it?

12      A    That's correct, yes.

13      Q    And you were driving that vehicle in the same area

14  where you believed someone had previously operated a

15  snowmobile, right?

16      A    That's correct, yes.

17      Q    And -- and I apologize if you stated this on

18  direct examination.  But how long have you worked for the

19  Keystone Ski area?

20      A    Two years at Keystone.

21      Q    And that business, you mentioned, has snowmobiles,

22  correct?

23      A    That's accurate, yes.

24      Q    Can you tell us approximately how many snowmobiles

25  the Keystone Ski Resort has.

1        A    Quite a few.  I -- I don't know right off the top

2    of my head.  More than 25, I believe.

3        Q    Okay.  And I -- I think you mentioned that, to

4    your knowledge, no employees were using those snowmobiles in

5    April of 2020, correct?

6        A    That's correct.

7        Q    But fair to say these employees have access to

8    those snowmobiles, right?

9        A    Yes.  Limited, albeit some.

10       Q    What do you mean by "limited"?

11       A    The equipment -- or the vehicle maintenance shop

12   that housed the access keys for those vehicles was locked at

13   the time.

14       Q    And do -- do employees -- some employees have a

15   key to open that lock?

16       A    There are some employees that have keys for that

17   lock, yes.

18       Q    Okay.  Can you tell what brand of snowmobile made

19   the tracks that you found?

20       A    No, sir.

21       Q    What about the type of snowmobile, whether it's

22   utility, or trail, or crossover, or something else?

23       A    Could not say.

24       Q    Did you have an expert look at the tracks and --

25   and try to match them with the snowmobile depicted in

1  Government's Exhibit 1?

2      A    Not to my knowledge, no.

3      Q    So you can't definitively say whether those tracks

4  were recreated by the snowmobile depicted in Government's

5  Exhibit 1, or some other snowmobile?

6      A    That's correct.

7      Q    You believe the tracks were from April 24, 2020,

8  right?

9      A    Well, I -- I suppose so, yes.

10     Q    You sound less than confident about that --

11     A    I can't be certain.

12     Q    -- am I -- am I correct?

13     A    I can't be certain.  Yeah.  No -- I really -- I

14  really don't know.  I'm not certain.

15     Q    So if you don't know, I mean, the -- the tracks

16  could have been from an earlier date, correct?

17     A    Absolutely, yeah, they could be.

18     Q    You weren't physically present when the tracks

19  were made, right?

20     A    No, sir.

21     Q    And -- and we just went through Government's

22  Exhibits 1 through 3, which are -- are purportedly posts

23  from David Lesh's Instagram.  Do you recall those photos?

24     A    I do, yes.

25     Q    Okay.  And you can't identify any of the

1    individuals depicted in those photos just by looking at

2    them, correct?

3         A    No, sir.

4         Q    And to clarify:  Were you -- were you working on

5    April 24, 2020?

6         A    From home, but not at the resort at that time.

7         Q    I see.  But even though you were working from

8    home, part of your job as a manager is to be generally aware

9    of what's happening in the ski area, correct?

10        A    Yes, sir.

11        Q    Because you weren't there, you never saw David

12   Lesh on the property on April 24, 2020?

13        A    I did not, no.

14        Q    All right.  Did any employees tell you that they

15   saw David Lesh on the property that day?

16        A    No, sir.

17        Q    Did any guests at the Keystone Ski Resort tell you

18   that they saw David Lesh on the property that day?

19        A    No, sir.

20        Q    The Keystone Ski area also has a security team,

21   doesn't it?

22        A    That is correct, yes.

23        Q    And part of that security team's job is to make

24   sure that there are no prohibited activities taking place

25   within that ski area, correct?

1      A    That's correct, yes.

2      Q    And did anyone from the security team tell you, on

3   April 24, 2020, that they saw David Lesh at the Keystone Ski

4   area?

5      A    They did not.

6           MR. FADDIS:  Thank you, sir.  That's all I have.

7           THE COURT:  All right.  Any redirect, Mr.

8   Hautzinger?

9           MR. HAUTZINGER:  Very briefly, Your Honor.

10                    REDIRECT EXAMINATION

11   BY MR. HAUTZINGER:

12      Q    Mr. Ingham, I just want to make sure there's no

13   confusion here.

14           Defense counsel asked you some questions about

15   previous trespasses to the closed area of the Keystone

16   Resort during the pandemic.  Do you remember those

17   questions?

18      A    Yes, sir.

19      Q    To your knowledge, did any of those involve a

20   snowmobile going off the jumps in the terrain park?

21      A    Not that I was aware of.

22      Q    The previous trespasses you referred to involved

23   skiers or cross-country skiers, correct?

24      A    That's correct.

25      Q    And you didn't report those to law enforcement?

54

```
1          A    We did not.

2          Q    Had there been a previous trespass involving a

3     snowmobile that you had evidence about, would you have

4     reported that to law enforcement?

5          A    Yes, sir.

6          Q    Are you aware of any other trespasses involving a

7     snowmobile during that time period?

8          A    Not during that time period, no.

9               MR. HAUTZINGER:  Thank you.  I have nothing

10    further.

11              THE COURT:  All right.  Is this witness excused,

12    Mr. Hautzinger?

13              MR. HAUTZINGER:  He is, Your Honor.

14              THE COURT:  Mr. Ingham, you are excused.  Thank

15    you very much.

16              MR. INGHAM:  Thank you.

17              THE COURT:  Anybody need a break or do we keep

18    rolling?

19              MR. HAUTZINGER:  It's probably not a bad time to

20    take a brief break, because I've got to get my computer

21    hooked up for the next witness --

22              THE COURT:  Okay.

23              MR. HAUTZINGER:  -- your Honor.

24              THE COURT:  All right.  What do you think?  Five -

25    ten minutes?
```

1            MR. HAUTZINGER:  Yeah.

2            THE COURT:  Okay.  We'll be back in, say, 10

3     minutes then.  Thank you.

4            (Recess from 10:03 a.m. to 10:14 a.m.)

5            THE COURT:  All right.  Mr. Hautzinger, your next

6     witness?

7            MR. HAUTZINGER:  The Government would call Special

8     Agent Benjamin Leach.

9            THE COURT:  All right.  Special Agent Leach, come

10    on up.

11                       BENJAMIN LEACH,

12    called as a witness, having been first duly sworn, testified

13    as follows:

14            THE WITNESS:  I do.

15            THE COURT:  All right, please take a seat.  The

16    record will reflect that Special Agent Leach has been sworn.

17            Could you please state your full name and spell

18    both your first and last name for the record.

19            SPECIAL AGENT LEACH:  Yes.  Benjamin Leach,

20    B-E-N-J-A-M-I-N.  Last of Leach, L-E-A-C-H.

21            THE COURT:  All right.  Mr. Hautzinger?

22                       DIRECT EXAMINATION

23    BY MR. HAUTZINGER:

24        Q   Good morning, sir.  Can you please tell Judge

25    Gallagher what your occupation is.

1        A    I'm a Special Agent for the US Forest Service.

2        Q    How long have you been a Special Agent?

3        A    Since 2013.

4        Q    Did you have prior employment with the Forest

5   Service before you became a Special Agent?

6        A    Yes.  I was a -- a law enforcement officer --

7   uniformed law enforcement officer since 2008, and then had

8   worked for the Forest Service since the late '90s.

9        Q    What are your responsibilities as a Special Agent?

10       A    I do -- investigate criminal activity associated

11   with the management of National Forest system lands,

12   predominantly on the Western Slope of Colorado.

13       Q    Where are you based?

14       A    Out of Delta, Colorado.

15       Q    Are you the only Special Agent for the Forest

16   Service in Western Colorado?

17       A    I am.

18       Q    And so are you essentially responsible for any

19   significant investigations involving the Forest Service in

20   Western Colorado?

21       A    I am, that's correct.

22       Q    What is your training and experience?

23       A    I have a degree in natural resources, recreation

24   and tourism, a bachelor's of science, and worked in

25   recreation initially, and then got into a fire, and then

1    ultimately law enforcement within the United States Forest

2    Service.  I've worked in several states in the West

3    throughout my career.

4         Q    Where are you from originally?

5         A    Colorado Springs.

6         Q    Born and raised in Colorado?

7         A    I -- I was.

8         Q    You said you had experience working in recreation

9    prior to moving into law enforcement, correct?

10        A    That's correct.

11        Q    What do you mean by that?

12        A    Typically, to get in with the Forest Service, you

13   work, historically, seasonally.  And I worked with the --

14   within recreation for the Arapahoe Roosevelt National Forest

15   up near Fort Collins, Colorado, and with National Visitor

16   Use Monitoring, which is a -- another aspect of recreation

17   within the Forest Service.

18        Q    When you were a law enforcement officer with the

19   Forest Service, prior to becoming a Special Agent, where

20   were you based?

21        A    I was based in northern California.

22        Q    And then did you come back to Colorado to be a

23   Special Agent?

24        A    I did, I did.  And I've done enforcement in

25   uniform as well.  We do that occasionally.  That includes on

1    skis for special events and things of that nature, on, you

2    know -- on permitted ski areas as well.

3        Q    What is the Forest Service -- Forest Service's

4    relationship with ski areas?

5        A    It's -- sometimes it can be complex.  You have,

6    oftentimes, a special use permit that is authorized so that

7    the business can operate within the National Forest system

8    land boundaries under special -- a special use authorization

9    and special regulations associated with that.

10           So it makes sense to explain it -- the fact that,

11   oftentimes, ski resorts don't necessarily own everything

12   within the boundaries, but they are authorized to utilize

13   that land base that's managed by the Forest Service.

14       Q    And, in fact, the vast majority of ski areas in

15   Colorado are largely on Forest Service lands, aren't they?

16       A    That's correct.  And, usually, there's a -- at

17   some point, a demarcation between a private property

18   boundary -- like a base area where you would have

19   structures, and then the permit area which would be,

20   typically, the higher elevation where you have a lot of the

21   acreage, if you will.

22       Q    And you said that a ski area, being a commercial

23   business on National Forest lands, requires a special use

24   authorization; is that right?

25       A    That's correct.  There's certain terms and

1    conditions that both parties would then agree to under that

2    and it includes things like, you know, public safety, and

3    then the infrastructure, water delivery for snow-making, you

4    know, the development of things like towers to maintain lift

5    access, on slope restaurants, on and on and on --

6    infrastructure.

7        Q    And does all of that specifically apply to the

8    Keystone Ski area?

9        A    Each permit, I know, is unique, but I believe

10   Keystone is, again, very similar in that regard with having

11   a special use permit to operate.

12       Q    And is Keystone on National Forest Service lands?

13       A    I -- yes.

14       Q    If criminal activity takes place in a ski resort

15   on National Forest Service lands, what is the jurisdictional

16   situation, in terms of investigating that criminal activity?

17       A    Typically, the Forest Service law enforcement

18   and/or local sheriff's department, depending on

19   jurisdiction, would have a -- both would have authority to

20   deal with components or issues, depending on what they are.

21       Q    Have you previous experience with specifically

22   investigating criminal activity at ski areas?

23       A    Yes.  In general speaking, yes.

24       Q    And patrolling at ski areas?  You said you've done

25   work on skis as a law enforcement officer?

1        A     Yeah.  And typically special events, things like

2   that, higher profile events.

3        Q     Have you been a skier?

4        A     Yes, I've skied and snowboarded my -- most my life

5   -- adult life.

6        Q     So do you have experience in observing tracks in

7   the snow?

8        A     I do.

9        Q     As the special agent responsible for Western

10  Colorado, were you responsible for this investigation?

11       A     I oversaw a good portion of this investigation.

12  We had other involvement with officers as well.

13       Q     Certainly law enforcement officers did some

14  boots-on-the-ground-type work, right?

15       A     Precisely.  We have managed an area that covers a

16  tremendous amount of acreage and/or square miles, if you

17  will, so we have uniformed officers.  And I'm the agent that

18  covers a pretty large area.

19       Q     But have you, yourself, personally done specific

20  work on this investigation?

21       A     I have.

22       Q     And are you familiar with every aspect of the

23  investigation?

24       A     I am.

25       Q     Have you viewed all of the evidence involved?

1       A    I have.

2       Q    I'm going to put up what's already been admitted

3   as Government's Exhibit 7 -- I need to zoom out a bit,

4   sorry.

5            Is that on the screen in front of you, Agent

6   Leach?

7       A    Yes, it is.

8       Q    Okay.  Can you see that well enough?

9       A    Yes, it seems to be clear.

10      Q    I put this up because it's probably the best image

11  of tracks that -- from the photographs that were taken by

12  Mr. Ingham.  Can you see the tracks there?

13      A    I can.

14      Q    Based on your training and experience, both as a

15  lifelong skier and a specific law enforcement officer who

16  has worked, oftentimes, on ski areas, can you offer an

17  opinion as to how fresh those tracks appear to be?

18           MR. FADDIS:  And I would object to expert

19  testimony at this time.  Again, none of this has been

20  disclosed in any report.  And so for those reasons, we

21  believe it's inadmissible.

22           THE COURT:  All right.  What is it, Mr. Faddis,

23  you think is the expert portion of this versus just the

24  general observation portion, based off the training and life

25  experience?

1          MR. FADDIS:  Your Honor, the Government is asking

2     about the purported recency of these tracks.  At least thus

3     far, there's been no foundation that -- that Mr. Leach even

4     visited the scene on that date.  So there's also a

5     foundational issue, and -- and for those reasons, it appears

6     -- the recency of tracks is something that an expert would

7     need to opine on.

8          I can't just go to a ski resort and -- or -- and

9     look at some tracks and tell you when they were made.  And I

10    think a person with training and experience does not somehow

11    qualify them to render that opinion either.

12         THE COURT:  Well, the objection is sustained in

13    part, based off of foundation.  The Court will take judicial

14    notice, as a lifelong skier, that, essentially, it is

15    entirely possible for a person with no special training, but

16    just general observational skills, to potentially look at

17    tracks in the snow and, within some broad variations, be

18    able to tell, potentially, age.

19         Based off of what the Court has heard so far, we

20    don't have a foundation for that one way or the other, but

21    maybe we'll get to that point.

22         MR. HAUTZINGER:  And, Your Honor, I am not

23    offering this as an expert opinion.  This -- I'm asking for

24    the witness' opinion, based on his life experiences, which

25    include his law enforcement experiences, because it had him

1    on the mountain a lot more.

2             THE COURT:  Sure.  And I'm not overruling it in --

3    or I'm not sustaining it on the objection portion is -- in

4    terms of the expertise.  I equate this more to the

5    equivalent of somebody, essentially, seeing somebody

6    intoxicated on the street, that that does not necessarily

7    need to be an expert opinion.  If somebody sees somebody

8    that they think is drunk, they can say it if they've given

9    enough information.

10            I'm sustaining it at this point, at least in part,

11    based off of the foundation of what this officer has

12    happened to have seen with regards to this case.

13       Q    (By Mr. Hautzinger)  Agent Leach, based -- based

14    on your observations as a lifelong skier and the time you've

15    spent on mountains and your law enforcement experience on

16    ski areas, and your careful inspection of all of the

17    evidence in this case, including Government's Exhibits 4, 5,

18    6, and 7:  Do you have an opinion as to the -- how fresh

19    those tracks appear to be?

20            MR. FADDIS:  I would object to foundation.  I

21    would also object on the grounds that there's been no

22    evidence about the details of these photographs, with what

23    kind of camera it was taken, the caliber of that camera,

24    that -- the pixilation of that camera.  And to just have

25    this officer look at some photograph and try to tell this

64

```
1    Court that, Yeah, those look kind of recent to me, I don't
2    believe that's competent evidence.  I don't believe there's
3    foundation for it.
4            THE COURT:  The objection is noted.  It's
5    overruled.  If the witness can answer, he may.  And it is
6    certainly subject to later cross-examination.
7            Go ahead, Mr. Hautzinger.
8        A    I -- I do.  I believe they were quite fresh, based
9    on, again, the -- the photographs provided with the
10   Government exhibits.
11       Q    (By Mr. Hautzinger)  And what do you mean by
12   "fresh"?
13       A    They don't appear to be significantly degraded by
14   sunlight, heat, baking and hardening of the snow.  It
15   appears to be relatively fresh snow with fresh tracks in
16   that fresh snow.
17       Q    Thank you, sir.
18            Are you aware of somebody named David Lesh?
19       A    I am.
20       Q    And how long have you been aware of David Lesh?
21       A    Since, I believe, about 2019.
22       Q    Did he first come to your attention in relation to
23   an incident that took place on Independence Pass?
24       A    Yes, I believe that would have been --
25            MR. FADDIS:  I would object to a 404(b) at this
```

1   time.

2          THE COURT:  Mr. Hautzinger?

3          MR. HAUTZINGER:  This is not 404(b).  It's not on

4   a charge of misconduct.  It's res gestae, part of a pattern

5   of conduct by this defendant.  And it's important for the

6   finder of fact to be aware of it in order to take the

7   entirety of the case into account.

8          THE COURT:  Mr. Faddis?

9          MR. FADDIS:  An alleged event that was ultimately

10  dismissed from 2019 is not res gestae of some other event

11  that the Government claims to have happened in April 2020.

12  They are different locations, there are different

13  individuals involved, different investigatory measures

14  taken.

15         The Government cannot simply side-step Federal

16  Rule of Evidence 404(b), not provide any notice that they

17  want to get into other evidence, and then just tell this

18  Court, Oh, well, it's just a pattern of conduct that we want

19  the Court to know about.  That's not legally admissible or

20  appropriate.

21         And I would object under 404(b) grounds.

22         THE COURT:  Give me a moment here.

23         MR. FADDIS:  And if I may further, Your Honor?

24         THE COURT:  In just a moment.  I wanted to look

25  back and see if there was any filing request with regard to

1   404(b).  I don't recall if there was or not.

2            MR. FADDIS:  Yes, sir.

3            THE COURT:  All right.  Mr. Faddis?

4            MR. FADDIS:  Yes, Your Honor.  Just to state

5   further:  Part of the notice requirement of 404(b) is in

6   place because it allows the defense to investigate a matter,

7   to look into it, and to try and challenge the admissibility

8   of that matter.  There's an entire analysis that the Court

9   would have to go through.

10            Oftentimes, this matter is briefed thoroughly by

11   both parties.  None of that has occurred here.  There has

12   been zero notice that we were going to bring up Independence

13   Pass issues.  I would also note that that matter, I believe,

14   was dismissed in its entirety.

15            And so, you know, for those reasons -- there's a

16   notice requirement for a reason, and the Federal Government

17   doesn't get to just side-step it and say, Oh, well, you

18   know, this is what we think Mr. Lesh does.

19            So Your Honor, here's modus operandi evidence, or

20   pattern of conduct evidence, and it's absolutely not res

21   gestae.  Res gestae is perhaps something that happened on

22   April 23, 2020, or April 25, 2020.  It is not something that

23   happened in 2019.  And so for all of those reasons, defense

24   strenuously objects to any evidence regarding Independence

25   Pass.

1          THE COURT:  All right.  Well, in terms of -- just

2   so we can tailor the argument:  In terms of the issue of the

3   prior conduct being dismissed or not, there's nothing in

4   404(b) that requires that there be a conviction or even a

5   charge.  It includes other crimes, wrongs, or acts, and an

6   act may not necessarily be criminal conduct.

7          So the objection is overruled on that part.

8          With regard, Mr. Hautzinger, to Section B(3)

9   notice in a criminal case, what's your response?

10          MR. HAUTZINGER:  First off, the defense has been

11   provided considerable -- all evidence relating to the

12   Independence Pass incident.  That was provided in the 87

13   pages of.  Discovery, it's been detailed and the point of

14   this and what I was going to ask the officer about is that

15   Mr. Lesh posted an Instagram posting relating to

16   Independence Pass with, also, a photograph of him on a

17   snowmobile.  That's what is relevant, that is what is res

18   gestae.

19          I am not -- I was going to have the witness

20   testify to the fact that the violation notice was resolved

21   without a conviction or acquittal or a guilty plea, but the

22   fact that the defendant continued to post on Instagram is

23   relevant, is res gestae.  It's not another act, and it

24   didn't require notice.

25          MR. FADDIS:  And --

1          THE COURT:  Mr. Faddis?

2          MR. FADDIS:  -- if I may, Your Honor?

3          Why in the world would we have 404(b) then?  Why

4     even have it?  If -- think about if this was a theft case,

5     for example.  There was an allegation of a theft, and then

6     the Government wanted to bring up some alleged theft that

7     had happened more than a year prior to that.  That would

8     absolutely have to be noticed under 404(b) so that the

9     defense could be ready to defend against that.

10          That is -- that's not what happened here.  The

11    Government can't just say, Oh, we believe the defendant has

12    acted in a similar way in the past on multiple occasions.

13    And, therefore, Your Honor, we want you to consider that in

14    his federal criminal trial, but we're not noticing under

15    404(b) and we just want it in.

16          That's not permissible.

17          THE COURT:  All right.  Mr. Hautzinger?

18          MR. HAUTZINGER:  I maintain my position, this

19    isn't 404(b).  It's res gestae, Your Honor.

20          THE COURT:  All right.  Well, based off of what I

21    have heard so far, I don't find it to be res gestae.  I do

22    find it to be 404(b).  It would potentially be proper 404(b)

23    as to identity under 404(b)(3), the subsections (a), (b),

24    and (c).  The notice requirement is not just that the

25    information be provided, which I haven't heard that it

1    hasn't been, but that there be reasonable notice that the

2    prosecutor intends to offer at trial, that there be an

3    articulation in the notice of the permitted purpose, and the

4    reasoning, and that it be done in writing before the trial,

5    unless there's good cause otherwise.

6         So at this point in time, it's going to be

7    excluded.  Okay.

8         Go ahead, Mr. Hautzinger.

9    Q    (By Mr. Hautzinger)  You've been aware of Mr. Lesh

10   since the summer of 2019, correct?

11   A    That's correct.

12   Q    Have you personally inspected his Instagram

13   account on multiple occasions?

14   A    I have looked at his -- yeah, social media

15   postings, yes.

16   Q    Let's turn to the investigation relating to

17   snowmobiling on -- at the Keystone Mountain Resort on or

18   about April 24th or 25th of 2020.  Were you responsible for

19   that investigation?

20   A    Yes.

21   Q    Are you familiar with the details of it?

22   A    Yes.

23   Q    Who was the original law enforcement officer who

24   worked that case?

25   A    Gillian Wick.

1     Q     And she was a LEO -- a street cop, under Forest

2     Service terms, responsible for the Keystone area?

3     A     Yes.  Generally speaking, yes.

4     Q     What is her status now?

5     A     She's retired.

6     Q     But you were aware of her work and you supervised

7     her work, correct?

8     A     That's correct.

9     Q     Were you alerted to an additional posting

10    concerning Hanging Lake made by David Lesh on or about June

11    10, 2020?

12          MR. FADDIS:  And I would object to relevance, as

13    well as 404(b).  This is obviously another act.  It concerns

14    a completely separate location on a completely separate

15    date.  We have been provided no notice that this would be

16    brought up in Mr. Lesh's criminal trial regarding the

17    Keystone Ski Area.

18          Again, the Government cannot just side-step 404(b)

19    and try to, you know, throw everything at the wall and see

20    what sticks.  It's completely impermissible.  And there's

21    also no relevance as to how it would apply to this case.

22          THE COURT:  Mr. Hautzinger?

23          MR. HAUTZINGER:  Count 2 charges that:  On or

24    about April 24 through October 21, 2020, in Colorado, upon

25    lands administered by the US Forest Service -- namely the

 1    Keystone Ski Area, and elsewhere.  It's an inclusive charge

 2    of multiple dates, and the defendant's postings subsequent

 3    to Keystone are relevant to Count 2 and are entirely

 4    admissible.

 5            They do not require notice, and they are not

 6    404(b) evidence.

 7            THE COURT:  (Inaudible).

 8            MR. FADDIS:  Yes, Your Honor.

 9            THE COURT:  All right.  Mr. Faddis?

10            MR. FADDIS:  So I think it's pretty apparent

11    what's happening.

12            The Government had, as Your Honor is fully aware,

13    charged Mr. Lesh with some violations with respect to

14    Hanging Lake.  They ultimately dismissed those violations,

15    but now they want to kind of backdoor that information and

16    use it against Mr. Lesh in an impermissible way.

17            It looks like, in the superceding information,

18    they have defined the Keystone Ski Area, and literally any

19    other area throughout the entire nation that is upon the

20    lands of the United States Forest Service.

21            That is not pled with specificity.  There's no way

22    the defense can be on notice to try and defend against that

23    when we have no idea the geographical location in which

24    they're saying that this crime happened.

25            It -- obviously, Mr. Hautzinger knows that the

1    Hanging Lake event allegedly happened in that geographical

2    locale.  And so if they wanted to include that as part of

3    Count 2, they would have done that.  They did that, in fact,

4    in their First Information.

5              And so in the Second Information, to try and just

6    say, Yeah, Keystone Ski Area and literally any other

7    possible geographical location upon the lands of the United

8    States Forest Service, it's not properly pled, and it's just

9    a way to backdoor an information that they cannot prove.

10             And so defense is not -- that doesn't apprise

11   defense of what we're defending against.

12             And so for those reasons, I believe that testimony

13   about Hanging Lake is completely impermissible.

14             THE COURT:  Mr. Hautzinger, I'm sorry.  I didn't

15   hear:  What was the alleged date of the Hanging Lake picture

16   -- or the posting?

17             MR. HAUTZINGER:  That is on or about June 10,

18   2020, Your Honor.

19             And I would also respond by noting:  We're not

20   alleging anywhere in the United States.  The Information

21   says in the State and District of Colorado.

22             THE COURT:  All right.  Under -- this is being

23   offered for a different purpose, not for 404(b).  With

24   regard to Count 2, it isn't, as asserted by counsel,

25   nationwide.  It's clearly limited to the State and District

1  of Colorado, and to lands administered by the Forest

2  Service.  Under the circumstances, it has a date range of

3  approximately a little bit less than six months.

4          Looking back through the course of the record

5  here:  To the extent that any party believed that the

6  pleading documents were insufficient, I don't see that there

7  was a bill of particulars, not that that, in any way,

8  switches the burden on the Government -- of course, pleading

9  with specificity -- but I don't see that that litigation

10  occurred.

11          Mr. Faddis?

12          MR. FADDIS:  Oh, I'm sorry.  I didn't mean to

13  interrupt you, Your Honor.

14          THE COURT:  Oh, no problem.  You were standing up.

15  So I figured before I finished my ruling, I'd see what you

16  had to say.

17          MR. FADDIS:  Oh, I appreciate it.  My apologies.

18          THE COURT:  Okay.  So for those reasons, the

19  objection is overruled on the basis that, essentially, the

20  Government is proceeding now, which is that this would be

21  res gestae.

22          Because it's included within Count 2, it will be

23  allowed.

24      Q   (By Mr. Hautzinger)  Were you alerted to an

25  additional by David Lesh on or about June 10, 2020?

1        A    I was.

2        Q    Did that concern Hanging Lake?

3        A    That -- it did.

4        Q    What law enforcement officer headed up -- well,

5   you headed it up, but what law enforcement officer was the

6   boots on the ground for the Hanging Lake investigation?

7        A    That would have been Officer Chris Mander.

8        Q    And what is his status right now?

9        A    He's on administrative leave.

10        Q    But you were aware of that investigation and

11   supervised it?

12        A    Yes.

13        Q    Was a six-count Information filed September 15,

14   2020 against David Lesh?

15        A    I believe so.

16        Q    And did that information contain charges relating

17   to both the Keystone incident and the Hanging Lake incident?

18        A    I believe it did.

19        Q    And was a bond hearing conducted on October 2,

20   2020?

21        A    I believe that was the date, yes, the bond hearing

22   was conducted.

23        Q    And did the Court issue petitions of release on

24   October 6, 2020?

25        A    I believe they did.

1          MR. FADDIS:  I'd object to relevance at this time.

2          THE COURT:  And how's it relevant, Mr. Hautzinger?

3          MR. HAUTZINGER:  It's relevant to the pattern of

4    conduct and explains the relevance of the next posting

5    regarding Maroon Lake, which is also on National Forest

6    Service lands, Your Honor.

7          THE COURT:  Mr. Faddis?

8          MR. FADDIS:  I would renew my objection under

9    404(b).  I don't think the Government can just include this

10   very large date range and just pick and choose which alleged

11   events within that date range they want to prosecute without

12   providing adequate notice to the defense.

13         Even though there was no bill of particulars

14   requested, that's because, you know, on it's face and the

15   superceding information, it's apparent that they've

16   identified a place at which they believe the crime

17   occurred -- namely, the Keystone Ski Area -- and to just

18   tack on this catch-all phrase of "elsewhere" is improper and

19   it doesn't provide adequate notice to the defense in terms

20   of challenging it.

21         MR. HAUTZINGER:  And Your Honor --

22         THE COURT:  And, Mr. Hautzinger, just so we're

23   clear for the record -- you may have said it, but if you

24   did, I didn't catch it:  What was the date of the Maroon

25   Lake post?

1            MR. HAUTZINGER:  Maroon Lake post was June 10th.

2            THE COURT:  All right.

3            MR. HAUTZINGER:  I'm sorry.  Hanging Lake was June

4     10th.  Maroon Lake was October 21st.

5            THE COURT:  All right.  So based off of the method

6     of pleading here, which was -- first, a date range in a

7     federal case of a little bit less than six months is not a

8     particularly expansive date range.  Federal case date ranges

9     often include years of alleged conduct.

10           Here, the alleged conduct is for a bit less than

11    six months.  It is limited in both scope and in geographic

12    location to Forest Service lands for the District of

13    Colorado.  Of course, this count was subject, as all counts

14    are, to a request for a bill of particulars, which I've

15    already noted wasn't filed here.

16           So the idea that the date range didn't queue

17    anybody in for an idea that this was going to be an argument

18    for this trial, that's a little bit unbelievable, to some

19    extent, because of the nature of the litigation that has

20    occurred here, which has included a case that specifically

21    charged that date.

22           So a view of this complaint, on its face, would

23    queue somebody into the idea that they needed to be looking

24    at that information.

25           So I do find that it's permissible res gestae.

1   It's, of course, subject to cross-examination, but I am

2   going to allow this testimony as well.

3           Go ahead, Mr. Hautzinger.

4       Q   (By Mr. Hautzinger)  Were you notified of an

5   additional posting by David Lesh concerning Maroon Lake on

6   October 25, 2020?

7       A   I was.

8       Q   And did you, yourself, personally, handle that

9   investigation?

10      A   I did.

11      Q   Was part of the reason for that investigation the

12  fact that the Court had previously ordered the defendant not

13  to trespass on any National Forest Service lands?

14      A   That's correct.

15      Q   And not to violate any closures?

16      A   That's correct.

17      Q   That was from the Court's order of October 6,

18  2020; correct?

19      A   I believe so, that's correct.

20      Q   I'm going to show you what's been marked as

21  Government's Exhibit Number 11.  Can you tell me if you

22  recognize that.

23      A   I do.

24      Q   What is Government's Exhibit 11?

25      A   It's a photo of Maroon Lake and with what appears

1   to be Mr. Lesh bending over holding onto a -- like a piece

2   of driftwood in the lake.

3        Q    And how can you say that's Maroon Lake?

4        A    Just due to the characteristic background.  I've

5   been there, and it's a very famous -- one of the most

6   visited spots in the entire National Forest system in the

7   United States, I believe.

8        Q    Did you observe this back in October of 2020?

9        A    I did.

10       Q    And did you also observe it this week?

11       A    I did.

12       Q    In fact, did you look at the defendant's Instagram

13  site on August 3rd of 2021 at 0800?

14       A    That morning, I did.  On August 3rd, I did look at

15  the Instagram posts.

16       Q    And is Government's Exhibit 11 a fair and accurate

17  rendition of what you personally observed on August 3, 2021?

18       A    Yes, in particular, the photograph.

19            MR. HAUTZINGER:  I'd move for the admission of

20  Government's 11, Your Honor.

21            THE COURT:  Mr. Faddis?

22            MR. FADDIS:  I would object to foundation,

23  authenticity.  There is no indication that this is actually

24  an authentic photograph.  And, in fact, I think the

25  prosecutor is --

1          MR. HAUTZINGER:  It's not offered for that

2    purpose, Your Honor.

3          THE COURT:  Hold on a second, Mr. Hautzinger.

4          Go ahead, Mr. Faddis.

5          MR. FADDIS:  And I think the prosecution is well

6    aware of that fact.  And further it's only relevant if this

7    was an actual event that took place upon lands administered

8    by the United States National Forest Service.  There is --

9    as the prosecutor's aware -- no solidified authenticity of

10   this photograph, and that it's even -- that it even really

11   happened.

12         There are, obviously, technological mechanisms by

13   which photographs can be augmented, altered, and completely

14   created.

15         And so for those grounds, there is simply not

16   authenticity established that this is a photograph of an

17   actual event.

18         THE COURT:  Mr. Hautzinger?

19         MR. HAUTZINGER:  As I think defense counsel knows,

20   it's not offered for that purpose, Your Honor.  It's offered

21   to show the defendant is continuing to promote his business

22   with photographs, whether doctored or not, of National

23   Forest lands.

24         The defendant's the one who kept on posting these

25   things over this time period, Your Honor.  I intend to

1    introduce evidence that we don't believe that to be an

2    authentic photograph.  It is still relevant as res gestae,

3    and relevant to Count 2, which charges ongoing promotion of

4    his business using National Forest (inaudible - voice

5    dropped).

6              THE COURT:  Mr. Faddis?

7              MR. FADDIS:  If I may just briefly, Your Honor?

8              THE COURT:  Sure.

9              MR. FADDIS:  In the superceding Information, the

10   language of Count 2 says that it's only a crime if it

11   happens upon lands administered by the United States Forest

12   Service.  If -- that's the only way it's relevant, is if it

13   took place, geographically, on those lands.  The

14   prosecution, I think, is conceding that the photograph is

15   not authentic.

16             There's no indication that Mr. Lesh was actually

17   upon those lands during this event.  And for that reason,

18   it's not -- it's also not relevant.

19             THE COURT:  Mr. Hautzinger?

20             MR. HAUTZINGER:  I think it's absolutely relevant,

21   which is why the defense is protesting so vehemently.

22             THE COURT:  All right.  Well, in terms of the

23   photograph:  At this juncture, as the parties are well aware

24   from the course of multiple litigations that have occurred

25   here -- and I don't know what occurred exactly behind the

1    curtain that led to dismissal of the Maroon Lake case -- but

2    the arguments certainly insinuate -- and I suspect we'll

3    hear more -- about the fact that there is a belief that this

4    picture is perhaps not an authentic picture.

5             That is a different proposition from the issue of

6    whether someone is purporting to use images of National

7    Forest System land in some fashion for purposes of

8    advertisement, either personally, or in a business

9    circumstance.

10            Now, whether the picture actually is evidence of a

11   violation, which gets to Mr. Faddis' argument about whether

12   it was something that was done on National Forest System

13   land or not, that's a completely separate argument that

14   needs to be addressed during the course of trial, but that

15   doesn't mean that the Government's theory and evidence

16   shouldn't be admitted at this stage.

17            So I am admitting Government's Exhibit 11.  Of

18   course, it is subject to both cross-examination and to

19   argument on exactly the point that Mr. Faddis raises, which

20   is essentially the general argument that, you know, it

21   didn't happen on National Forest System land, it's not a

22   crime.

23            But that's not a reason not to admit the exhibit.

24   That's an argument for later in our proceedings.

25            Go ahead, Mr. Hautzinger.

1                (Exhibit 11 admitted.)

2       Q    (By Mr. Hautzinger)  I think you already testified

3  that you had personally supervised the investigation into

4  Maroon Lake, correct?

5       A    I did.

6       Q    Did you send a law enforcement officer to Maroon

7  Lake to make observations as to the status of the lake and

8  its condition on or about October 21st?

9       A    Oh, I did.

10      Q    And who was that?

11      A    Chris Mandrake (ph).

12      Q    Did Officer Mandrake observations that led you to

13 conclude the photograph was likely inauthentic?

14      A    That's correct.  He may have gone up the next day,

15 but he did go up there.  And then I remember he -- there was

16 an -- an issue with the lack of, I believe, avalanche debris

17 in the water.

18      Q    Debris in the water, also the water level?

19      A    That's correct.

20      Q    Did you, yourself, offer an affidavit that was

21 submitted to Magistrate Judge Gallagher on October 22nd?

22      A    I did.

23      Q    And did that affidavit detail the discrepancies

24 between the photograph in -- the images in Government's

25 Exhibit 11 and the actual observations made by Forest

1   Service personnel?

2       A    Yes, it did.

3       Q    I'm now going to put up what's been marked as

4   Government's Exhibit 9.  On or about January 18, 2021, did

5   the New Yorker magazine publish an article entitled

6   "Trolling the Great Outdoors"?

7       A    Yes, it did.

8       Q    And have you read that article?

9       A    I have.

10      Q    Is it, in fact, a profile of David Lesh, his

11  business Virtika, and his pending federal charges?

12      A    I think that would be an accurate description.

13           MR. HAUTZINGER:  Your Honor, I'm going to move for

14  the admission of Government's Exhibit 9 and it is

15  self-authenticating under Federal Rule of Evidence 902(6).

16           THE COURT:  Do you object, Mr. Faddis?

17           MR. FADDIS:  Yes, Your Honor.  So I would object

18  on multiple grounds.

19           The first is that there are several layers of

20  hearsay within this article.  This is an article authored by

21  Nick Paumgarten.  And if the Government wanted to present

22  evidence about the content of that article, they should have

23  called journalist Nick Paumgarten.

24           THE COURT:  Let me -- let me stop you for a second

25  on that.  Doesn't 902(6) get around exactly that?

1          MR. FADDIS:  Well, Your Honor, I think the issue

2     arises where there are quotes that are purportedly

3     attributed to Mr. Lesh.  And the only person -- or the only

4     people who know whether those quotes are accurate are Mr.

5     Lesh and Mr. Paumgarten.  And so -- and in addition to that,

6     there is a ton of hearsay from the author of this article.

7          He opines about Mr. Lesh and his personal

8     impressions of Mr. Lesh.  There is a ton of irrelevant

9     evidence within this article, including information about

10    Mr. Lesh's love life; personal information about, I believe,

11    whether he wants to have children.  There -- information

12    about the pandemic, information about vanlifers, information

13    about chasing a moose --

14          THE COURT:  I'm sorry, what's a vanlifer?

15          MR. FADDIS:  Your Honor, that's kind of a cultural

16    movement where people live in vans.

17          THE COURT:  Oh, understood.  Okay.  Go ahead.

18          MR. FADDIS:  And the article is, you know, several

19    pages -- approximately eight pages, or so, long with all --

20    with especially including information about prior alleged

21    criminality and -- from Mr. Lesh's childhood years, and the

22    fact that -- and allegations that he was expelled in school.

23          None of this is relevant to whether he is guilty

24    of that Keystone Ski area charge.

25          If there are specific statements within that

1   article that the prosecution wants to try and bring out,

2   then they can do that.  But, absolutely, the article in its

3   entirety is -- is not relevant, it is multiple levels of

4   hearsay, there are authenticity issues with respect to

5   whether the quotes attributed to Mr. Lesh are actually

6   accurate.

7           And all of those reasons dictate that the article

8   is not admissible.

9           THE COURT:  Mr. Hautzinger?

10          MR. HAUTZINGER:  The article is chocked full of

11  parties -- party opponent admissions directly relating to

12  the evidence in this case.  The article is

13  self-authenticating under the Rules of Evidence.

14          In fact, the Department of Justice policy

15  prohibits me from subpoenaing a reporter, or trying to

16  access media reports.  It would be a violation of that

17  policy for me to attempt to do so.

18          And I further intend to introduce a YouTube

19  interview with Mr. Lesh where he says to the interviewer:

20  Everything in that article is true, it was fair.

21          He has affirmed the accuracy -- the -- of the

22  article.  There is not an authenticity issue.

23          I'm not offering any of the other things that

24  defense counsel's upset about against the defendant.  I'm

25  offering the whole article under the rule of completeness,

1    because I think that's the cleanest way to handle the

2    evidence, but I will certainly be highlighting specific

3    statements that the defendant made in the article.

4            THE COURT:  All right.  Mr. Faddis, it's your

5    objection.  So final word on that?

6            MR. FADDIS:  Thank you, Your Honor.

7            If -- for nothing else, for record purposes and

8    for appellate purposes, we cannot have an eight-page article

9    that talks about Mr. Lesh being expelled in 8th Grade being

10   admitted into his criminal trial for this Keystone Ski area

11   allegation.  It's completely improper.

12           It's riddled with 404(b) information, none of

13   which has been noticed.  And, additionally, there's a lot of

14   paraphrasing.  There are some -- what are purportedly direct

15   quotes, but a lot of it is paraphrasing.

16           And there is obviously an issue that arises with

17   respect to whether those paraphrasing sections are accurate,

18   reliable, competent evidence for this Court in a federal

19   criminal trial.

20           And so for those reasons -- you know, if the

21   prosecution wanted to redact the article and try and present

22   only what they believe to be direct quotes from Mr. Lesh,

23   that's maybe a separate issue, but that's not what's going

24   on here.

25           They're asking to put forth this entire eight-page

1    article.

2           THE COURT:  All right.  At this point in time, the

3    objection is going to be overruled.  Looking at Federal Rule

4    of Evidence 902(6), there is a hearsay exception for printed

5    material purporting to be a newspaper or periodical.

6           On its face, this is an article from a newspaper

7    or from a periodical.  I'll keep in mind that this is a

8    bench trial.

9           So, for example, the argument that Mr. Lesh is or

10   was expelled from school in some prior time, or has views on

11   having children, or things of that nature, those arguments

12   were made by defense counsel in defense counsel's objection.

13          So you often hear the statement you can't unring a

14   bell.  And I suspect if we were trying this matter in front

15   of a jury, this would be done by way of a bench conference.

16          But this isn't a jury trial; it's a bench trial.

17   And that information was provided to me by defense in their

18   argument.  But yet, at the same time, I'm asking my brain,

19   essentially, to exclude that evidence as being irrelevant,

20   and that is exactly what I will do.

21          The purpose of this argument is for statements of

22   the defendant.  The Court is fully competent of reviewing

23   this article and looking at it only for the statement of the

24   defendant and not as to his opinions on matters aside from

25   this.

1          Under the rule of completeness, the entirety of

2    the article does need to be admitted in terms of the idea

3    that the author of the article would need to be called for

4    that purpose.  The parties are certainly aware that there

5    has been significant recent litigation by the Department of

6    Justice on exactly that point.  And it -- there's a

7    Department of Justice's policy, and it would be improper,

8    given various privileges that exist under the law, to

9    require the author to come in and be here personally on

10   that.

11         With regard to arguments that the defense may wish

12   to make that statements were misquoted, or misconstrued, or

13   any of the like, they can have at it during

14   cross-examination or otherwise during the course of the

15   trial.

16         But at this point in time, Government's Exhibit 9

17   is admitted.

18         (Exhibit 9 admitted.)

19         All right, Mr. Hautzinger, you may proceed.

20         MR. HAUTZINGER:  Your Honor, may I approach.  You

21   have in your trial notebook under (inaudible - away from

22   microphone).

23         THE COURT:  All right.

24    Q    (By Mr. Hautzinger)  Special Agent Leach, I am

25   handing you what's been marked as Government's Exhibit 13.

1    Do you recognize that?

2         A    I do.

3         Q    And what is Government's Exhibit 13?

4         A    I believe this is the YouTube video with Mr.

5    Crowe.  It's a -- approximately, I believe, 56- or

6    57-minute-long interview.  Like a YouTube style podcast, I

7    believe, would be the term.

8         Q    And did you, yourself, personally go to YouTube

9    and view that interview and burn a copy of it?

10        A    Yes, I did.

11        Q    And did you and I specifically review that disc,

12   Government's Exhibit 13, yesterday in its entirety, from

13   minute 1 to minute 56?

14        A    I -- we did.

15        Q    And is that a fair and accurate rendition of what

16   you viewed on YouTube?

17        A    That's correct.

18        Q    Does Government's 13 also include a trimmed

19   version that is just a one-minute excerpt of something Mr.

20   Lesh said?

21        A    Yes.

22        Q    And is that very near the start of the interview?

23        A    Yes, I believe it is.

24             MR. HAUTZINGER:  Your Honor, I'd move for the

25   admission of Government's 13.

1              THE COURT:  Mr. Faddis?

2              MR. FADDIS:  Your Honor, I would object to

3    admission of 13 in its entirety for much of the same reasons

4    that I'm -- that I objected to the New Yorker article.

5              There is -- it is riddled with 404(b) evidence,

6    certainly information that could be impermissible under 403

7    and 404.

8              I have no objection to the minute that the

9    prosecution wants to admit, because I know what is in that,

10   and I think it's legally admissible.  But the remainder of

11   the podcast is -- contains a ton of irrelevant information,

12   again, about Mr. Lesh's love life, about whether he wants to

13   have children, about prior alleged activities when he was

14   much younger, that has no bearing on the issues in this

15   case.

16             Like I said though, I have no objection to the

17   one-minute excerpt that I believe contains an admissible

18   statement.

19             THE COURT:  And, Mr. Hautzinger, my understanding

20   is essentially -- while it hasn't been baldly stated this

21   way, that the entirety of this is being submitted for

22   purposes of the rule of completeness.  But I'm guessing

23   because of the one-minute excerpt, that that's ultimately

24   what the Court is going to be asked to consider, rather than

25   watch --

    1              MR. HAUTZINGER:  That's exactly --

    2              THE COURT:  -- 56 minutes of a YouTube interview

    3    that sounds like it may have significant impermissible

    4    information in there, but at least it puts this in context.

    5              Is that the Government's theory?

    6              MR. HAUTZINGER:  That's exactly why I prepared the

    7    disc the way we did, Your Honor.  So I can play the

    8    one-minute excerpt for the Court here in court.

    9              The rule of completeness, I think, compels me to

   10    put the whole interview into the record, but I'm not asking

   11    the Court to review it and take anything else into account.

   12              THE COURT:  Mr. Faddis?

   13              MR. FADDIS:  Just lastly, Your Honor:  The rule of

   14    completeness is to ensure that there is no misunderstanding

   15    about, you know, like a half-statement that was made.  The

   16    rule of completeness would then dictate that the remainder

   17    of that statement also come into evidence.

   18              It does not apply to an entire hour-long podcast.

   19    That's not -- the rule of completeness, the purpose of it is

   20    to ensure that there is no kind of misunderstanding with a

   21    half-statement.

   22              And so I don't believe it applies in the way that

   23    the Government is asserting.

   24              THE COURT:  All right.  Objection is overruled.

   25    The rule of completeness may apply to an individual

1   statement, or it may apply to the context of an entire

2   statement, depending on the circumstances.

3           Here, I don't know exactly what argument the

4   defense might make against this.  The Court is being asked,

5   at this point, I believe, to watch a one-minute excerpt.

6   Nobody's asked me to watch more.

7           I'm fully confident -- or to exclude from my

8   consideration what sounds like is significant irrelevant

9   information on there.  But it may be that the defense, as

10  we're going along, has some contextural argument with

11  regards to this that does require the entirety of the disk

12  to be admitted.

13          So I am admitting the entirety of it.  But at this

14  point I don't intend, unless somebody asks me to, to watch

15  more than the one minute that I think we're about to queue

16  up and watch right now.

17          If somebody wants me to watch more of it, then I

18  will specifically discuss later what I am excluding from my

19  consideration if I end up having to watch more.

20          All right.  Mr. Hautzinger, are you asking to

21  publish at this point?

22          MR. HAUTZINGER:  I'm asking to publish the one

23  minute -- it's a few minutes, but it's at the very start of

24  the interview.  And I'm asking to publish that now, Your

25  Honor.

1             THE COURT:  You may do so.

2             (Exhibit 13 played.)

3             (Playing of Exhibit 13 concluded.)

4             MR. HAUTZINGER:  Give me one second to reconnect

5   the Elmo.

6             THE COURT:  The record will reflect, as was taped,

7   that we watched a minute or two of a cutout that was also

8   displayed on the video screen with both an initial intro by

9   the interviewer, and then Mr. Lesh on video himself.

10      Q    (By Mr. Hautzinger)  Okay.  I think you've already

11  testified to this, but just in case, I'm going to ask:  Have

12  you, in fact, reviewed the entirety of the article that was

13  published in the New Yorker in considerable detail?

14      A    I have.  I have read the article.

15      Q    And does it contain multiple statements from Mr.

16  Lesh that are directly relevant to this prosecution?

17            MR. FADDIS:  Objection; calls for a legal

18  conclusion.

19            THE COURT:  Mr. Hautzinger?

20      Q    (By Mr. Hautzinger)  Does it contain multiple

21  statements that pertain to this case?

22            THE COURT:  All right, I'll sustain the objection.

23            And the next question, go ahead.

24      Q    (By Mr. Hautzinger)  Does it?

25      A    Yes.

1        Q    Does it contain a specific statement about the

2    Keystone photos?

3        A    I believe it does.

4        Q    And is that statement, quote, He posted a couple

5    of photos of him snowmobiling off a jump in a closed terrain

6    park at the Keystone Ski area, which, like Breckenridge, is

7    operated by the company that owns Vail Ski Resort on land

8    belonging to the Forest Service.  Lesh wrote, "Solid park

9    sesh, no lift ticket needed."

10        MR. FADDIS:  Objection, Your Honor.  This is

11    absolutely hearsay.  It's not an admission of a party

12    opponent.  This is the author's own interpretation of

13    something that he believes happened.  It's not a direct

14    quote from Mr. Lesh.  It's not in quotation marks.

15        THE COURT:  Mr. Hautzinger, let's go specifically

16    to what page of the article we're talking about, so we're

17    clear for the record, please.

18        MR. HAUTZINGER:  Oh, I'm sorry.

19        THE COURT:  No problem.

20        MR. HAUTZINGER:  (Inaudible - away from

21    microphone).  It is -- I'm sorry, my version isn't numbered.

22    So it's one, two, three --

23        THE COURT:  Yeah, just counting from the

24    beginning --

25        MR. HAUTZINGER:  Page 7.

 1            THE COURT:  Page 7?  All right.

 2            MR. HAUTZINGER:  The middle of the paragraph

 3    starting with:  The charges at hand to do -- had to do

 4    with --

 5            THE COURT:  Okay.  And so --

 6            MR. FADDIS:  And my apologies -- oh, I'm sorry.

 7            THE COURT:  Give me a moment.  Let's just identify

 8    exactly which statements we're referring to here.

 9            Which statement are you highlighting, Mr.

10    Hautzinger?

11            MR. HAUTZINGER:  I was highlighting -- he posted a

12    couple of photos of him snowmobiling off a jump in a closed

13    terrain park at the Keystone Ski area, which, like

14    Breckenridge, is operated by the company that owns Vail Ski

15    Resort on land belonging to the Forest Service.

16            Lesh wrote:  "Solid park sesh, no lift ticket

17    needed, #fuckvailresorts."

18            MR. FADDIS:  And my apologies, if I may have some

19    further guidance as to where within the article this is.

20            THE COURT:  Sure.

21            MR. FADDIS:  (Inaudible) just look at --

22            THE COURT:  Yeah, I'm on page 7 --

23            MR. HAUTZINGER:  It's page 7.

24            THE COURT:  And the paragraph that starts:  "The

25    charges at hand" which is about -- oh, maybe a little more

1    than a third -- almost halfway down the page.  The third

2    full sentence in there starts, "He posted" -- I want to --

3    give me a moment here, I want to --

4              MR. FADDIS:  Okay.  I found it.  Thank you, Your

5    Honor.

6              THE COURT:  Okay.  Give me a moment.  I want to

7    read the context around that.

8              All right, Mr. Hautzinger.  So what's your

9    arguments in terms of this statement, please.

10             MR. HAUTZINGER:  My argument is that the defendant

11   specifically adopted the entirety of this article when he

12   told the interviewer everything he said is true and fair.

13   You have the author mischaracterize the information that Mr.

14   Lesh has shared with him by saying he posted those photos,

15   or that -- when, in fact, he didn't, Mr. Lesh would not have

16   gone on YouTube and said everything he said was true.

17             THE COURT:  Mr. Faddis?

18             MR. FADDIS:  Your Honor, I don't think that Mr.

19   Lesh expressly stated that everything in the New Yorker

20   article is true.  But what the Government seems to be

21   relying on is some flippant remark during a Vance Crowe

22   podcast -- certainly not a statement made under oath or in

23   court.

24             And he's -- this is one reason I didn't want the

25   entire article to be admitted, because this is clearly just

1   the author's opinion as to what happened.  It is -- it

2   doesn't cite to some statement made by Mr. Lesh on which

3   this passage relies.  It doesn't do anything like that.

4           It simply is the author's opinion as to what

5   happened.  That is -- there's a foundation issue.  There's

6   hearsay.  There's all sorts of issues.  And it's not an

7   admission by a party opponent.

8           In no way did Mr. Lesh somehow give credence to

9   every single word of this eight-page article.  That

10  suggestion is completely untenable.

11          THE COURT:  Mr. Hautzinger?

12          MR. HAUTZINGER:  "Nothing he said was untrue or

13  unfair."  Defendant's words.  I think that adopts the

14  entirety of the article, Your Honor.

15          THE COURT:  All right.  Give me just a moment

16  here, please.

17          MR. FADDIS:  And if I may when Your Honor is

18  ready?

19          THE COURT:  Sure, go ahead.

20          MR. FADDIS:  The Government is only presenting the

21  first few words of that minute-long statement.  Other

22  portions of that statement says:  "But it only captures one

23  aspect of me, or one part of my life, one part of our

24  marketing, one part of my company.  It's relatively

25  one-sided."

1          The statement alone, "It's relatively one-sided"

2    indicates that Mr. Lesh is not adopting every single word in

3    this eight-page article.

4          THE COURT:  All right.  So first, in terms of the

5    idea that --

6          MR. HAUTZINGER:  May I add one more thing, Your

7    Honor?

8          THE COURT:  Oh, you may.  Go ahead.

9          MR. HAUTZINGER:  I think all the arguments defense

10    counsel makes are somewhat legitimate, but they go to

11    weight, not admissibility.

12          The Court is entirely capable of parsing whether

13    this is something that the defendant would have denied if it

14    wasn't true.  But given the global nature of the statement

15    he made in the interview, I think the Court should be

16    considering the entirety of relevant statements in the

17    article.

18          THE COURT:  So in terms of the argument which Mr.

19    Hautzinger essentially addressed here at the end and I'll

20    start with, that the article shouldn't have been admitted,

21    because it contains a lot of other information.  This is a

22    good example of that, and the Court is perfectly capable of

23    sorting those issues out so that the original ruling stands

24    that the argument -- or that the entirety of the article was

25    being admitted.

1          Looking at Rule 801, statements that are not

2    hearsay are essentially those made by the plaintiff or

3    opposing party under certain circumstances, which can

4    include a defendant.

5          Here the issue is that, at least as to the

6    author's writing:  He posted a couple of photos of him

7    snowmobiling off a jump in a closed terrain park at a

8    Keystone area, which, like Breckenridge, is operated by the

9    company that owns Vail Ski Resorts on land belonging to the

10   Forest Service.

11          It isn't clear whether Mr. Lesh later said that it

12   was true or not; it isn't clear that Mr. Lesh said that.

13          That could have been research that the author came

14   up with.  It could have been something that Mr. Lesh told

15   the author during the course of the interview.  But at least

16   at this point, it's not attributed to Mr. Lesh.

17          So that statement, I won't consider a statement of

18   the defendant in -- with exception to the hearsay, because

19   it isn't clear whether he ratified it and said it's true or

20   not is not the issue.  The issue is whether it's excludable

21   hearsay.  And I can't find, based off the information that I

22   have at this point, that Mr. Lesh actually said that.

23          MR. HAUTZINGER:  And you wouldn't find that he

24   adopted it by saying that "everything in the article is

25   true," Your Honor?

1        THE COURT:  Well, the fact that he adopted it

2   doesn't mean he said it.

3        MR. HAUTZINGER:  Well, I'm not offering it for

4   that, Your Honor.

5        THE COURT:  Sure.

6        MR. HAUTZINGER:  Okay.

7   Q    (By Mr. Hautzinger)  Later in the article -- Agent

8   Leach, give me a second to pull these out highlight them in

9   the article itself.

10        Did the defendant -- did the author -- did the

11   author write, quote:  Lesh wrote, in a new post, quote --

12   and this is a quote of the defendant --

13        THE COURT:  I'm sorry.  Can you tell me -- give me

14   a moment, Mr. Hautzinger.  Before we do that, where are we

15   -- just so I'm looking at what you're looking at.

16        MR. HAUTZINGER:  I'm -- okay.  I need a minute.

17   I'm sorry, Your Honor.

18        THE COURT:  No problem.  Give me a moment before

19   you go on.  I want to go back and look at one other thing.

20        Can we go ahead and watch the video exhibit,

21   briefly, again, please.

22        MR. FADDIS:  Oh, Lord.

23        THE COURT:  And I need to -- I'm going to have my

24   Clerk take a look at something here in the meantime,

25   Katelyn, I'm going to send you something here.

1             Were you able to get that, Ms. Grimmer?

2             Oh, you might be on mute -- and just so there's --

3    oh, you got it.  Okay.  Just so there's no confusion about

4    what I'm doing, my --

5             MS. GRIMMER:  Can you hear me?

6             THE COURT:  Yep, I hear you.  Great, I think I saw

7    your response.  Yeah, just so we're clear:

8             What's going on --

9             MS. GRIMMER:  Okay.  Great.

10            THE COURT:  -- behind the curtain:  The Court's

11   Clerk sits in Denver.  So that's who I was texting for some

12   legal research here as we were going along.

13            All right.  Go ahead, Mr. Hautzinger, whenever

14   you're ready.

15                 (Playing of Exhibit 13 starts.)

16            MR. FADDIS:  Oh, no.  Your Honor, this is --

17            MR. HAUTZINGER:  I hit the wrong button.

18   Disregard this.

19                 (Playing of Exhibit 13 stops.)

20            THE COURT:  I'm not worried about that, Mr.

21   Faddis.  I understand that this is not the clip we were

22   looking for.  I'm not watching the whole video.  I just want

23   to see the actual language of the clip.

24                 (Playing of Exhibit 13 starts.)

25                 (Playing of Exhibit 13 stops.)

```
 1              THE COURT:  All right, thank you.  Give me a

 2     moment.  I -- let's take about a five-minute recess and

 3     we'll be back together.  I think we need to resolve this

 4     before moving on, because it's an issue that's going to flow

 5     through to other things and we'll be back together here

 6     momentarily.

 7              Thank you.

 8              (Recess from 11:20 a.m. to 11:31 a.m.)

 9              THE COURT:  All right.  We are back on the record

10     after taking a break for -- we're back on the record after

11     taking a break.

12              I had previously ordered that the statement found

13     on page 7 of the article, which is Exhibit 9, was not

14     admissible based on, essentially, the circumstance that the

15     Court couldn't tell from that statement whether it had been

16     made by Mr. Lesh, essentially that it had not been directly

17     attributed to Mr. Lesh.

18              The Government had propounded, although -- not

19     explicated on, but certainly propounded the argument that

20     there was an adoption of that statement.

21              Upon further review, I believe that my ruling on

22     that point was wrong, and I'm reversing that ruling, and

23     I'll go through why.

24              Looking at 801(d)(2)(b), a statement is not

25     hearsay if a defendant has manifested an adoption of its
```

1   belief or truth.  The closest case on point is US v.

2   Harrison, 296 F.3rd 994, which cites to Bourjaily vs. United

3   States, 483 US 171.  Looking at the Harrison case,

4   particularly at page 1001, it discusses Rule 801(d)(2)(b) in

5   terms of a statement not being hearsay under the rule if

6   there's a manifestation of adoption.  It all -- and it

7   appears to set forth a couple-part test.  Part 1 would be

8   whether there has been some kind of notice to the defense by

9   way of production or otherwise.

10          Here, there clearly was.  This article was listed

11  on the Government's exhibit list in advance, and so was the

12  video.  So the defense was aware.

13          In terms of Part 2, I have to determine whether,

14  by a preponderance of the evidence, there has been an

15  adoption of the belief or truth of the statement based on an

16  observation of Exhibit, I believe it was 13, which is the

17  clip that has been shown twice at this point in time from

18  the YouTube podcast.

19          I do believe that by a preponderance of the

20  evidence, the defendant has manifested an adoption or belief

21  in the truth of the statements set forth in the article.

22          So of course, it will be subject to further

23  cross-examination, but I am reversing my earlier ruling and

24  the Government proceed as if those were statements of a

25  party opponent.

1          All right, Mr. Faddis?

2          MR. FADDIS:  Your Honor, may I briefly place

3   something on the record --

4          THE COURT:  Sure.

5          MR. FADDIS:  -- with respect to the Court's sua

6   sponte reversal of its own ruling?

7          So just to be clear:  The video -- the interviewer

8   asks something to the effect of, Does this article

9   adequately capture who you are?  So it's extremely broad.

10  Mr. Lesh does say -- it's -- something to the effect was,

11  Nothing said was untrue or unfair.  But then he later says,

12  "It's relatively one-sided and it does not, obviously,

13  capture me or my life."

14         So I just wanted to make sure that the record was

15  clear on that.  Thank you.

16         THE COURT:  Okay.  And the record is clear and

17  that is the subject to cross-examination portion of it,

18  because, of course, everything is subject to

19  interpretation.  And you'll have an opportunity to

20  cross-examine.

21         Mr. Hautzinger?

22         MR. HAUTZINGER:  Your Honor, do you still have the

23  article in front of you?

24         THE COURT:  I do.

25         MR. HAUTZINGER:  There is one more specific

1   statement I intend to have Special Agent Leach highlight.

2   It's in that same paragraph that we were looking at in the

3   middle of page 7.

4          THE COURT:  All right, go ahead.

5          MR. HAUTZINGER:  I tell you that in advance so

6   that yourself and counsel are aware of it.

7          THE COURT:  I appreciate that.

8      Q   (By Mr. Hautzinger)  Agent Leach, did the article

9   also say -- the -- the author wrote, quote, Lesh wrote, in a

10  new post, quote --

11         MR. FADDIS:  And I would object -- my apologies.

12  I don't mean to interrupt.

13         But I would object under the best evidence Rule

14  1001, 1003.  This is referencing some separate writing about

15  which there is no agreement as to the content of that

16  writing.

17         If the Government wants to present this, they have

18  to present the original writing and not some recapturing of

19  that writing in some later article.

20         THE COURT:  Mr. Hautzinger?

21         MR. HAUTZINGER:  I disagree with that argument,

22  Your Honor.

23         THE COURT:  Yeah.  It's a quote attributed to Mr.

24  Lesh, which is coming in under -- purportedly under a

25  manifest adoption, I don't find that the best evidence rule

1   is appropriately applied in this circumstance.

2          Mr. Hautzinger?

3      Q    (By Mr. Hautzinger)  Agent Leach, did the author

4   wrote -- write, quote:  Lesh wrote in a new post, quote,

5   those money hungry halfwits decimate wilderness around the

6   world, build lifts, lodges, and resorts, and treat their

7   customers and employees like shit.  People flock by the

8   millions and pay $200/day to ski there.  I post a picture

9   harming no one.  Everyone loses their minds?

10      A    Yes, that was in the article.

11      Q    And have you actually personally witnessed an

12  Internet posting from the defendant with that language in

13  it?

14      A    I believe I did.

15      Q    And was that just recently, on August 3rd?

16      A    I don't know if that was the August 3rd language

17  or not.

18      Q    Oh, no.  Was that -- that -- might you have

19  witnessed that closer to when you were investigating the

20  actual YouTube video?

21      A    I'm sorry.  What was that?

22      Q    Was that related to the unofficial networks

23  posting?

24      A    I believe that was.

25      Q    And did you see that yourself?

1        A    Yes.

2        Q    Okay.

3             Elsewhere in the article, did Mr. Lesh claim that

4    the Hanging Lake and Maroon Lake photos were fake; that he

5    had photoshopped them?

6        A    I believe that's discussed in there.

7        Q    And did he state that his business, Virtika's

8    sales had gone up by 30 percent since he started posting

9    these?

10       A    I believe so --

11            MR. FADDIS:  I'm sorry to interrupt.  I would

12   object under the rule of completeness and that that is not

13   an accurate recitation of what quote states.

14            THE COURT:  All right.

15            MR. FADDIS:  And if I may get to that --

16            THE COURT:  Let's go to the exact quote just so

17   we're clear what we're talking about for the record.

18   Somebody has a -- I know it's not numbered, but just in --

19   sequentially, if somebody can direct me to the right page,

20   that'd be great.

21            MR. FADDIS:  And if I may, Your Honor.

22            I -- my copy is paginated differently than the

23   prosecution's, but I believe the paragraph starts with, "For

24   lunch," it's approximately four pages in, at least on my

25   copy.

1          THE COURT:  Okay.  Give me a moment.

2          MR. FADDIS:  I would further note that this is

3    another paraphrase about which we don't know the

4    reliability.

5          THE COURT:  All right.  I'm finding the paragraph,

6    in the count just so we're clear, and I'll be going off of

7    my exhibit, which I understand might be paginated different

8    than others.

9          So on the top of the 10th page, I have a paragraph

10   that starts, "For lunch."

11         Is that the paragraph, Mr. Hautzinger?

12         MR. HAUTZINGER:  It is, Your Honor.

13         THE COURT:  Okay.  So what quote in there are we

14   looking at?

15         MR. HAUTZINGER:  I was specifically talking --

16   well, I'll read the entire sentence, Your Honor, and you can

17   decide.

18         It's the third sentence, quote:  Lesh declined to

19   reveal Virtika's annual sales, though he claimed they were

20   up 30 percent since he posted the photo at Hanging Lake.  He

21   said he owns the company outright and carries very little

22   debt.

23         THE COURT:  All right.  So what's the Government's

24   proposition for admitting that statement, essentially as a

25   party opponent, and the relevance of it?

1          MR. HAUTZINGER:  It's a party-opponent statement,

2     Your Honor.  And the relevance is at -- under Count 2, that

3     why the defendant is doing this -- he's doing these postings

4     to increase his business sales, and doing work activities,

5     and offering for sale merchandise without authorization.

6          THE COURT:  Mr. Faddis?

7          MR. FADDIS:  Your Honor, I would just state that,

8     again, it's only relevant if Mr. Lesh conducted some

9     activity upon the lands that are administered by the United

10    States Forest Service.

11         It seems like the proposition that the Government

12    doesn't disagree with is that this post was fake, and that

13    he was never upon those lands.

14         And so simply saying this defendant does a post

15    and thinks it may have affected his business, that's not

16    relevant.  That's not narrow enough with respect to the

17    language of Count 2.

18         THE COURT:  All right.  Well, there was an earlier

19    argument, which I'm not sure is still being propounded, but

20    I'll be clear for the record, in terms of whether this

21    statement was a statement that Mr. Lesh made and was

22    manifested adoption, I'm allowing it on that basis, to the

23    extent it was objected to.

24         As to the next objection, which kind of is an

25    ultimate argument objection that circularly argues that

1    because, essentially, Mr. Lesh is argued to have potentially

2    doctored photos, and thus that evidence doesn't -- isn't

3    competent evidence to prove beyond a reasonable doubt Count

4    2, well, that's what we're here to decide.

5         So I am going to allow the evidence.  I do find

6    that it's relevant.  I'm not saying, at this juncture, of

7    course, in any way, that it leads the Court one way or

8    another; but the Government's entitled to present its case.

9    And you can depose that at the appropriate time, in the

10   appropriate fashion.

11        So the objection's overruled.

12   Q    (By Mr. Hautzinger)  Agent, I just asked you about

13   the defendant's claim that -- in the article that both the

14   Hanging Lake photo and the Maroon Lake photo were fake, and

15   that he had photoshopped them.  Do you recall that?

16   A    Yes.

17   Q    Is there any claim in that article, anywhere, that

18   the Keystone photos were photoshopped?

19   A    No, I don't believe so.

20   Q    Have you and your law enforcement partners

21   attempted to investigate and try to disprove the defendant's

22   allegations of photoshopping with respect to either Maroon

23   Lake or Hanging Lake?

24   A    We have looked into those, but I -- not been able

25   to find --

111

1      Q    You testified earlier that Officer Mandrake had

2  gone to Maroon Lake and made observations that were

3  inconsistent with that photograph?

4      A    That's correct.

5      Q    Would -- I think it's Government's 11,

6  specifically the water level, the lack of debris in the

7  lake?

8      A    That's correct.

9      Q    With respect to the Hanging Lake photo, have you

10  found evidence, one way or the other, that would prove or

11  disprove the claim that it was photoshopped?

12     A    I can't conclusively say, one way or the other,

13  that it was photoshopped.

14     Q    Is there anything you're aware of in the entirety

15  of this investigation that is comparable to what you know

16  about the Maroon Lake photo to corroborate the claim of

17  photoshopping in that photo to the Hanging Lake photo?

18          And that's a really bad question.  Do you

19  understand?

20     A    I -- I believe so.  Are they -- reflections in the

21  water appear to be accurate and genuine from my view.

22     Q    And that's the Hanging Lake photo?

23     A    Yes, there's reflections in that as well.  But,

24  again, I'm -- I'm not a -- you know, that's -- that's just

25  my -- that's my opinion.

1      Q     That's your observation as a human being, based on

2    life experience; not as an expert or anything, correct?

3      A     That's correct.

4      Q     Whereas the Maroon Lake photo, we have specific

5    evidence that tends to corroborate the claim that it's

6    photoshopped, correct?

7      A     That's correct.

8            MR. FADDIS:  Objection.  Leading.

9            THE COURT:  I'm going to allow it for purposes of

10   gravity here.

11     Q     (By Mr. Hautzinger)  That's correct, you said?

12     A     That's correct.

13     Q     As a result of our inability to disprove the

14   defendant's claim that Hanging Lake was photoshopped, and as

15   a trained law enforcement officer, you know we would have to

16   disprove that beyond a reasonable doubt, correct?

17     A     That's correct.

18     Q     As a result of our inability to disprove that, was

19   a collective decision made to dismiss the Hanging Lake

20   charges?

21     A     That's correct.

22     Q     And instead, to pursue a superceding information

23   focusing on Keystone and merchandise sales between April 24

24   and October 21, 2020?

25     A     That's correct.

113

1      Q    And as a result of that, was a collective decision

2  made to pursue a superceding information?

3      A    Yes.

4      Q    And was that filed on -- on February 10th of this

5  year?

6      A    I -- I believe so.

7      Q    You've already testified that you've made some

8  additional observations of the defendant's Instagram

9  activity just recently -- just two days ago, I believe,

10  right?

11      A    That's correct.  The 3rd, I believe.

12      Q    In reviewing his Instagram activity, does he

13  continue to make comments relating to Hanging Lake and

14  Keystone?

15      A    The images are there, and there's comments from

16  other individuals.  It's -- it's still an active site with

17  the Hanging Lake photo that I saw there, and then a photo

18  from the Keystone incident, and then --

19      Q    I'm going to put up what's been marked as

20  Government's Exhibit 10.  Can you tell the Judge what

21  Government's Exhibit 10 is.

22      A    Yes.  That would be a, like a rendition of his

23  Instagram account that I -- one aspect of it.  And it shows

24  a -- a recently posted picture, it looks like, from CBS News

25  4 in Denver, concerning the Hanging Lake becoming murky and

114

1    -- it looks like it's filled with some type of

2    sedimentation.

3        Q    And does the defendant, David Lesh, add the

4    comment: "Really puts into perspective the insignificance

5    of a few photoshopped those on a log.  The citizens of

6    Colorado should demand federal charges be brought against

7    the Forest Service for failing to protect -- protect this,

8    quote, fragile ecosystem?

9        A    Yeah, I'd have to look at it in a little bit finer

10   detail, but I believe that.  It's hard for me to see the

11   actual wording on my screen.

12           Can I look at your copy --

13       Q    Oh, sure.

14       A    -- if you don't mind?

15           MR. HAUTZINGER:  Can I approach, Your Honor?

16           THE COURT:  You may.

17       A    Thank you.  Yes, that's -- I believe, the wording

18   there.

19       Q    (By Mr. Hautzinger)  Page 2 of Exhibit 10, also  a

20   posting from the defendant's Instagram.  That is the story

21   from the Vail Daily about the Government having dropped the

22   five charges relating to Hanging Lake?

23       A    Yes.

24       Q    And does that have a comment from the defendant:

25   Felt cute, might delete later?

1          MR. FADDIS:  And I would object at this -- on

2     these grounds as to relevance.  And also 403.  I know it's

3     a Court trial, but what in the world does that have to do --

4          THE COURT:  You know it's a what?  I didn't hear

5     that.

6          MR. FADDIS:  Oh, I know it's a Court trial, Your

7     Honor.  But, you know, what in the world does this have to

8     do with whether he's guilty of Count 1, or Count 2?

9          THE COURT:  Okay.  Mr. Hautzinger, in terms of --

10     on page 2 of Exhibit --

11          MR. HAUTZINGER:  I'm not saying it goes to guilt

12     or innocence, Your Honor.  It's just that the defendant

13     continues to comment about this prosecution on Instagram.

14          THE COURT:  At least as to page 2, I don't see any

15     relevance to page 2.

16          MR. HAUTZINGER:  Sure.  I'll remove page 2 from

17     the exhibit.

18          THE COURT:  All right.  I'm going to just strike

19     through page 2.

20     Q    (By Mr. Hautzinger)  Page 3 of the exhibit, what

21     does that show?

22     A    I -- it appears to be the terrain park jump in

23     question earlier at Keystone.

24     Q    The same -- it -- it appears to be the same images

25     in Government's 1 and 2, I believe?

116

1        A    Yes, I believe.

2        Q    Has the defendant added some language there,

3    though?

4        A    There's a comment there under "David Lesh," it

5    says, Solid park sesh, no lift ticket needed,

6    #fuckvailresorts.

7        Q    And finally, page, now 3 of the exhibit,

8    contemporaneous as of this Wednesday morning, he still has

9    the Hanging Lake photo posted to his account?

10       A    Yes.  I noticed that photo on the -- the 3rd of --

11   of August.

12            MR. HAUTZINGER:  Your Honor, I'd move for the

13   admission of Government's Exhibit 10, a now three-page

14   document.  I'll remove the Vail Daily article.

15            THE COURT:  All right.  I'm just going to remove

16   that page just so we're clear for later purposes, such as

17   appeal.  So that page will essentially be removed.

18            So, Mr. Faddis, as to the motion to admit the now

19   3 page exhibit?

20            MR. FADDIS:  Yes, Your Honor.  Defense has no

21   objection to page 1 being admitted.

22            THE COURT:  Okay.

23            MR. FADDIS:  Page 2 has been stricken.  And the

24   new page 2, we would object to that as cumulative.  It's

25   literally the exact same image and caption as the

1    Government's 2, I believe.

2              THE COURT:  It's not.  There's an additional --

3    clear addition, the "#fuckvailresorts."

4              MR. FADDIS:  Well --

5              THE COURT:  So with that in mind, what's your

6    argument in terms of cumulative?

7              MR. FADDIS:  Oh, my apologies.  I didn't see that

8    addition.

9              Yeah.  It -- being that the -- essentially this

10   one has already been admitted, I've got no objection to

11   admitting that one.

12             THE COURT:  Okay.  And as to the now third page

13   with regard to Hanging Lake?

14             MR. FADDIS:  Your Honor, I would object, based

15   largely off of my prior record that we don't believe it's

16   relevant.  There's nothing commercial about this photo

17   whatsoever, or this post.  It's simply, I think, an attempt

18   by the prosecution to make Mr. Lesh look like a bad guy.

19             These charges have been dismissed.  We object

20   under relevance grounds --

21             THE COURT:  All right, and --

22             MR. FADDIS:  -- as well as 404(b).

23             THE COURT:  Objection is overruled.  I have

24   previously ruled that, based off of the way that Count 2 is

25   charged, that the information with regard to Hanging Lake,

1    at least, is relevant to be admitted.  I'm not stating, at

2    this point, the time that it is persuasive.  That is for

3    another time and argument of the Government later in this

4    trial, but it is admissible.

5         So the objection as to the modified exhibit, which

6    is now a three-page Exhibit 10, is admitted.

7         (Exhibit 10 admitted.)

8         Mr. Hautzinger?

9    Q    (By Mr. Hautzinger)  Finally:  Agent Leach, you

10   had testified at the beginning of your testimony about

11   special authorization permits, and the steps that people

12   have to go through if they want to use federal lands to

13   promote their business.

14        Do you recall that testimony?

15   A    Yes, I do.

16   Q    So, hypothetically, if a person wanted to

17   legitimately and legally use or go onto US Forest Service

18   lands in order to create content meant to promote their

19   business or sales of their merchandise, what authorization

20   would legally be required first by the Forest Service?

21   A    It would be a special use authorization, or, in

22   this particular instance, maybe specifically a commercial

23   filming permit.  There's a whole various -- there's lots of

24   different types of special use authorizations that are

25   granted by the Forest Service for precisely what you're

119

1    talking about.

2         Q    To the best of your knowledge, has David Lesh ever

3    made any such application?

4         A    No.

5         Q    And has any authorization ever been given to David

6    Lesh?

7         A    Not that I'm aware of.

8              MR. HAUTZINGER:  I have no further questions, Your

9    Honor.

10             THE COURT:  Mr. Faddis, do you want to

11   cross-examine now, or do you want to do it after -- start

12   after lunch?

13             MR. FADDIS:  Your Honor, not to be difficult, but

14   I think the cross-examination might be rather lengthy --

15             THE COURT:  Okay.

16             MR. FADDIS:  -- and so if the Court is okay with

17   it --

18             THE COURT:  I'm fine with it either way.  That's

19   why I asked.

20             MR. FADDIS:  I appreciate it, Your Honor, and we

21   prefer to start after lunch.

22             THE COURT:  Okay.  Hour and 15 minutes enough for

23   everybody for lunch?  We'll start at 1:15.

24             MR. FADDIS:  It's fine for defense.

25             THE COURT:  Yeah.  So we'll be back together then

1    at 1:15.

2              Thanks, we'll be in recess.

3              (Recess 11:55 a.m. to 1:16 p.m.)

4              THE COURT:  All right.  Now we're back on the

5    record and all of the parties are back with us.  And,

6    counsel, and we are ready for a cross-examination of Special

7    Agent Leach, who is still on the stand and still under oath.

8              So Mr. Faddis, you may proceed.

9              MR. FADDIS:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. FADDIS:

12        Q    Good afternoon, Special Agent Leach.

13        A    Good afternoon.

14        Q    So I want to first talk about those special use

15   permits that you discussed on direct examination.

16             So, essentially, what you were saying is that if

17   someone wanted to conduct business activity on the United

18   States Forest Service land, they would have to apply for a

19   special use permit for that purpose, correct?

20        A    For specific uses.  So there's a various --

21   various types of permits of varying degrees of -- of

22   business size and activities, as you can imagine, on public

23   lands, being a pretty diverse landscape.

24        Q    Understood.  But if someone had no intention of

25   conducting business activity on such lands, they would have

121

```
 1   no reason to apply for the -- such a permit, would you

 2   agree?

 3       A    At the -- at the -- like at the time of --

 4            THE COURT:  Hold on --

 5       A    -- doing something and then later on using it --

 6            THE COURT:  Hold on just a moment.  Okay.  Yes, I

 7   need to have you stay at a microphone.  We weren't picking

 8   you up.

 9            MR. FADDIS:  Yes, Your Honor.  My apologies.

10            THE COURT:  Why don't I have you back -- I'm going

11   to have you back up a question just so -- did we get that

12   question or not?

13            Okay.  Let's just back up a question just to make

14   sure we're making a good record.

15            MR. FADDIS:  Yes, sir.  My apologies.

16            THE COURT:  Nope, no problem.

17       Q    (By Mr. Faddis)  Special Agent Leach, so if -- if

18   someone had no intention of conducting business activities

19   on such lands, they would have no reason to apply for such a

20   permit, correct?

21       A    I suppose.

22       Q    Okay.  And -- and -- and if they, in fact, did not

23   conduct any business activity on such lands, they would have

24   no reason to obtain a permit for that -- for that purpose,

25   correct?
```

122

1       A    If they didn't conduct business activities --

2       Q    They wouldn't need a permit for it, right?

3       A    Depending on what -- yeah, that definition would

4  be.  Yeah.

5       Q    Okay.  Well -- well, it sounds like you know the

6  definitions, don't you?

7       A    Well, like I said, there's probably hundreds, if

8  not thousands, of potential uses of public land for

9  commercial uses.  So there would be a sliding scale of

10  analysis and/or, you know, application, and/or requirement,

11  depending on what it is.

12      Q    I see.  And -- and so you mentioned that you

13  reviewed Mr. Lesh's Instagram account, correct?

14      A    I -- I did.

15      Q    And do you personally have an Instagram account?

16      A    I do not.

17      Q    Okay.

18      A    Well, actually -- pardon me.  Let me back up.  I

19  -- I do now.

20      Q    You do?  Okay.  Got it.

21       So you're reasonably familiar with how Instagram

22  works, correct?

23      A    Reasonably.

24      Q    Okay.  Have you heard of the term "influencer"?

25      A    Yes, I have.

1     Q    What is your understanding of that term?

2     A    It's -- my understanding is that an influencer

3  would be an individual that could potentially monetize

4  exposure -- kind of like branding, if you will.  If you have

5  X number of followers, potentially, there's a way of -- of

6  monetizing that to your advantage.

7     Q    Is it your contention that when any influencer

8  posts a photo on US Forest Service land, that that runs

9  afoul of Count 2 in this superceding information?

10          MR. HAUTZINGER:  I'm going to object, Your Honor.

11  That calls for a legal conclusion.

12          THE COURT:  I'm going to allow it for purposes of

13  exploring this line of questioning, with the understanding

14  that the ultimate decision -- because I think it goes to how

15  we got here in this investigation.

16          The ultimate decision, of course, will be made by

17  the Court here in terms of what constitutes use --

18  essentially commercial use, for a lack of a better term at

19  this point.  You may proceed.

20     A    I believe the question -- I believe it would

21  depend on what type of industry, or how large that

22  influencer would have a business, or an influence, if you

23  will, on any given type of use.

24     Q    (By Mr. Faddis) So --

25     A    If that makes -- if that makes sense.  Does that

124

1    -- does that clarify it?

2         Q    Well, let me -- let me try to clarify.

3              So if an influencer has extensive following, is it

4    your contention that that makes it more likely that some

5    post on US Forest Service land would constitute prohibited

6    business activity?

7         A    Potentially.  Depending on, again, a size -- if

8    you have, you know, an average member of the public that had

9    1000 followers, maybe that wouldn't count.  But if you had

10   somebody that had significant influence and/or business

11   associated with that, that could rise to a -- a higher

12   threshold, if that makes sense, for determining from an

13   agency administrative standpoint that that's business

14   versus, you know, I was out on the weekend and I snapped a

15   picture and put it on my account, if that makes sense.

16        Q    Okay.  So if someone had a snowmobiling retail

17   company, for example, and they were an influencer, and they

18   posted a photo on US Forest Service land, would that

19   constitute business activity in a prohibited fashion?

20        A    I'm sorry, a snowmobile company?

21        Q    Yes, sir.

22        A    If -- if --

23        Q    If the influencer also owned a snowmobile company?

24        A    If it was directly related to the company, I could

25   see how that could be an issue --

125

1       Q    I see.  But -- but if it wasn't directly related

2   to the company, it wouldn't be an issue; would you agree?

3       A    It would, again, be kind of a sliding scale.  If

4   it was something for -- just purely their personal usage and

5   was not tied into their company or business associated with

6   the public lands, that may be one thing.  But if it was

7   reasonable that that would be connected to their brand

8   and/or business, I think that would be something else.

9       Q    I see.  So -- so if the photo was -- photo was --

10  was essentially for personal usage, and did not relate to

11  their company, then that would not constitute prohibited

12  business activity on such lands?

13      A    Or if it was a separate website, something of that

14  nature where it was clearly delineated as a separate type of

15  non-commercial use.  You know, this landscape is changing in

16  this country.  You know, the use of social media and the

17  ability to monetarily benefit from it is changing, but,

18  hopefully, I can articulate it at.

19      Q    Understood.  Okay.

20           I want to transition now and talk about the Maroon

21  Lake event, or alleged event, that was referenced with

22  respect to October 2020, okay?

23           So you're aware of the photo posted to Mr. Lesh's

24  Instagram that appears to show Maroon Lake, correct?

25      A    I am.

1      Q     And -- and your agency further investigated that

2   photo, right?

3      A     Yes.

4      Q     In fact, I think you said that Officer Mandrake

5   actually went out to Maroon Lake, and -- and tried to

6   further the investigation, correct?

7      A     That's correct.

8      Q     And -- and what Officer Mandrake found was that

9   the ecological status of Maroon Lake was not consistent with

10  what was depicted in Mr. Lesh's Maroon Lake photo, correct?

11     A     I -- I wouldn't say "ecological status."  I would

12  just say details that just weren't consistent.  Like that

13  avalanche debris that appeared to be missing, and then water

14  level.

15     Q     And --

16     A     Things of that nature that you could articulate,

17  or try to find a -- you know, try to look into.

18     Q     I see.  So I think what I hear you saying is that

19  it didn't appear as if that photo was taken at Maroon Lake

20  in October 2020, correct?

21     A     It may not have been.  I can't -- you know, one

22  way or the other, definitively, I guess give you a -- a more

23  definitive answer.

24     Q     Okay.  But -- but you firmly believe that Maroon

25  Lake photo to be fabricated, right?

1      A    I don't know either way.  The shadows look

2  authentic from the shadowing.  That's a -- clearly, I think,

3  a good photo if it isn't a genuine.  I just don't know,

4  so --

5      Q    Okay.  And you would agree with me that probable

6  cause is a relatively low standard, right?

7      A    I -- I don't know if I would say -- yeah.  I would

8  say that, yes.

9      Q    Okay.  And if you had probable cause to believe

10  that that photo was authentic and a bond violation, you

11  could have sought additional charges against Mr. Lesh,

12  couldn't you have?

13      A    I suppose.

14      Q    But you didn't, right?

15      A    Yeah, I don't believe so.

16      Q    Mr. Lesh wasn't charged with anything with respect

17  to this alleged Maroon Lake event, correct?

18      A    At this point, no.

19      Q    And -- and you don't have any definitive evidence

20  that he was ever at Maroon Lake with respect to that photo,

21  correct?

22      A    You mean other -- other things associated -- other

23  -- other than the photo?  You mean other evidence, like --

24      Q    Any -- any evidence.

25           I'm -- I'm saying:  Do you have definitive

128

1    evidence that Mr. Lesh was at Maroon Lake in October 2020?

2        A    I do not.

3        Q    I see.  I want to transition now to the Hanging

4    Lake event that was discussed.

5             So you mentioned that, as with the Maroon Lake

6    photo, you also do not know whether the Hanging Lake photo

7    is authentic, correct?

8        A    I do not, no.

9        Q    Okay.  So you can't say definitively that is

10   authentic?

11       A    That would be correct.

12       Q    Okay.  And -- and you have forensic measures that

13   law enforcement can take to assess the authenticity of a

14   photo.  Would you agree?

15       A    I guess it would depend on the severity of the

16   crime and/or the type of image.  It would be a number of

17   factors.  And again, I'm not a crime analyst or a -- you

18   know, I don't work at a -- at an analysis laboratory.  But

19   so, yeah, there would be different levels of capability, I

20   suppose.

21       Q    Okay.  But -- but let me just make sure I

22   understand.

23            So you could have enlisted an expert to

24   forensically analyze that photo, correct?

25       A    Somebody probably could have been found from one

129

1    agency or another, to a higher degree of analysis, I

2    suppose.  That's possible.

3        Q    Okay.  And -- and -- and you regularly work with

4    other agencies, right?

5        A    I do.

6        Q    Okay.  Like -- like the FBI, for example?

7        A    I guess you could say -- not regularly, but I do

8    work with other federal agencies.

9        Q    Okay.  And are you aware that the FBI has forensic

10   analysts who can analyze photographs and -- and draw

11   conclusions about them?

12       A    They probably do, I'm sure.

13       Q    But that wasn't done here, correct?

14       A    No.

15       Q    And it wasn't done with respect to the Maroon Lake

16   photo either, right?

17       A    No.

18       Q    Okay.  I want to talk also about the New Yorker

19   article.

20            So we discussed some passages within that article.

21   Do you recall those?

22       A    Yeah.  There's quite a few that were discussed

23   here in this magazine.

24       Q    Right.  But -- but it's fair to say that you

25   weren't personally privy to any conversation between David

1    Lesh and Nick Paumgarten, right?

2        A    I was not.

3        Q    So you -- so you don't know what, precisely, was

4    said by either party, correct?

5        A    If -- if it was -- yeah.  If it went one to

6    another, I was not there, I was not in that -- a party to

7    their conversations.

8        Q    Got it.

9             And in your experience in law enforcement, you'd

10   agree that it's not uncommon for an individual to be

11   misquoted in some kind of report, right?

12       A    In law enforcement, in general?

13       Q    Yes.

14       A    I'm sure people are misquoted, yes.

15       Q    Okay.  And -- and -- and that's not uncommon?

16       A    Well, in law enforcement, we just try really hard

17   to, when you write a report, especially with direct quotes,

18   be as accurate as you can, because it could be very damning.

19   But I'm sure there are issues.

20       Q    And -- and -- and in those instances, you put

21   those direct quotes in literal quotation marks in the

22   report, right?

23       A    Oftentimes, that can be the case.

24       Q    Okay, but -- but sometimes law enforcement will

25   paraphrase a statement from a witness, or a suspect, or

1    something like that?

2         A    Yeah, given whatever scenario.

3         Q    And -- and -- and you'd agree that that's

4    paraphrasing -- involves some level of interpretation,

5    right?

6         A    It would be based on the memory of an individual

7    -- yeah, if you were to paraphrase something, you would not

8    certify it as 100 percent accurate with regard to the exact

9    words used in the exact order.

10        Q    I -- I think what I hear you saying is that

11   paraphrasing can be inaccurate, correct?

12        A    Yeah, depending on what your interpretation of

13   accuracy is.  If it's just a general intent of the thought,

14   or if it was the exact, literal, you know, how many letters

15   or syllables and in what order.

16        Q    And you don't know in what format Mr. Lesh and

17   Nick Paumgarten were communicating, correct?  You don't know

18   if it was oral, or e-mail, or text, or something else?

19        A    Just from the context of reading the article, it

20   sounded like there was some face-to-face discussion -- time

21   spent in a face-to-face manner.

22             But other than that, I don't know specifically the

23   -- the layout of the interview, or the -- you know, the --

24   you know.  There's -- there's stuff there that I don't know.

25        Q    What measures did New Yorker journalist Nick

1    Paumgarten take to confirm the content of his article?

2        A    What -- what -- what -- I'm sorry, what was --

3    could you say that one more time?

4        Q    Yes, sir.

5             What measures did New Yorker author Nick

6    Paumgarten take to confirm the content of his article?

7        A    I don't know what he -- what measures he took.

8        Q    You don't know whether he took any measures to

9    corroborate the veracity of that content, correct?

10       A    Yeah.  Other than the fact that that's a -- a

11   major publication and it's a -- it's a very well-read

12   publication.

13       Q    Are you aware of any instances in which major

14   publications have gotten -- gotten it wrong?

15       A    I'm sure they have in the past -- in time.

16       Q    With respect to the Vance Crowe podcast -- if I

17   may have just a moment?

18            THE COURT:  Sure.

19       Q    (By Mr. Faddis)  So you saw that approximately

20   one-minute clip that the prosecution played and then entered

21   into evidence, that -- that shows Mr. Lesh's statements,

22   correct?

23       A    Yes, from the Vance Crowe podcast.

24       Q    Yes, sir.  And -- and -- and in one portion of his

25   statement, Mr. Lesh has something to the effect of:  Nothing

1   the journalist said was untrue or unfair.

2          Do you remember that?

3      A   Yes.

4      Q   Do you remember Mr. Lesh also saying that the

5   article was relatively one-sided?

6      A   Yes.  I believe that was the -- after the -- after

7   that.

8      Q   Do you remember at the end of that statement where

9   Mr. Lesh says something to the effect of:  It -- it does

10  not, obviously, capture me or my life?

11     A   Something to that nature.

12     Q   If -- if you heard such a statement, would you

13  conclude that the declarant was adopting the entire truth of

14  that eight-page article?

15         MR. HAUTZINGER:  Again, Your Honor, I'm going to

16  object.  It calls for a legal conclusion.  Inappropriate

17  question.

18         MR. FADDIS:  I think the door's been opened to

19  this line of questioning, Your Honor.

20         THE COURT:  Well, Mr. Faddis, how -- the statement

21  has been entered, but no other witness has been asked to

22  opine about it.  So how has that been opened?

23         MR. FADDIS:  Your Honor, so this witness has

24  already asserted that he believes Mr. Lesh has adopted the

25  entire article as truth.  And I think I'm allowed to

134

1    cross-examine as to whether he really believes that.

2         MR. HAUTZINGER:  That's simply untrue, Your Honor.

3    He did not make any such assertion.  That assertion has come

4    from the Government as part of our legal argument.  This

5    witness has opined -- made no opinions about the legality or

6    the adoption of the statement.  He has simply testified to

7    what was in the article.

8         THE COURT:  Objection sustained.  The witness here

9    was the introducing vehicle for the article and for the

10   tape, but didn't comment on whether he believed or didn't

11   believe the assertions therein.  That's fodder for argument

12   later, but not for opinion from this witness.

13        So the objection is sustained.

14        MR. FADDIS:  Understood.

15   Q    (By Mr. Faddis)  So the reciprocal of that is --

16   is you have no opinion as to whether Mr. Lesh has adopted,

17   in full, the veracity of that content?

18   A    Well, I think he would have any number of

19   opportunities to correct anything in that interview that

20   would have been inaccurate with regard to the Paumgarten

21   interview.

22        I mean, if there was something that was glaringly

23   bad in there, wouldn't you want to explain that, or further

24   flesh that out after it went to print?

25   Q    Well -- well, if a person is already facing

1   federal charges, you understand that they have a Fifth

2   Amendment right to not make any statements regarding that

3   case, correct?

4        A    That would be correct.

5        Q    Okay.  I want to turn now to your opinions

6   regarding the photos that were taken at the Keystone Ski

7   area.

8             Do you remember those photos taken by Mr. Ingham?

9        A    I -- I do.

10       Q    Okay.  And so just to clarify:  You -- you never

11   went to that area of the Keystone Ski Resort to investigate

12   the scene, correct?

13       A    No, I did not.

14       Q    Okay.  And -- and no one with whom you work at the

15   US Forest Service went to personally investigate the scene,

16   right?

17       A    I don't know if Jill went up there after the fact,

18   or if Todd just talked to him.  I don't know the exact

19   circumstances there.

20       Q    Okay.  Because I thought you testified that --

21   that you knew every aspect of the case?

22       A    It's a pretty broad case over a -- a long -- you

23   know, multiple years.  So I've --

24             THE COURT:  Mr. Faddis, let me back up for a

25   moment.

1              What, exactly, area of the Keystone Resort are you

2    referring to at this point?

3              MR. FADDIS:  Oh, my apologies, Your Honor.

4              I'm referring to the area where Mr. Ingham took

5    the photos.

6              THE COURT:  Which photos?

7              MR. FADDIS:  I believe that they were all taken in

8    relatively the same area on relatively the same run.

9              THE COURT:  Okay.  So we're talking about Ingham's

10   photos on -- at the terrain park?

11             MR. FADDIS:  Yes, Your Honor.  My apologies if --

12             THE COURT:  No problem.  Just wanted to make sure

13   we're clear for the record.  Go ahead.

14             MR. FADDIS:  Yes, sir.

15        Q    (By Mr. Faddis)  So -- so you're not aware of any

16   US Forest Service Agent -- or you can't definitively say

17   whether any US Forest Service Agent went to that area of the

18   terrain park at the Keystone Ski Area to investigate the

19   scene?

20        A    Yeah, I can't tell you that.  I -- I don't believe

21   that that -- somebody went up onto the hill, like, right

22   away.  If that makes sense.

23        Q    Okay.  So -- so you didn't go and personally

24   observe any -- what you believe to be snowmobile tracks?

25        A    I did not.  Due to the fact that we have huge

137

1    geographies, that's not out of the norm to, you know -- you

2    wouldn't drive, necessarily, five hours for every initial

3    report that would come in about any given issue --

4           Q    I see --

5           A    -- or --

6           Q    And -- and so your opinion on direct examination

7    as to the recency of those tracks was based on the photos

8    that Mr. Ingham took, correct?

9           A    Yes.  Those photos and -- yes.

10          Q    Okay.  And -- and -- and your opinion is only as

11   reliable as those photos are, right?

12          A    That seems logical.

13          Q    Okay.  Do you know what kind of camera Mr. Ingham

14   used to take those photos?

15          A    I couldn't tell you the make or model of that

16   camera.

17          Q    Do you know anything about, like, the lighting

18   settings on those cameras when -- when he took the photos?

19          A    I think one thing that was -- no, I don't know the

20   lighting settings.  I think one thing that was advantageous

21   was that snow reflects a lot of light, so it inherently

22   provides a good photo for, you know, definition, things like

23   that.

24          Q    But if the lighting settings on the camera had

25   been modified or augmented in some way, that wouldn't give a

1    true and accurate depiction of what those tracks look like?

2         A    Well, I guess it depends.  If it was a -- you

3    know, most modern phones, including iPhones and camera

4    phones, have very good quality imagery.

5              So I would think that this -- photos are pretty --

6    they're stand-alone photos.  I -- I couldn't tell you the --

7    yeah, the make or model.  But they seem to be relatively

8    clear and seem to have sufficient lighting and -- to depict

9    what I believe to be fresh tracks.

10        Q    Okay.  So -- so I'm confused, though.

11             Is it your contention that Mr. Ingham used an --

12   an iPhone or -- or a phone to take those photos, or a

13   camera?

14        A    Well, there are cameras that are integrated into

15   phones.  I mean, this is common knowledge and common usage

16   in today's world.

17        Q    Got it.

18        A    I doubt he probably had a Polaroid that you had to

19   shake in the air.  I mean things have changed, you know.

20        Q    Yeah.

21        A    They continue to change drastically.

22        Q    It sounds like you have no idea what kind of

23   camera Mr. Ingham used; is that correct?

24        A    That's correct.

25        Q    Okay.  And so you don't know whether there was

1    any, like, contrast setting on that camera, right?

2         A    I don't.

3         Q    You don't know whether there was any toggling of

4    the exposure setting on that camera, correct?

5         A    I -- I don't know that.

6         Q    How about the brightness or saturation on that

7    camera?  Do -- do you have any information about those

8    settings on the camera that was used to take these photos?

9         A    No, I do not.

10        Q    And you'd agree with me that those factors can

11   change how a photo looks?

12        A    Yeah, I would.  I -- I just don't know why he

13   would want to try to manipulate a photo you take from the

14   cab of your -- or presumably the cab of your snow machine.

15        Q    Even if he had no intention to manipulate it, he

16   may have been using a camera with settings that you're

17   unaware of, correct?

18        A    He -- he could have.  Yeah.  That's -- yeah.

19        Q    Okay.  And then you mentioned that your opinion is

20   based on, like, I think you said how the snow appeared to be

21   degraded by heat, or the lack of degradation; is that

22   correct?

23        A    Potentially something to that nature.  I could

24   explain it again if you'd -- if you want me to.

25        Q    Sure.  Yeah, go ahead.

1        A     You know, the sun and heat, at -- especially at

2   higher elevations, changes snow, changes the conditions, the

3   quality of the crystals quickly.  And so being that we're in

4   a relatively high-altitude state here, we get -- tend to get

5   drier snow than you would on the West Coast or even the East

6   Coast.  And it changes -- and by skiing, you know, most

7   folks that ski quite a bit do -- you pay attention to those

8   conditions, because it -- it means you have a good ski day,

9   or you have a -- a nasty, crusty, crummy ski day, or any

10   number of conditions therein.

11         So it's -- it's one of those things that -- that's

12   what I was getting at, really.

13        Q     And so I -- what I think I hear you saying is that

14   how the sun reflects off of the snow, can give you an

15   indication as to when the tracks were made; is that right?

16        A     The sun helps light the -- the photograph, but you

17   look at the snow and you can see the conditions.  Is it

18   compacted?  Is it hardened?  Has it been refrozen?  Or does

19   it appear to very light and fluffy, fresh?  Or has it been

20   out for two or three light cycles throughout, you know, a

21   given day, and you can tell that it starts to, you know,

22   degrade.

23         It's all dependent on weather conditions and so

24   forth.

25        Q     I see.  And what were the weather conditions as of

1   April 24 and 25 of 2020?

2       A    I'd have to look at the, you know, history of what

3   was going on up there.

4       Q    Okay.

5       A    Well, I'm just trying to explain how, kind of,

6   again, in greater detail, the conditions -- snow conditions

7   would change.

8       Q    What time of day were Mr. Ingham's photos taken?

9       A    I'd have to look into that, what particular hour

10  or minute.  Perhaps he could answer that, you know, more

11  accurately than I could.

12          MR. FADDIS:  Okay.  I want to publish, if I may,

13  Your Honor, what's already been admitted as the Government's

14  Exhibit 5.

15          THE COURT:  Sure.

16      Q    (By Mr. Faddis) So sir, I -- I published this on

17  the screen.  Can you see that okay?

18      A    Yeah, be -- maybe I can look into my book here.

19  It might be a lot clearer.

20          MR. FADDIS:  And, Your Honor, if I may approach to

21  just --

22          THE COURT:  You may.

23          MR. FADDIS:  -- see what the witness is looking

24  at?  Yep.

25      Q    (By Mr. Faddis) So in the Government's Exhibit 5,

142

1    it -- can you opine a little more on -- on, I think you

2    said, the crystallization of -- of that snow and -- and how

3    that influences your opinion as to recency.

4        A    Yeah.  It looks to be relatively fresh.  It

5    doesn't look like it's got a lot of hard, refrozen ice.  It

6    looks -- I can't tell you exactly -- again, I'm not a snow

7    scientist or anything of that nature.

8            But just from looking at -- at these photographs,

9    it doesn't look like it's been there for multiple days.

10       Q    And -- and forgive me.  But where within this

11   photograph are you seeing that?

12       A    Oh, there's disturbances of various kinds in that

13   photograph.  Across the front, you know, all throughout

14   there.  That's -- the snow is textured.

15           You know, when it falls, it would be a flat

16   patterning on the -- you know, on -- on the top of the earth

17   there.  And then this looks like there's been tracks and

18   activity through that.  It looks relatively fresh.

19       Q    And can you tell -- can you kind of be a little

20   bit more precise as to where within this photograph you're

21   seeing snowmobiling tracks?

22       A    You would look -- it appears to me that it kind of

23   crosses through the frame, but I can't tell you the make, or

24   the model, or the width of the tread, or any of that.  It's

25   -- a lot of those are just impressions in general.

1     Q   And -- and it -- with impressions in general, it's

2  kind of hard to draw any definitive conclusion, right?

3     A   From this?  Yeah, I can't tell you a whole lot of

4  specifics.

5         MR. FADDIS:  Okay.  And then, Your Honor, request

6  to publish what's already been admitted as the Government's

7  Exhibit 6.

8         THE COURT:  You may.

9     Q   (By Mr. Faddis)  And so, sir, I've -- I've

10  published 6 and with the Court's permission, you're welcome

11  to look at it in your exhibit book.  Are you there?

12     A   Yeah, I think I'm there.

13     Q   Okay.  So do you see where I am indicating with my

14  pen on this photograph?

15     A   Yeah.  So right below that clump of trees on the

16  far right side.

17     Q   Yeah.  And do you see kind of a -- I think what

18  you called disturbances in this area?

19     A   Yeah.

20     Q   When were those disturbances made?

21     A   I -- I don't know when exactly any of these

22  disturbances were made.  It's not that specific.  I don't

23  have that specific knowledge.

24     Q   I think you testified that -- you know, when you

25  look at these photographs, you -- you'd mentioned something

144

1    about snowpack and -- and that kind of thing.

2          Do any of those details of that area allow you to

3    draw a conclusion as to when those disturbances were made?

4    A     Not by, like, a specific, you know, hour, or

5    minute, or day.  I don't -- I can't draw that from that.

6    Q     Not by -- you can't -- you can't determine what

7    specific day those disturbances were made, correct?

8    A     Since I wasn't physically there, I -- I can't --

9    the Operations Manager could further explain those specific

10   details.

11         MR. FADDIS:  I see.  Right, and then Your Honor,

12   if I may publish what's already been admitted as

13   Government's Exhibit 1.

14         THE COURT:  Sure.

15   Q     (By Mr. Faddis)  And so, sir, I'm -- I'm

16   publishing Government's Exhibit 1, and I believe you have it

17   in your binder.  With the Court's permission, you can look.

18   A     Yeah, I'm -- I'm there.

19   Q     Okay.  How many humans do you see depicted in this

20   photo?

21   A     I believe there's two -- it's like one, maybe,

22   looking at or taking a photo of another on the snow machine

23   that's in the air.

24   Q     And is it your belief that there was a third

25   individual who probably took this photo of these two

1    individuals?

2         A    May very well have -- or a -- some kind of a

3    tripod usage with a camera.  Something of that nature.

4         Q    Yeah.  So -- so you don't know whether there were

5    two or three people present that day, correct?

6         A    Yeah, I don't know that.

7         Q    Okay.  And both people depicted in the

8    Government's Exhibit 1 are covered in clothing and gear.

9    Would you agree?

10        A    It -- it appears to be consistent with ski

11   clothing.

12        Q    Okay.  And from the photo itself, you can't

13   determine the snowmobiler's age, right?

14        A    No.

15        Q    You can't determine whether they're 20, or 60, or

16   some other age, right?

17        A    That's correct.

18        Q    You can't determine the snowmobiler's sex,

19   correct?

20        A    That would be correct.

21        Q    You can't determine their race or ethnicity?

22        A    It doesn't appear -- no.  It doesn't appear to be

23   -- you would be able to tell that.

24        Q    And -- and you can't make any facial -- make out

25   any facial features of the snowmobiler, correct?

1        A    No.  It looks like they're both side angle shots.

2        Q    So you can't determine eye color, right?

3        A    That's correct.

4        Q    You can't determine hair color, can you?

5        A    That's correct.

6        Q    You can't determine hair length, correct?

7        A    I don't believe so.  Maybe if you blew it up, you

8    might be able to see some more detail on -- on hair.  But at

9    this size, I -- I don't think I can.

10       Q    And as a law enforcement agent, you have -- you

11   have the means to blow up this photo if you wanted to

12   further examine it, correct?

13       A    Well, yes and no.  I mean, you might be able to

14   pull it up on a bigger screen on a computer and get a better

15   look, but depending on how tight the pixels are, or the

16   definition, we would have varying degrees of success.

17       Q    And -- and it's your understanding that David Lesh

18   had long, sandy, blonde hair in April 2020, correct?

19       A    I don't know what kind of hairdo he had at the

20   time.  I mean --

21       Q    Okay.

22       A    -- it depends on if he put it up in a hat or --

23   yeah, I couldn't give you an accurate -- accurate --

24       Q    Yeah.  And -- and you would just be speculating

25   that he put it up in a hat, or --

147

1     A   Yeah --

2     Q   -- or that someone --

3     A   I -- I don't know what his haircut was.

4     Q   Okay.  You don't see any long, blonde hair

5 sticking out of -- of that snowmobiler's head, right?

6     A   No, I -- I don't.

7     Q   And -- and so from the photo itself, you cannot

8 identify who the snowmobiler is, correct?

9     A   That's correct.

10    Q   And with respect to the other person who appears

11 to be standing in the photo, you also can't tell that

12 person's age, right?

13    A   No.

14    Q   You can't tell their sex?

15    A   No.

16    Q   You can't tell their ethnicity, or skin tone, or

17 facial features?

18    A   No.

19    Q   You can't tell their eye color, or hair color, or

20 hair length?

21    A   No.

22    Q   And from that photo itself, you can't identify who

23 the other person is, correct?

24    A   The other person, as in what?  The snowmobiler?

25    Q   No, no.  The person who was not snowmobiling.  You

1    -- you can't identify that person from this photo?

2        A    If they're a person.  It could be a tripod setup,

3    but yeah.  Whatever took that image.

4        Q    Oh, and my apologies.  I was referring to the --

5    what appears to be a person standing -- I think you said

6    that you thought they were taking a picture.

7        A    Yeah.  Or looking through some type of an object

8    at the subject, on a machine.

9        Q    I see.  And so you can't identify who that person

10   is from this photo, correct?

11       A    No, I cannot.

12       Q    But you're firmly confident that the snowmobiler

13   is David Lesh, right?

14       A    Due to past histories and association with this

15   type of marketing, that's an assumption.

16       Q    And the clothing the individuals are wearing

17   doesn't specifically identify them, does it?

18       A    No.

19       Q    A lot of Coloradans have winter clothing and gear,

20   would you agree?

21       A    Yes.

22       Q    A lot of non-Coloradans have winter clothing and

23   gear?

24       A    Yes.

25       Q    Snowmobiling is a relatively common winter

149

```
 1   activity in Colorado?
 2       A    I -- it -- well, not -- I wouldn't say that.  It
 3   -- it is and it isn't.
 4            It's very expensive to either rent and/or own.
 5   And so it's one of those things that is certainly not as
 6   common as hiking and/or cross-country skiing, or
 7   snowshoeing, things of that nature that don't require that
 8   much infrastructure or -- yeah, just expensive equipment.
 9            So it's -- it's limited to a certain type of user
10   group by a margin.
11       Q    Got it.
12            Now, the snowmobile itself, can you see -- can you
13   see that?
14       A    Yes.
15       Q    That has some distinctive features, doesn't it?
16       A    It has a red -- it looks like a red cowling --
17   engine cowling, and then a -- a black tread track.
18       Q    Yeah, kind of a neon-red front, would you agree?
19       A    Yeah.  Whatever color red that is, but it appears
20   to be red.
21       Q    Okay.  And -- and what brand is that snowmobile?
22       A    I -- I can't tell from here.  I don't know if it's
23   a Polaris, or an RMK, or something like that.  I -- I -- I
24   can't tell you the exact model or make.
25       Q    Okay.  And your investigation didn't yield any
```

1    evidence that David Lesh owns this snowmobile, did it?

2         A    I -- yeah.  I don't have evidence that he owns

3    that particular machine.

4         Q    Do you have any other evidence that David Lesh has

5    ever possessed that snowmobile at any point in his life?

6         A    I don't.

7         Q    You'd agree that there are a lot of photos on the

8    Internet of David Lesh, wouldn't you?

9         A    I -- yeah.  I would say that there's a lot of

10   photographs.

11        Q    And I presume that you looked into those, didn't

12   you?

13        A    It depends on what's available for viewing.  I did

14   look into his accounts, so I did look at a number of

15   photographs.

16        Q    Okay.  Did you contact any snowmobile realtors --

17   retailers to try and identify what kind of snowmobile that

18   was?

19        A    I did not.

20        Q    Okay.  And so you weren't able to identify, like,

21   the type, or the year, or the model, correct?

22        A    That's correct.

23        Q    You didn't learn how many of those snowmobiles

24   were sold in Colorado recently, did you?

25        A    No.  I'd have to know the make and model.

1        Q    I --

2        A    I don't know if you could even get that

3   information.

4        Q    Well -- well, let me ask you:  If you went to --

5   wouldn't it be reasonable for -- for you to go to a

6   snowmobile retailer -- retailer and show them the photo and

7   say, Hey, can you tell me what this is?

8        A    I suppose, unless it was customized, or -- yeah.

9   I don't know that they could offer an opinion.

10       Q    But at any rate, you didn't do that, correct?

11       A    No, I did not.

12       Q    Okay.  The post caption doesn't tell you who's

13   depicted in the post, does it?

14       A    In this particular exhibit?

15            MR. FADDIS:  Oh.  And I'm sorry, sir.  With the

16   Court's permission, if I may publish the -- what's already

17   been admitted as the Government's Exhibit 3.

18            THE COURT:  Sure.

19       Q    (By Mr. Faddis)  If you'll take a look at the

20   Government's Exhibit 3, please, sir?

21       A    Okay.

22       Q    So the -- the caption:  "Solid park sesh, no lift

23   ticket needed," that doesn't tell you who was depicted in

24   the post, does it?

25       A    It just appears that that came from David Lesh's

152

1    Instagram account, with his -- he's got that distinctive

2    circle image with what looks like a pink jacket, which would

3    lead you to believe that he posted that, but it doesn't say

4    specifically any more, other than that narrative right

5    there.

6        Q    Okay.  And -- and in that photo -- pardon me, I'll

7    withdraw that.  It -- so you said that you do have an

8    Instagram account now, correct?

9        A    Yes.

10       Q    Okay.  Are you aware that you can go to an

11   Instagram post with your smart phone, and hold your finger

12   down, and it will tell you if anyone's tagged in there?

13       A    I -- it sounds plausible.

14       Q    Did you do that?

15       A    I'm sorry, that you can hold down -- all right,

16   what -- can you explain that?

17       Q    Yes, sir.  Are you aware that if you hold your

18   thumb on an Instagram post from a smart phone, it will

19   reveal whether there is anyone tagged in that photo?

20       A    If you hold your thumb on the phone?

21       Q    Yes, sir.

22       A    I'm not aware of that.

23       Q    Okay, and I think that you testified recently

24   that, you know, you saw this post come from Mr. Lesh's

25   Instagram, so you assumed that he was the one depicted in

153

1    the post?

2        A    I -- just the context would appear that as well.

3    Solid park sesh, no lift ticket needed.  If that was from

4    your account with your image, that would lead the reader to

5    believe that you were out there.

6        Q    I see.  Did the US Forest Service speak to anyone

7    who was physically present when this photo -- when these

8    photos were taken?

9        A    No.

10       Q    No witness with whom the US Forest Service spoke

11   positively identified the snowmobiler as David Lesh,

12   correct?

13       A    That's correct.

14       Q    And -- and this case has gotten some significant

15   media attention, would you agree?

16       A    Yes.

17       Q    But during the pendency of the case, no witnesses

18   came forward identifying the snowmobiler as David Lesh, did

19   they?

20       A    No.

21       Q    The US Service -- Forest Service didn't, like,

22   present a lineup to any -- to anyone as part of this

23   investigation, did they?

24       A    Like a lineup for, like, a felony-type case?

25       Q    For -- for identifying -- identifying a suspect in

154

1    a federal offense.

2         A    We did not do, like, a photo lineup.

3         Q    Okay.  What measures did you take to identify the

4    individual in the photo who's not on the snowmobile?

5         A    I didn't have much to go on, so I don't have a --

6    much to -- to add to who that is, or what their relationship

7    is.

8         Q    So are you saying that you took zero measures to

9    try and identify that person or something else?

10        A    If -- if I had more information to lead me down a

11   road to maybe look into other ways of identifying that

12   person, I probably would have.  But yeah, I -- I don't know

13   who that person is.

14        Q    And -- and you mentioned that you were essentially

15   the lead investigator on this case, correct?

16        A    Yes.

17        Q    And that you know basically every aspect of the

18   case; is that right?

19        A    That would be correct.

20        Q    Okay.  Did you try to call David Lesh and get a

21   statement from him?

22        A    No, I did not.

23        Q    Did -- did you try to go to his residence and talk

24   to him, and ask him, Hey, is this you?

25        A    I did not.

1       Q    Did anyone at the US Forest Service do that?

2       A    For previous citations, yes.

3            MR. FADDIS:  And I would object to 404(b).  I'm

4   not referring to previous citations.  I'm obviously

5   referring to this Keystone Ski area event.

6            THE COURT:  Mr. Hautzinger?

7            MR. HAUTZINGER:  I think he's opened the door,

8   Your Honor.  The witness is going to say that he was aware

9   of the fact that Mr. Lesh was already represented.

10           THE COURT:  I think the door is opened to --

11  essentially, the gist of the question was:  Why you didn't

12  call Mr. Lesh on this occasion and ask for a statement?  And

13  that opens the door to -- didn't open -- I didn't do it,

14  because I knew something about it.

15           So the door is open.  The question can be

16  answered.

17           MR. FADDIS:  Okay.

18      Q    (By Mr. Faddis)  Did anyone from the US Forest

19  Service go to Mr. Lesh's house and try to talk to him about

20  this?

21      A    About this particular instance, no.

22      Q    So -- so it sounds like law enforcement did not

23  give Mr. Lesh an -- an opportunity to make a statement on

24  this case; is that correct?

25      A    I mean, I guess he would have -- had an

156

1    opportunity.  I did not try to hunt him down at -- either,

2    you know, somewhere in Breckenridge, or somewhere in Denver.

3        Q    If you have a suspect in a federal offense, isn't

4    it pretty common to -- to want to go and talk to that

5    suspect?

6        A    It all depends on what your strategy would be to

7    work that particular case.

8            MR. FADDIS:  Now if we may go back -- Your Honor,

9    if I may republish Government's Exhibit 1, which has already

10   been admitted.

11           THE COURT:  Sure.  And just for the future:  You

12   don't -- just republish.  You don't need to ask me --

13           MR. FADDIS:  Thank you, Your Honor.  Will do.

14       Q    (By Mr. Faddis)  If -- if you'll please take a

15   look at Government's Exhibit 1, sir.  So there were several

16   items depicted in this photograph, right?  And I can be a

17   little more clear.

18           For example:  There's a snowmobile with a red

19   front in this -- in this photograph, right?

20       A    Exhibit 1, yes.

21       Q    And -- and -- and there's clothing on these

22   individuals in this exhibit, correct?

23       A    Yes.

24       Q    And I think I'm going to go to Government's

25   Exhibit 3.  If you could please take a look at that.

157

```
 1          Government's Exhibit 3, you can more clearly see
 2   -- you can more clearly see the clothing that the
 3   snowmobiler is wearing, correct?
 4       A    Yes.  It looks like a camouflage pattern jacket.
 5       Q    Okay.  And then -- sorry to jump around.
 6          But back in -- in Government's Exhibit 1, there
 7   appears to be a person with a camera, right?
 8       A    Something -- it looks like they're holding up to
 9   their face in that direction of the rider that's in the air.
10       Q    During its investigation, did law enforcement ever
11   find David Lesh in possession of any of these items?
12       A    Of the red snowmobile, or the clothing?
13       Q    Or the clothing, or the camera, or anything that's
14   depicted there.
15       A    I don't believe so, no.
16       Q    Okay.  There are investigative measures that the
17   US Forest Service could have taken, but didn't, in its
18   investigation; would you agree?
19       A    I would say almost in any investigation, depending
20   on the severity of the crime, the resources allocated to the
21   severity of that particular crime, a sliding scale of
22   resources associated with the severity of -- of the type of
23   incident.
24       Q    Understood.
25          So it -- did -- did anyone contact Keystone, or
```

158

1    Mr. Ingham and ask if there were surveillance cameras

2    pointed at any of their runs?

3         A    I don't know if Jill did that or -- or not.  I'm

4    not aware of any video footage that was discovered of that

5    area, being that it was closed down and it's actually up,

6    you know, on the mountain versus, like, the entryway to a,

7    you know, mid-mountain eatery, or something of that

8    nature --

9         Q    So --

10        A    -- where it would be commonplace to have a

11   surveillance system.

12        Q    But -- but -- but you didn't look into that, did

13   you?

14        A    I -- I did not.

15        Q    Okay.  And to your knowledge, no one from the US

16   Forest Service looked into that, did they?

17        A    At this point, no.

18        Q    Did you author a search warrant for Mr. Lesh's

19   residence?

20        A    I put one together, and it was never executed, or

21   fully authorized, I guess.

22        Q    Okay.  Did -- did you author a search warrant for

23   the Virtika warehouse?

24        A    That would be -- that would be the location,

25   excuse me.  The warehouse, not some other residence.

1       Q      Okay.  So no search warrant was ever executed

2   there, correct?

3       A      That's correct.

4       Q      Did you ever author a search warrant for David

5   Lesh's electronic devices?

6       A    I did not.

7       Q      Did you try and obtain GPS locational data from

8   any of those devices?

9       A    I did not.

10       Q      Did you try and analyze cell tower locational

11   information to try and place Mr. Lesh physically at that

12   scene?

13       A    I did not.

14       Q      Did you enlist any expert to try and do that?

15       A    I did not.

16       Q      Did you send a production of records requests to

17   Instagram?

18       A    I did not.

19       Q      How about to Facebook?

20       A    I believe they're the same company, but no.

21       Q      Okay.  Did -- did you try and obtain the

22   properties of this photo, which could give -- give you

23   information about when it was taken?

24       A    I did not.

25       Q      Did you try and interview any of David Lesh's

1   business associates?

2      A    What kind of business associates?

3      Q    Well -- well, didn't you testify that -- that he

4   is the owner of Virtika?

5      A    Yeah.  You mean, like, somebody that would work in

6   the warehouse, or somebody that would -- I mean, could you

7   be more specific?  I -- I did not --

8      Q    Sure.  Someone with whom he works?

9      A    Yes, I did not.

10     Q    Okay.  Did -- did you ever try to interview any of

11  his friends?

12     A    No, I did not.

13     Q    How about any of his family members?

14     A    No.

15     Q    Did you ever try to interview any Virtika

16  employee?

17     A    No.

18     Q    Have -- have you reviewed the -- Virtika

19  Outerwear's website?

20     A    I have looked at their website --

21     Q    So if you looked at the website, then you saw the

22  "Meet the Team" page on that website, right?

23     A    I don't know which particular aspect of that

24  you're referring.

25     Q    So you don't recall seeing a "Meet the Team" page

1   on the Virtika Outerwear website?

2        A    I don't recall that.

3        Q    Okay.  So you didn't try and interview any of

4   those 11 team members?

5        A    No, I did not.

6        Q    And -- and as mentioned, you have the ability to

7   request that other law enforcement agencies assist with an

8   investigation, right?

9        A    Do I have the capability to request that?

10       Q    Yes.

11       A    Yeah.  I mean, again, that would usually be with

12  heavy-duty felonies, or violent crime, things of that

13  nature.  There's a sliding scale, depending on the severity

14  and the type it is.

15       Q    Okay.  Well -- well, the Government is spending at

16  least a whole day in a court trial on this matter, so

17  wouldn't you say that's relatively serious?

18       A    I -- I would say it's serious.  But again, with

19  limited resources, limited funding, we have to make

20  decisions on how cases are managed and/or strategies to

21  manage them.

22       Q    Sure.  But your funding doesn't have any bearing

23  on whether you would request the local sheriff's office to

24  come investigate, right?

25       A    You -- I suppose you could.

162

1      Q     Right.  And you could -- you could have requested

2    the FBI, or other local police departments, correct?

3      A     I -- I doubt I would have requested FBI assistance

4    on something -- unless I -- depending on the severity of the

5    crime.  Because if you call them every day, they probably

6    won't help you out.

7      Q     Okay.  But -- but you have that option and you

8    just didn't exercise it, right?

9      A     Potentially.  That depends on how that agency

10   would have responded.  But yes, you can request things from

11   r agencies.

12     Q     You could make the request, can't you?

13     A     Yes.

14     Q     Okay.  So as you're aware, Count 2 of the

15   superceding information alleges that there was business

16   activity conducted upon National Forest Service lands,

17   correct?

18     A     Count 2, that there was business -- you have to

19   look at the statute, or the -- the wording, but -- that

20   there was -- yeah, basically.

21     Q     Well, didn't you recommend that those charges be

22   filed?

23     A     Yeah.  But it would -- there's specific wording in

24   there, but basically, yeah, you can't utilize public lands

25   for commercial usage without a special use authorization.

163

```
1        Q    Okay.  And -- and you don't have any evidence that

2   this post was also posted to Virtika's Instagram, correct?

3        A    That this photo was posted to Virtika's -- to the

4   Instagram account?  I -- I -- on the 3rd of this month, I

5   looked, and this picture -- this photo was on the Instagram

6   account for David Lesh.

7        Q    Right.  But my question was:  You have no evidence

8   that this photo was also posted to his business page,

9   correct?

10       A    You mean the Facebook page?

11       Q    No.  I mean the Virtika Instagram page.  Are you

12  aware that Virtika has an Instagram page?

13       A    Probably not.  The other one, I guess, if there's

14  a -- yeah, no.  The answer would be no.

15       Q    Okay.  So you have no evidence that this was

16  posted to Virtika's Facebook page, correct?

17       A    The David Lesh Facebook page, I believe, had it on

18  there.

19       Q    You'd agree --

20       A    It said "Virtika" in the -- I believe in the

21  caption.  It depends on how -- I don't know.  He could have

22  a whole pile of other social media things that I'm not --

23       Q    Well, referring to Government's Exhibit 3, where

24  in the caption do you see "Virtika" anywhere?

25       A    On this particular one, I -- it just says
```

164

1    "@davidlesh" and it's Instagram.  I don't -- I don't see

2    Virtika's mentioned in this particular one.

3         Q    Okay.  And -- and then I think you said that you

4    had reviewed Virtika's website, correct?

5         A    Yes.

6         Q    And you've got no evidence that this post was also

7    put onto Virtika's website?

8         A    I don't.

9         Q    You'd agree with me that this post doesn't offer

10   any items for sale, correct?

11        A    Directly, no.

12        Q    It doesn't say, like, Buy these Virtika gloves for

13   $20?  Or something like that?

14        A    I don't believe it says that, no.

15        Q    It doesn't reference any specific merchandise,

16   does it?

17        A    No.  Other than potentially the jacket, or the

18   clothing on the individual on the snow machine.

19        Q    Do -- do you have evidence that that is for --

20   Virtika clothing?

21        A    No.  I'm just saying that --

22        Q    Just guessing?

23        A    -- if you were -- if you were to look at that.

24        Q    Got it.

25             There's no pricing information in the post, is

165

1    there?

2         A    Not in this one, no.

3         Q    In fact, the post doesn't reference "Virtika" in

4    any way, shape, or form, does it?

5         A    Just from this image that was captured, I -- I

6    don't see a reference to "Virtika."

7         Q    Well, if it's helpful, you're welcome to look at

8    Government's Exhibit 1, which is the first image of that.

9    If you can tell me if you see any "Virtika" reference in --

10   in that exhibit, please.

11        A    I don't see anything in reference to that in

12   Government 1.

13        Q    And -- and you're not aware of any business

14   transactions that took place on April 24, 2020 in that area

15   of the Keystone run, are you?

16        A    No.

17        Q    Can you cite to this Court any specific sales of

18   Virtika merchandise as a result of this Keystone photo?

19        A    No.  And like we said earlier, you know, if you

20   have a large following, that can be monetized.  So you may

21   never trace down an individual who would have purchased from

22   a website associated with -- with what a customer may have

23   liked or associated their own identity, or their type of

24   skiing with that particular type of apparel.

25        Q    So you can speculate that this may have resulted

1    in sales, correct?

2         A    I would believe it's a motive to result in higher

3    sales and sell more focused apparel items to customers, and

4    break through the fray of all the other companies that are

5    doing the exact same thing and trying to stand out.

6         Q    But if that were the intention, wouldn't it make

7    sense for the person to either tag Virtika or say, Buy this

8    cool Virtika jacket?  Or something like that?

9         A    Well, it depends on what the customer -- potential

10   customer would like in any given industry, or apparel

11   industry.

12             I mean, if -- if you look at apparel in general,

13   people tend to buy the clothing that they like to identify

14   with, either through the look of it, or other associations

15   with that brand.

16             I mean, you could probably name hundreds of brands

17   of different things, from watches, to colognes, to suits

18   that would suit -- or be marketed towards a specific

19   individual that wants a specific look.

20        Q    So I think what I hear you saying is that any

21   Instagram influencer could make a post and if they have a

22   big enough following, you would surmise that that's going to

23   lead to increased sales?

24        A    It depends on if it's some kind of focused -- I'm

25   sorry.  Could you say that one more time?

1       Q    Sure.  So -- so it sounds like you're saying that

2  any Instagram influencer can post something and if they have

3  a wide enough reach, that will lead to increased sales of

4  whatever their business is?

5       A    Potentially.

6       Q    Okay.  Does that seem problematic to you at all?

7  That -- that just a person posting a photo might somehow get

8  them charged with a federal offense?

9       A    It would -- it would all depend on how focused,

10 and how -- what -- what type of posting, and how that

11 relates to regulation and usage with regard to a given

12 federal offense in a given industry and a given location.

13      Q    Okay.  But to be clear:  You have no evidence that

14 this post directly increased Virtika's revenue, correct?

15      A    I -- I -- yeah, I couldn't say that Customer 145

16 bought gloves because he saw this individual photo.

17      Q    Right.  And -- and did you seek a subpoena for any

18 of Virtika's business or financial records?

19      A    No.

20      Q    Okay.  You could have, right?

21      A    I potentially could have pursued that avenue.

22      Q    You don't have any evidence that this photo had

23 any financial consequence to Virtika, do you?

24      A    That it had any financial --

25      Q    Yes.  Do you have any evidence that this photo had

```
1    some financial consequence for the company, Virtika?

2        A    Financial consequence?

3        Q    Yes.

4        A    Specifically this photo?

5        Q    Yes.

6        A    I don't have anything.

7        Q    Okay.  And so part of your reasoning for believing

8    that Mr. Lesh is depicted in this photo is that it was

9    posted to his Instagram account, correct?

10       A    It would be common, yes.  You could post this to

11   your Instagram account to help with regard to sales and/or

12   marketing, because it directly relates to ski apparel --

13       Q    And -- and you'd agree that Mr. Lesh's Instagram

14   account contains multiple posts of individuals engaged in

15   winter sports, correct?

16       A    I would say there's a number of them.

17       Q    There are several posts depicting snowmobiling,

18   for example?

19       A    I'd -- I'd have to look through to give you more

20   accurate --

21       Q    Well, didn't you do that in your preparation for

22   this trial?

23       A    I -- I did, and there's lots of images.

24       Q    Okay.

25       A    That's like a -- building a lifestyle profile
```

169

```
 1   that --

 2        Q    Okay.

 3        A    -- would help assist in sales of outdoor-specific

 4   clothing.

 5             MR. FADDIS:  Your Honor, I would request to

 6   approach with Defendant's -- what's been previously marked

 7   as Defendant's Exhibit A.

 8             THE COURT:  And do I have a copy of that?

 9             MR. FADDIS:  Oh, gosh.  My apologies, Your Honor.

10   I do have a copy for the Court.

11             THE COURT:  Okay.

12             MR. FADDIS:  I may have neglected to tender it.

13             THE COURT:  And does Mr. Hautzinger?

14             MR. FADDIS:  Yes, Your Honor.

15             MR. HAUTZINGER:  Well, I have the photos.  I don't

16   know if I have the labels.  Which one is that?

17             MR. FADDIS:  All right.  Permission to approach

18   the bench --

19             THE COURT:  You may --

20             MR. FADDIS:  -- and the witness.

21             THE COURT:  -- once -- I'd like to get my copy,

22   too --

23             MR. FADDIS:  Yes, sir.

24             THE COURT:  -- so I'm looking at the same thing.

25   Thank you very much.
```

1          MR. FADDIS:  I'm handing the witness what's been

2     previously marked as Defendant's Exhibit A.

3          Q     (By Mr. Faddis)  So, sir, can you tell from which

4     Instagram account this photo was posted?

5          A     It looks like it could be the same Instagram

6     account.  You've got the same style of layout that the one

7     particular -- the one -- Exhibit 1 here.  It looks like

8     David Lesh's Instagram, I suppose.  I -- I -- yeah.

9          Q     Okay.  Would -- would you agree that -- well,

10    I'll withdraw that.

11         So in the Government's exhibits, you -- you note

12    -- you believe that those are posted to David Lesh's

13    Instagram, because his -- his Instagram handle is at the

14    top.  It says "David Lesh" and then there's a blue checkmark

15    in the Government exhibits.  Do you remember that?

16         A     You mean the -- yeah, the image with a pink

17    jacket.

18         Q     Yeah.  And -- and so that indicated to you that

19    that post was posted from David Lesh's Instagram, right?

20         A     That may be posted, yes.

21         Q     Okay.  And -- and you'd agree that Defendant's

22    Exhibit A has that same characteristic, in that it says

23    "David Lesh" and there's a blue checkmark?

24         A     I just can't tell with just this photo, if it was

25    -- if he had tagged this, or if this was his account.  You'd

171

1   have to go through and take a look at more items on there

2   other than just one still image.

3       Q    Well -- well, didn't you go through his Instagram

4   account and -- and review it?

5       A    I -- I did.  There's lots, and lots of images,

6   and --

7       Q    Do you have any reason to believe that this photo

8   was not posted to his Instagram account?

9       A    No.

10      Q    Okay.  What does the photo depict generally?

11      A    It looks like basically a snow machining through

12  some alpine forest, or alpine environment.

13      Q    And specifically, does it appear to be a

14  snowmobile?

15      A    There's a lot of powder in front, but it looks

16  like a headlight.  It looks like he's -- whoever, he or she

17  is leaning, it looks like, holding onto the controls of --

18  it could be a -- yeah, some type of snow machine.

19      Q    Who's depicted in this post from Mr. Lesh's

20  Instagram?

21      A    Who's -- I'm sorry, who's depicted?

22      Q    Yes.

23      A    Do you have -- I don't know who's -- who's in that

24  photo.

25      Q    Why don't you know?

172

1      A      Because I wasn't there and I'm not familiar with

2   that location, or that day.  You can make an inference from

3   the "Replies" and the "Likes," but that's about it.

4      Q      What -- what inference would that be?

5      A      That whoever this was potentially had taken this

6   photo, or was in a photo in December 27th of 2016 or

7   earlier.  And it could be any number of those individuals

8   that may have commented there.

9             I -- I can't give you anything more specific than

10  that.

11     Q      I see.  But you're sure that in the Government's

12  Exhibits 1 through 3, that depicts David Lesh as the

13  snowmobiler, right?

14     A      That's my -- my opinion, that that would be David,

15  but I can't tell you that that's 100 percent him.  I didn't

16  see his face, like we went through all that questioning.

17            MR. FADDIS:  Got it.  Your Honor, at this time I

18  would ask to retrieve that exhibit.

19            THE COURT:  Sure.  Are you moving to admit it?

20            MR. FADDIS:  Not at this time.  I do intend to do

21  that.  And may I have just a moment?

22            THE COURT:  Sure.  Thanks.

23            MR. FADDIS:  And Your Honor, permission to

24  approach the witness with what's previously been marked as

25  Defendant's Exhibit B and Exhibit C.

```
 1              THE COURT:  And do you have copies for me?

 2              MR. FADDIS:  Yes, Your Honor.  If I may approach

 3     the bench as well?

 4              THE COURT:  You may.

 5              MR. FADDIS:  I'm handing the witness what's

 6     previously been marked as Defendant's Exhibits B and C.

 7              THE COURT:  Thank you.

 8        Q    (By Mr. Faddis)  Can you tell me from whose

 9     Instagram account these -- these photos were posted.

10        A    I can't tell you.

11        Q    I'm sorry.  Did you say you can't tell me?

12        A    No, I can't tell you.

13        Q    Do you -- do you see a similar characteristic in

14     terms of the Instagram handle at the top of that textual

15     column?

16        A    Yeah, the "@davidlesh."

17        Q    And there's a blue checkmark next to it; isn't

18     there?

19        A    Yes.

20        Q    Okay.  And -- and what does B depict, generally?

21        A    I'm sorry, what was that?

22        Q    What does Defendant's Exhibit B depict, generally?

23        A    Oh, B?  Okay.  It looks like a snow machine with

24     some fat skis on the back in the back country somewhere.

25        Q    And when you say "snow machine," are -- do you
```

174

```
 1   mean snowmobile?

 2        A    Yes, I --

 3        Q    Got it.

 4        A    In lay terms.

 5        Q    Okay.  And -- and how about Defendant's Exhibit C?

 6   What does that depict, generally?

 7        A    It looks like a skier in mid-air off of a jump in

 8   the back country somewhere.

 9        Q    I see.  And who's depicted in these photos?

10        A    Oh, I can't tell you.

11             MR. FADDIS:  Permission to retrieve the exhibits,

12   Your Honor.

13             THE COURT:  You may.

14             MR. FADDIS:  Thank you.

15        Q    (By Mr. Faddis)  And so can you say for sure on

16   what date the Keystone photos reflected in the Government's

17   exhibits were -- were taken?

18        A    I'd have to look at the -- I'd have to look at,

19   like, on what day that was from the --

20        Q    Just --

21        A    -- park manager.  I'd have to look at that.  I

22   don't remember off the top of my head.

23        Q    It -- it may be helpful, if I may draw your

24   attention to the Government's Exhibits 1 through 3, which

25   have already been admitted.
```

1        A    Yeah, I'd have to look at the report narrative.

2        Q    Is there a date on the Government's Exhibits 1

3   through 3 -- oh, perhaps -- perhaps there isn't, but isn't

4   it your contention that these photos were posted on April

5   24, 2020?

6        A    Yeah, I believe that's what it was.

7        Q    Okay, but on what date were they taken?

8        A    I don't know the date that they were taken.

9        Q    Okay.  By whom were they taken?

10        A    You're talking about Exhibit 2?

11        Q    No, I'm sorry.  Government's Exhibits 1 through 3.

12        A    The day that actual image in Exhibit 1, 2, and 3

13   was taken -- I don't know the exact date that those were

14   taken.

15        Q    And you mentioned that you reviewed Agent Wick's

16   report regarding her investigation of this incident,

17   correct?

18        A    Yes.

19        Q    And you also spoke with Agent Wick about the case,

20   didn't you?

21        A    Yes.

22        Q    And you took her report into consideration during

23   your investigation, right?

24        A    Yes.

25        Q    Her report identifies the snowmobile as Mr. Lesh's

176

```
1    over-snow vehicle, correct?

2         A    It may have that in that narrative.

3         Q    Would looking at that report refresh your

4    recollection?

5         A    Yes, I believe so.

6              MR. FADDIS:  Your Honor, permission to approach?

7              THE COURT:  You may.

8         Q    (By Mr. Faddis)  Sir, I'm handing you Agent Wick's

9    report, and so do you see the Synopsis section?

10        A    Yes.

11        Q    And do you see where it says -- or it has an

12   indication as to who is the owner of that snowmobile

13   depicted in Government's 1 through 3?

14        A    Yes.

15        Q    Okay.  And it says that it's his over-snow

16   vehicle, meaning David Lesh's, correct?

17        A    I believe that's the inference in there, yes.

18        Q    Okay, but you were never -- you were never able to

19   confirm that this snowmobile belongs to, or -- or is owned

20   by Mr. Lesh, correct?

21        A    That's correct.

22        Q    So you'd agree that that inclusion is inaccurate

23   in that report?

24        A    Yes, I believe that would be -- well, I -- it may

25   be accurate, but I don't know for sure that that was David
```

177

1    Lesh.

2         Q    You don't know -- I'm sorry, could you say that

3    again?

4         A    I said I don't know that that -- for sure, that

5    that was David Lesh.

6         Q    You don't -- that what was David Lesh?

7         A    It said -- it said here in the Synopsis, David

8    Lesh published photo of himself using his OSV on Keystone

9    Ski Area.

10        Q    Got it.  So that passage clearly indicates that

11   Agent Wick believed this snowmobile was owned by Mr. Lesh,

12   correct?

13        A    Yes.

14        Q    But you were never able to confirm that with any

15   evidence, right?

16        A    That's correct.

17        Q    Okay.  And the US Forest Service believes that

18   either one or two other individuals were also involved in

19   the -- in the Keystone Ski Area photos, correct?

20        A    If you're referring to the individual on the end

21   of the jump?

22        Q    Well, it's your investigation, you tell me, but

23   it's my understanding that you believe that there is two

24   individuals depicted there, and potentially a third

25   individual taking a photograph that is not seen in the

1    photograph, because --

2         A    Yeah, that's more accurate.  Yes, that would --

3         Q    I see.  And Agent Wick wasn't able to identify

4    those other two individuals, correct?

5         A    I don't believe so, no.

6         Q    And you were unable to identify anyone present

7    when that photo was taken, right?

8         A    That's correct.

9         Q    But the one thing you're sure of is that

10   Government's 1 through 3 absolutely depicts David Lesh,

11   correct?

12        A    It's my opinion, due to the fact that he can -- by

13   posting that, he can conduct a work activity to help sell

14   clothing, but I cannot definitively tell you.

15        Q    You'd agree that Virtika is not a snowmobiling

16   company, right?

17        A    I -- as far as my knowledge, no, it's not.

18        Q    To be clear, you have no physical evidence

19   connecting Mr. Lesh to that crime scene at the Keystone Ski

20   Area on April 24, 2020, do you?

21        A    No.  We have these postings and these pictures,

22   but no.  What -- yeah, other type of evidence, no.

23        Q    Okay.  So you have the pictures, but -- and the

24   statements to which you had testified, but no other

25   evidence, correct?

179

```
 1         A    Yes.

 2         Q    Okay.  So you have no GPS evidence linking him to

 3    the scene, right?

 4              MR. HAUTZINGER:  Objection, Your Honor.  Asked and

 5    answered.

 6              THE COURT:  Sustained.

 7              MR. FADDIS:  That's all I have.  Thank you, Your

 8    Honor.

 9              THE COURT:  All right.  Any redirect, Mr.

10    Hautzinger?

11              MR. HAUTZINGER:  Yes, please, Judge.  Can I have

12    the three defense exhibits, please?

13              MR. FADDIS:  Certainly.

14                    REDIRECT EXAMINATION

15    BY MR. HAUTZINGER:

16         Q    Agent Leach, I want to spend a couple of minutes

17    talking about Defendant's A, B, and C.  Now, you didn't

18    personally observe these on Instagram, in contradiction to

19    the other Exhibits that you've testified to where you went

20    to Instagram and actually witnessed them, right?

21         A    Yeah, I don't remember seeing these.

22         Q    But they sure look like they would have come from

23    David Lesh's Instagram account; is that fair to say?

24         A    Yeah.

25         Q    And they're similar to a lot of other images that
```

180

1  you observed of the defendant's Instagram account, right?

2      A    Yes.

3      Q    And it certainly looks like the same avatar --

4  that's the word I was thinking of -- the little picture in

5  the pink and it looks a lot like the David Lesh signature

6  we've seen on a lot of other exhibits that -- that you have

7  seen yourself, right?

8      A    Yes.

9      Q    So there's really no reason for you, or for the

10  Government to contend that these aren't from David Lesh's

11  Instagram account, right?

12      A    That's correct.

13      Q    Is there a date in the bottom right-hand corner of

14  Defendant's A?

15      A    Yeah, I believe it says December 27, 2016.

16      Q    And the hashtag for Mr. Lesh, presumably, says,

17  Plenty of freshies in the Breck BC?

18      A    Yeah, I see that.

19      Q    Is -- would Breckenridge backcountry be in

20  National Forest lands?

21      A    Most likely.  There's a lot of public Forest

22  Service ground in the Breckenridge area.

23      Q    Was there a global pandemic in effect in December

24  27, 2016?

25      A    No.

181

1      Q     Was the Breckenridge backcountry closed down by

2   order of the Governor on December 27, 2016?

3      A     No.

4      Q     Similarly, Defendant's Exhibit B, again, looks

5   like it's from Mr. Lesh's account, right?

6      A     Yes.

7      Q     And it says Uinta Mountains, Utah?

8      A     Yes.

9      Q     Is the date March 2, 2013?

10      A     I believe that's what it says down there above all

11   the likes, yes.

12      Q     Are Uinta Mountains in the Utah National Forest

13   lands?  Do you know?

14      A     I -- off the top of my head, I can't remember

15   exactly which National Forest, but I believe they are.

16      Q     It could be --

17      A     A good portion of the high elevation in Utah is

18   public lands National Forest.

19      Q     But again, no global pandemic in March of 2013?

20      A     That's correct.

21      Q     No closure of the Uinta Mountains by order of the

22   Governor?

23      A     I don't believe so.

24      Q     Similarly, Exhibit C also looks like it's David

25   Lesh's, correct?

182

1        A    Yes.

2        Q    And the line says Pyramid Spine, the date is March

3    2, 2013?

4        A    I believe so,  yes.

5        Q    And again, no global pandemic then, no closure of

6    the property by Governor's order, right?

7        A    That's correct, to my knowledge.

8        Q    Defense counsel asked you a number of questions I

9    need to spend a little time about.  You've reviewed several,

10   if not hundreds, of posts on Mr. Lesh's Instagram account,

11   correct?

12       A    Yes.  A lot of -- a number of photos and so forth.

13       Q    And defense asked you that there are many, many,

14   many photos involving winter sports, correct?

15       A    That's correct.

16       Q    It's fair to say, isn't it, that most of those

17   photos are promoting Virtika on the defendant's Instagram

18   account?

19       A    I would say that --

20            MR. FADDIS:  And I would object to foundation.

21   The witness, when I was asking him about the Instagram

22   account, didn't really have any recollection of these

23   photos, and I don't think he has foundation to say whether

24   the majority of all of the photos --

25            MR. HAUTZINGER:  That's not the question --

1          MR. FADDIS:  -- reflect Virtika.

2          MR. HAUTZINGER:  -- I asked, Your Honor.

3          THE COURT:  No.  The question was essentially do

4   many of the photographs on the Instagram account essentially

5   show or promote Virtika.  The line of questioning when the

6   Special Agent was being cross-examined was did he remember

7   these specific photos, which is logically extremely

8   different from does he remember the general gist of what was

9   on there.

10          So I don't find anything inappropriate about the

11   question.  The objection is overruled.

12     A    I'm sorry, could you ask me the question one more

13   time?

14     Q    (By Mr. Hautzinger)  Is it fair to say that there

15   are a lot of winter sports photos on David Lesh's Instagram

16   account which promote Virtika?

17     A    There are.

18     Q    In fact, in the article is not Mr. Lesh quoted as

19   saying Virtika's sales had increased by 30 percent since he

20   posted the Hanging Lake photo?

21     A    I believe that's correct.

22     Q    Now, defense counsel asked you a lot of questions

23   about what was or was not done in the course of this

24   investigation.  Mr. Lesh is charged with -- I'm sorry

25   (inaudible).

1          Mr. Lesh is charged with a Class B misdemeanor,

2    correct?

3        A    I believe so, yes.

4        Q    It's a petty offense?

5        A    I believe so, yes.

6        Q    It's the lowest level of crime in the federal

7    system?

8        A    I believe so, yes.

9        Q    Maximum penalty is six months in jail?

10       A    Yes.

11       Q    Have you yourself, or have you ever heard of

12   anybody in the federal system doing expert photographic

13   analysis on a Class B misdemeanor?

14       A    It doesn't come to mind if it has.

15       Q    You actually drafted a search warrant on a petty

16   offense, correct?

17       A    Yes.

18       Q    That's going above and beyond on a crime of this

19   level, wouldn't you say?

20            MR. FADDIS:  I would object to leading,

21   argumentative.

22            THE COURT:  It's neither.

23       A    Yes.  I would say that's definitely something that

24   is quite rare.

25       Q    (By Mr. Hautzinger)  Have you ever drafted a

1   search warrant on a petty offense before?

2        A    I don't know if I have.  I may have, but the vast

3   majority are -- are felony level offenses.

4        Q    Defense counsel asked you a series of questions

5   about putting a lineup together to show to somebody, right?

6   Do you remember that?

7        A    Yes.

8        Q    If you put a lineup together that had David Lesh

9   in it, who would you show it to?

10       A    That's a good question.

11       Q    Do we have any named eye witnesses who were there

12  in Keystone?

13       A    No.

14       Q    Wouldn't that be the logical person to show a

15  photo lineup to?

16       A    Yes.

17       Q    Defense counsel asked you questions about

18  attempting to interview Mr. Lesh once you became aware of

19  the Keystone posting.  Do you recall that?

20       A    Yes.

21       Q    Did you know, in April of 2020, whether or not Mr.

22  Lesh -- David Lesh was represented in a pending criminal

23  matter by Steven Lesh?

24       A    He -- yeah, he may have -- yeah.  I believe he may

25  have been still represented or not.

186

1        Q     Well --

2        A     Like I said, I don't remember the timeframe

3    exactly.

4        Q     You know Steven Lesh withdrew as attorney after

5    the Maroon Lake posting?

6        A     Yes.

7        Q     And you know that before the pandemic hit and

8    before Keystone came to your attention, you sat here in this

9    courtroom with me and discussed the pending matter of David

10   Lesh's with Steven Lesh, attorney?

11       A     Yes, yes.

12       Q     It would be a violation of Forest Service and

13   Department of Justice policy to attempt to interview

14   somebody who you know to be represented in a pending

15   criminal matter, would it not?

16       A      I believe so.

17       Q     Defense counsel asked you a number of questions

18   about Mr. Ingham and his photographs, camera settings, type

19   of phone, what the light settings were, et cetera, and you

20   couldn't answer most of those, right?

21       A     That's correct.

22       Q     But you were present in court this morning when

23   Mr. Ingham testified under oath, weren't you?

24       A     I was.

25       Q     Do you recall Mr. Ingham testifying under oath

1    that the photographs, as introduced, are fair and accurate

2    depictions of what he personally witnessed on April 25,

3    2020?

4         A    I do remember that.

5         Q    Defense counsel asked you a series of questions

6    about the authenticity of the Maroon Lake photograph, and he

7    made reference to the evidentiary standard of probable

8    cause.  Do you remember that?

9         A    Yes.

10        Q    Based on your training and experience, would not

11   criminal charges, based on the Maroon Lake posting,

12   ultimately have to be proven beyond a reasonable doubt?

13        A    Yes.

14        Q    That's a considerably higher standard than

15   probable cause, is it not?

16        A    It is.

17        Q    In fact, it would be unethical to pursue criminal

18   charges when the Government didn't believe they could be

19   proven beyond a reasonable doubt, would it not?

20        A    I believe -- yes, that would be accurate.

21        Q    And is that the situation with the Maroon --

22   Maroon Lake posting?

23        A    Yes.

24        Q    In fact, with the Maroon Lake posting, because of

25   the observations by Officer Mandrake that that photo didn't

188

```
 1   have the debris that was, in fact, in the lake on October

 2   22nd, I think, is when he went up there, and the water level

 3   was significantly different, we, if anything, had reason to

 4   believe that the Maroon Lake photo probably wasn't

 5   authentic, correct?

 6        A    That's correct.

 7        Q    Is that part of why no charges were filed?

 8        A    That would have been, yes.

 9        Q    Conversely, with respect to the Hanging Lake

10   photo, we don't have those kind of physical observations

11   that undermined the authenticity of the photo, do we?

12        A    Yeah, we -- we don't.

13        Q    We cannot say whether it was or was not

14   photoshopped from a federal evidentiary standard, can we?

15        A    That's correct.

16        Q    But we do know that the defendant said in the

17   article that it was photoshopped, right?

18        A    Yes.

19        Q    Did we -- did you decide to take the defendant at

20   his word in advocating for dismissal of the Hanging Lake

21   charges?

22        A    Yes.

23        Q    Defense counsel asked you about influencers and

24   the commercial use of the Forest Service lands and was, I

25   think, trying to imply that -- that anybody who ever posts a
```

1   photograph of themselves on Forest Service lands who's an

2   influencer might face charges of this nature.  Do you recall

3   that?

4        A    Yes.

5        Q    Is that what you understood the inference to be?

6        A    That anybody that is an influencer could

7   potentially face charges?

8        Q    Yes.

9        A    Yeah.

10        Q    I think you responded to that question about that

11   it really depends on a sliding scale -- I think you used

12   that term a couple of times?

13        A    Exactly.

14        Q    What did you mean by -- what did you mean by

15   sliding scale?

16        A    Well, if you had somebody that has a significant

17   brand behind them and/or following, that can correlate to a

18   significant monetary gain for utilizing images of public

19   lands to further a -- a business or make money.  If somebody

20   has less likes, or a smaller brand, or approaches things

21   differently, it -- it depends.  And again, the reason why I

22   use sliding scale is because you could have any number of

23   thousands of different people that are trying to build a

24   brand, or stand out that would have a thousand different

25   levels of influence potential to monetize what images they

1    post on various social media platforms and/or traditional

2    advertising.

3              So it's a sliding scale.

4         Q    Doesn't it really boil down to a case-by-case

5    basis?

6         A    Exactly.

7         Q    Are you aware of any other cases where someone has

8    posted an -- a, quote/unquote, influencer has posted photos

9    of -- or appearing to depict National Forest lands and

10   claims that their business sales have gone up by 30 percent?

11        A    No.

12        Q    Again, do you take the defendant at his word?

13        A    Yes, for a lot of these, yes.

14        Q    I'm sorry, I had one more point about Mr. Ingham's

15   testimony.  Defense counsel asked you if you knew what time

16   of day that those photos had been taken.  It was in the

17   context of the camera settings and the weather and the

18   brightness, et cetera.  Do you remember that?

19        A    Yes.

20        Q    And I think you said you don't know what time of

21   day that they were taken?

22        A    Yes.

23        Q    Okay, but you were here when Mr. Ingham testified

24   this morning, weren't you?

25        A    Yes, I was.

1          Q     And didn't he testify he went out about 9:00 a.m.?

2          A     I believe he may have.  I -- I may have been

3    looking down when he said that.

4          Q     Okay.  Last point about taking Mr. Lesh at his

5    word in his interview in the article.  Hypothetically,

6    Special Agent Leach, if you were charged with a crime,

7    facing federal charges, and you knew you'd been falsely

8    accused, you -- the postings had been inaccurately

9    described, and yet you did an interview with the Grand

10   Junction Daily Sentinel, and the reporter wrote that you

11   had, in fact, posted those photos --

12             MR. FADDIS:  At this point I object to hearsay.

13   That's not in evidence.

14             MR. HAUTZINGER:  It's a hypothetical, Your Honor.

15             THE COURT:  Let's -- I'll instruct the witness, at

16   this point, not to shout out an answer.  Let's get the whole

17   question out and then we can have whatever the objection is

18   going to be.

19             So Special Agent Leach, once the question is done

20   being asked, just wait, because you know the objection is

21   coming, and we'll hear it here in full after we get the

22   question.

23         Q     (By Mr. Hautzinger)  Hypothetical is you're

24   charged with a crime -- make it a state offense, not a

25   federal offense, but you're charged with a crime -- a

1   relatively minor crime.  Let's say it's putting graffiti on

2   the side of the courthouse.

3          You're charged with that crime, there's photos

4   posted to Instagram that appear to show somebody committing

5   the crime.  You do an interview with the Grand Junction

6   Daily Sentinel and the reporter afterwards writes up that

7   article saying Ben Leach posted these photos to Instagram

8   that appear -- that show him putting the graffiti on the

9   wall, and then sometime later you're interviewed by KKCO,

10  the local TV station, and the first question they ask you,

11  Is that article fair?

12         If you'd been falsely accused and it wasn't you in

13  the photo, wouldn't you say, Yeah, there's a lot of problems

14  with that article?

15         THE COURT:  All right, your objection.

16         MR. FADDIS:  Objection, hearsay, facts not in

17  evidence, calls for speculation, and also burden shifting.

18         THE COURT:  All right.  Well, let's deal with

19  those one at a time.

20         First, in terms of the burden shifting, frankly

21  the argument -- the objection there in that circumstance is

22  a -- more of a right to remain silent and I'll construe it

23  in that fashion in the defense's benefit, and that is not an

24  issue here.  It's overruled on that objection, because the

25  defendant chose to make a statement.

1          In terms of hearsay, it's just not.  That's not

2     what's being asked here.  What's being asked is for an

3     opinion based off of what a reasonable person, or a logical

4     person would do with regard to that.  In terms of facts not

5     in evidence, that's also -- I'm overruling on that.  I am

6     going to sustain it on the basis that, frankly, it's

7     irrelevant.  Whether this officer, or anybody else would --

8     would do that is not something that needs to be asked.  I

9     think that can be argued.

10          The evidence is there for that argument to be

11     planted -- it's been planted, and it can be argued in

12     closing arguments.  So we don't -- we don't -- we don't need

13     the question.

14     Q    (By Mr. Hautzinger)  Officer Leach -- or sorry,

15     Special Agent Leach, you did read the article, correct?

16     A    I did.

17     Q    Many times?

18     A    Several times, yes.

19     Q    And you viewed the video interview --

20     A    Yes.

21     Q    -- a couple of times?

22     A    Yes, the Crow podcast.

23     Q    And -- and you viewed all 56 minutes of that

24     podcast on more than one occasion, correct?

25     A    Yes.

194

1     Q     And anywhere in that podcast, does David Lesh ever

2     say, The author of that article got it wrong?

3     A     I don't believe so.

4     Q     Does he ever say, I was misrepresented in that

5     article?

6     A     I don't believe in those words.

7     Q     He says it might have been spun negatively against

8     him, although he also said it wasn't all that brutal, right?

9     A     Yeah, something to that nature.

10    Q     Does he ever say, The author got it wrong when he

11    says I hosted photos of myself jumping off this jump in

12    Keystone?

13    A     No.

14    Q     He had ample opportunity to do so, did he not?

15    A     It appeared, yes.

16          MR. HAUTZINGER:  I have nothing further, Your

17    Honor.

18          THE COURT:  All right.  Special Agent Leach, you

19    can step down and we're at about quarter of 3:00.  Does it

20    make sense to take a break until 3:00, folks, or do you want

21    to start another witness, Mr. Hautzinger, and then take a

22    break in a little while?

23          MR. HAUTZINGER:  Actually, Your Honor, the

24    Government rests.

25          THE COURT:  All right, the Government rests.  You

1    may still step down, Special Agent Leach.  And Mr. Faddis,

2    do you -- are you ready to make a motion, if you're going

3    to, or do you want a few minutes to formulate that and do it

4    after a break?  What's your pleasure?

5              MR. FADDIS:  I'm prepared to make it, Your Honor.

6              THE COURT:  Okay.  Go ahead.

7              MR. FADDIS:  So at this time, defense would make a

8    Rule 29 motion for judgment of acquittal.  I think there are

9    several grounds for that, and I will try to be brief on

10   them.

11             So with respect to Count 1, it appears there is an

12   element that the Government just completely ignored and

13   presented no evidence on.  When you look at 36 CFR 261.14,

14   which is the legal authority for Count 1, what it states is

15   that after National Forest Service -- excuse me, after

16   National Forest System roads, National Forest System trails,

17   and areas on National Forest System lands have been

18   designated for over-snow vehicle use pursuant to 36 CFR

19   212.81 on an administrative unit or a ranger district of the

20   National Forest System, and these designations have been

21   identified on an over-snow vehicle use map, then it is

22   prohibited and criminal for a person to operate a snowmobile

23   upon such lands.

24             When the Court looks at 36 CFR 212.81(c), which

25   references the --

1          THE COURT:  Give me --

2          MR. FADDIS:  -- required designations --

3          THE COURT:  Hold on --

4          MR. FADDIS:  -- that must be shown --

5          THE COURT:  -- give me that statute cite again,

6    please?

7          MR. FADDIS:  Oh.  Yes, sir.  The statute for Count

8    1 or the other?

9          THE COURT:  No, the --

10         MR. FADDIS:  The second one?

11         THE COURT:  The last one you were -- the 212 --

12         MR. FADDIS:  Yes, sir.  It's 36 CFR 212.81(c).

13         THE COURT:  Thank you.

14         MR. FADDIS:  That regulation talks about what's

15   required before anyone can be convicted of a criminal

16   offense, as is reflected in Count 1, at which --

17         THE COURT:  Hold on just a moment.  Ms. Barnes,

18   could you grab me the section?  I've got -- it goes up to --

19   oh, actually, you know -- maybe I do have it.  Give me a

20   moment.

21         Actually, I do.  It's earlier in there.  Sorry.

22   Go ahead, Mr. Faddis.

23         MR. FADDIS:  Yes, Your Honor.  In that second

24   statue I referenced, 212.81(c), it states in part that the

25   designation shall be reflected on an over-snow vehicle use

197

1     map.  Over-snow vehicle use maps shall be made available to

2     the public at headquarters of corresponding administrative

3     units and ranger districts of the National Forest System,

4     and, as soon as practical, on the website of the

5     corresponding administrative units of ranger districts.

6            That is not some insignificant element.  That is a

7     critical element, and Count 1 and the activity alleged is

8     not criminal until there has been a showing that the

9     Government has complied with those required designations.

10           There has been no such designation, and I combed

11    through discovery, and I was waiting to get it at the 11th

12    hour, and I never got it.  There is no over-snow vehicle use

13    map that was ever provided, there was no indication that

14    such a designation appears on any website, and there's been

15    literally zero evidence as to that.

16           That is an element.  Now, it is not -- the

17    Government left it out of their superceding information, but

18    it's abundantly clear when you read 36 CFR 261.14.  That is

19    absolutely required.  There has been zero evidence of that,

20    and that charge must be dismissed.

21           Also, with respect to Count 1, there has been

22    insufficient evidence that Mr. Lesh was ever physically

23    present at the Keystone Ski Area on April 24, 2020.  In

24    fact, there's been insignificant evidence that these photos

25    were even taken around that time.  There has been no

1    compelling evidence presented that these photos were taken

2    on that date.

3              There's no witness to testify to them.  There are

4    some Government witnesses who are speculating as to when

5    they think the photos may have been taken, but that is not

6    substantial enough to sustain a conviction, even when the

7    evidence is viewed in the light most favorable to

8    prosecution.

9              And then with respect to Count 2, I think Special

10   Agent Leach admitted on the stand that there was no evidence

11   that any merchandise was sold, or offered for sale, or that

12   any work activity was conducted upon such United States

13   Forest Service lands, and that word is critical in that

14   statute.

15             The activity has to occur -- and the commercial

16   activity -- the business activity has to occur upon such

17   lands.  It can't be the case that there's a photo from such

18   lands and that it's used at some later time for some other

19   purpose.

20             Now, we contend that there's no evidence of that

21   either, but even if the Court were to be of that position,

22   there is zero evidence that there was a business activity

23   conducted on US National Forest Service lands, and I believe

24   that Special Agent Leach was very clear in his concessions

25   about that.

1          So that's the basis for our motion.

2          THE COURT:  All right.  Mr. Hautzinger, any

3    response?

4          MR. HAUTZINGER:  As you know, all inferences are

5    drawn in favor of the prosecution at this point.  I disagree

6    with defense counsel's analysis as to Count 1, and I think

7    that the evidence is more than sufficient to support our

8    burden at this point.

9          You have uncontradicted testimony that the entire

10   area was closed and it was off a designated route.  The

11   entire ski area was not a designated route.  There was

12   signage, as was testified to by Mr. Ingham.  It was clear

13   coming from any angle that you were going into a closed area

14   and that it is obviously off a designated route.

15         I think defense's argument fails for that reason.

16         Secondly, Count -- well, both Count 1 and Count 2

17   say, On or about April 24, 2020 through October 31, 2020.

18   On or about -- we don't have to prove beyond a reasonable

19   doubt it was necessarily April 24.  On or about puts the

20   defense on notice that it's in that time vicinity and that's

21   what we've done.

22         Between the testimony of Mr. Ingham and the

23   testimony of Agent Leach, there is ample evidence to convict

24   the defendant of Count 1 and Count 2.

25         Finally, the defendant -- defense counsel

1    mischaracterizes the scope of Count 2, because the language

2    is the defendant sold or offered for sale any merchandise or

3    conducted any kind of work activity.  There is evidence

4    that, and by his own admission when he adopted the article,

5    drove a snowmobile off the jumps at Keystone, may or may not

6    have been on a log at Hanging Lake, but certainly used the

7    images of Hanging Lake and Maroon Lake to promote his

8    business.  That's a work activity that the defendant

9    participated in.

10            The motion has to fail, Your Honor.

11            THE COURT:  Mr. Faddis, it's your motion.  Any

12   last words?

13            MR. FADDIS:  I would just respectfully request

14   that the Court view with a close eye -- and I know it will,

15   of course -- 36 CFR 261.14, and the statute specifically,

16   because I think it makes very clear that there is that

17   element that is present, that has not been met, and I would

18   say that simply testimony about the fact that certain areas

19   at Keystone were roped off, or that there's a sign, that

20   that does not rise to the level -- what is required in 36

21   CFR 261, which is a designation identified an over-snow

22   vehicle map.  Not a sign, not testimony from an agent that

23   it's closed, an over-snow vehicle map that has to be posted

24   on a website of the corresponding administrate units and

25   ranger units, as well as made available to the public at the

1   headquarters of corresponding administrative units and

2   ranger districts of the National Forest System.

3          That's simply -- there's no evidence been -- and

4   Count 1 has to fail on those grounds, that -- and that is

5   our request.

6          THE COURT:  All right.  We'll take about a

7   15-minute break for our afternoon break.  I want to take

8   another look at the statute, and we will be back together

9   here at about 10 minutes after 3:00.  Thank you.

10         MR. FADDIS:  Thank you, Your Honor.

11         (Recess was taken.)

12         THE COURT:  All right, we are back on the record

13  in the United States vs. David Lesh after a motion pursuant

14  to Rule 29.  Anything further from the parties before I make

15  my ruling?

16         MR. FADDIS:  None from defense, thank you.

17         THE COURT:  All right.  So in looking at Rule 29

18  specifically, the motion for judgment acquittal after the

19  close of the Government's case, the Court has to determine

20  whether evidence is insufficient to sustain a conviction.

21  Of course it was appropriately cited by the parties.  I have

22  to take all evidence in the light most favorable to the

23  prosecution at this stage.

24         In terms of Count 1, which is premised on a

25  violation of the statute 261.14 for over-snow vehicle use,

202

1    the specific issue -- well, a number of specific issues were

2    cited by the defense, but in particular one was with regard

3    to essentially the premise that, at least at this stage of

4    the proceedings, the Court has to be provided, essentially,

5    with a map showing prohibition for over-snow vehicle use on

6    National Forest System lands.

7           At this stage of the proceedings, the Court does

8    not find that that is the sole method of meeting that prong

9    of the analysis.  Here there was unrebutted testimony that

10   -- there was some challenges on hearsay issues, but

11   unrebutted as to the substance of the -- of it, at least at

12   this juncture, which, of course, is not shifting the burden,

13   but just discussing the testimony, that this occurred in the

14   State and District of Colorado on or about the date charged

15   in this matter, April the 24th of 2020, on National Forest

16   System lands, and that specifically the area in question was

17   signed -- I believe the testimony was that there was

18   essentially signage every hundred or so feet, and that it

19   was signed specifically that it was closed on this occasion,

20   and closed to snowmobiles.

21          At this point in time, based off of the testimony

22   that was provided -- and well, there was further testimony

23   that any snowmobile or snow machine usage in there was

24   limited to, essentially, other authorization, such as

25   emergency authorizations, for example:  Ski patrol, or some

1   kind of utility, or maintenance work, such as use of

2   snowcats or other snow machines for purposes of maintaining

3   the ski resort, but otherwise was closed.  That satisfies

4   that prong of the analysis with regard to Count 1 for

5   purposes of proceeding under Rule 29 at this point in time.

6        In addition -- also, of course, challenged in this

7   case more vehemently -- or I should say vehemently, as we're

8   going along, is the identity of the defendant, David Lesh.

9   Of course, the Court can proceed both on direct evidence and

10   indirect evidence, and here there's a combination of both

11   that's been presented.

12        In the light most favorable to the prosecution,

13   that evidence in combination, which is -- particularly to

14   point it out, but not necessarily to focus on all of it, is

15   various Instagram postings purportedly by Mr. Lesh with

16   statements such as, Such solid park sesh, no lift ticket

17   needed posted of what is clearly an unknown individual on a

18   snow machine going over a jump that's been identified as a

19   jump in the terrain park, but then later identification by

20   Mr. Lesh of that being himself through the more attenuated

21   circumstance of an article written about it that has been

22   admitted, and then a ratification by Mr. Lesh that the

23   information in that article was not incorrect with regard to

24   that specific statement in the article as it applies to that

25   portion of the evidence is:  He posted a couple of photos of

1    him snowmobiling off a jump in a closed terrain park at

2    Keystone Area, which, like Breckenridge, is operated by a

3    company that owns Vail Resort on lands belonging to Forest

4    Service.

5          So the combination of the pictures, the article,

6    and the video are sufficient to support the evidence

7    pursuant to Rule 29 at this juncture.  So I find that there

8    is sufficient evidence to proceed forward with regard to

9    Count 1.

10         Moving on to Count 2, I find that there is a need

11   for something, essentially, untoward, for lack of -- at

12   least this point, a more specific term that I'll define here

13   in a moment -- to happen under these circumstances for Count

14   2 to be proven.  I'll refer to a couple of cases.  One of

15   those is United States vs. Bartells, 1998 WestLaw 289231 at

16   star 4, which is a case out of the District of Colorado that

17   discusses filming and photography on National Forest System

18   lands can be found to be commercial activities falling

19   within the scope of 3 -- 36 CFR 261.10(c).

20         I also refer to the United States vs. Lewton,

21   L-E-W-T-O-N, 575 Federal.Appx.751 out of the Ninth Circuit,

22   which confirmed a conviction when an individual essentially

23   went into a closed area to film big horn sheep for profit

24   without a special use permit.

25         Here, based off of the evidence at this point and

1   looking at it in the light most favorable to the People, we

2   have evidence that supports Count 1, that supports Mr. Lesh

3   taking these pictures.  And then with regard to Count 2, we

4   have evidence of, essentially, a business model where an

5   individual posts various pictures of themselves and other

6   individuals doing things and essentially markets the company

7   across different media for those purposes, and then of

8   course, we finally have Mr. Lesh's statement referring back

9   to his postings, which indicate an increase in his profits

10  that occurred after posting the Hanging Lake photo, at least

11  by implication, which is sufficient for purposes of this

12  point, and by essentially indirect evidence, it's sufficient

13  to support the idea that Mr. Lesh uses various social media

14  in his activities to support and increase the sales of

15  Virtika as he discussed in the article that he later

16  ratified.

17          So for all of those reasons, I find that there is

18  competent evidence to proceed as to both Counts 1 and Count

19  2, and the motion under Rule 29 for judgment of acquittal is

20  denied.

21          Okay.  Anything, Mr. Faddis, before I advise your

22  client in terms of his right to testify or to remain silent?

23          MR. FADDIS:  Your Honor, may I just clarify a few

24  things from the Court's ruling on the Rule 29 motion for

25  purposes of the record?

1          THE COURT:  You can ask.  Go ahead.

2          MR. FADDIS:  Thank you, Your Honor.  So just to

3     clarify:  It sounds like, for purposes of Rule 29 anyway,

4     Your Honor is not requiring a designation on an over-snow

5     vehicle use map, which is the language of 36 CFR 261.14, but

6     rather that signage is adequate, at this stage, to meet that

7     portion of the statute.  Am I correct in stating that?

8          THE COURT:  My ruling speaks for itself on that

9     point.

10          MR. FADDIS:  Okay.  And then just to clarify:  The

11     passage that Your Honor was referencing with respect to the

12     New Yorker article, where I think Your Honor said he posted

13     a couple of photos of him snowboarding off a jump in a

14     closed terrain park at the Keystone Ski Area, which, like

15     Breckenridge, is operated by the company that owns Virtika

16     Ski -- excuse me, owns Vail Ski Resort on land belonging to

17     the National -- to the Forest Service, that was -- the Court

18     was viewing that, at least for purposes of Rule 29, as a

19     potential admission by Mr. Lesh, and not the author of that

20     article regarding the content of that statement; is that

21     right?

22          THE COURT:  Well, I've previously ruled, when I

23     reversed my earlier ruling, that essentially that can be an

24     admission based off of the manifestation argument that I

25     used to reverse.  So yes, that is an admission by Mr. Lesh.

1          MR. FADDIS:  Thank you, Your Honor.

2          THE COURT:  All right.  Anything further then

3    before I advise your client?

4          MR. FADDIS:  No, Your Honor.

5          THE COURT:  All right.  So Mr. Lesh, this is a

6    time -- you've probably noticed that my job isn't to ignore

7    you in court, but I only get to talk to you directly in

8    certain circumstances, and this is one of those

9    circumstances where we need to discuss one of your rights,

10   and that's your constitutional right to remain silent.  You

11   also have another constitutional right, and that is a

12   constitutional right to testify, and obviously you can't do

13   both of those things.

14         This is also one of those decisions that you get

15   to make and nobody else.  You certainly should talk to your

16   attorney about this decision, and I suspect strongly that

17   you already have, but I'll ask you that here in a moment.

18   But ultimately, if your attorney tells you to testify, you

19   don't have to do it, and alternatively, if your attorney

20   tells you not to testify, you also don't have to do that,

21   because you get to make your own decision.

22         If you choose to testify and you have certain

23   convictions, particularly a conviction for a felony or a

24   conviction for what would be considered potentially a crime

25   of moral turpitude, which is in many ways a crime having to

1   do with your truthfulness, the Government would almost

2   certainly be able to bring those things up for purposes of

3   arguing that you are not a truthful person.

4          Other convictions most likely wouldn't be brought

5   up, and it may be that you have no convictions of any sort

6   that would apply.  So this is just a hypothetical

7   discussion, but something to consider and talk to your

8   attorney about.

9          Also, once you make the decision to testify on

10  your own behalf and start testifying, it's not a decision

11  that you can then put back in the box.  If you testify, you

12  will be subject to cross-examination subject to the Rules of

13  Evidence and objections that your attorney might make, but

14  you don't get to answer one side of a question and not the

15  other side of the questions if you want me to consider your

16  testimony.

17         On the other side of things, if you choose not to

18  testify, I would not consider your silence in any fashion.

19  That doesn't get held against you in any fashion.  It's just

20  essentially not part of the evidence, and the Government

21  would, in no way, be able to argue -- and I don't suspect

22  that they would -- that because you didn't testify, there is

23  some implication of wrongdoing there.  It doesn't get

24  considered in any fashion.

25         So let me ask you, sir:  Have you had the

209

```
1    opportunity to talk to your attorney about your right to

2    testify and your right to remain silent?

3              MR. LESH:  I have.

4              THE COURT:  Would you like more time to talk to

5    him about that?

6              MR. LESH:  I would not.

7              THE COURT:  Okay.

8              Mr. Faddis, are you at the point where you want me

9    to ask your client if he's made a final determination as to

10   that, or do you want to wait until later in the trial about

11   that?

12             MR. FADDIS:  Your Honor, you can ask him about

13   that final determination.  Thank you.

14             THE COURT:  Okay.  Mr. Lesh, at this point in time

15   do you intend to testify or to remain silent?

16             MR. LESH:  To remain silent.

17             THE COURT:  Okay.  All right.  I appreciate any

18   further colloquy that you think we should have, Mr. Faddis?

19             MR. FADDIS:  No.  Thank you, Your Honor.

20             THE COURT:  All right.  I will ask Mr. Lesh, are

21   you under the influence of any alcohol, drug, medication, or

22   any circumstance today that would make it so you cannot make

23   an informed decision on your right to testify or to remain

24   silent?

25             MR. LESH:  I am not.
```

1            THE COURT:  All right, I do find that Mr. Lesh has

2    been appropriately advised.  He has made a decision to

3    remain silent, which of course the Court will honor.  I find

4    that to be a knowing, voluntary, and intelligent decision on

5    his part.

6            What I will tell you, Mr. Lesh, and I don't know

7    if your counsel intends to present a case or not.  I'm going

8    to come back to him momentarily and ask him about that.

9    Essentially, if he doesn't intend to present a case, we're

10   done and that's basically a final decision.

11           If he decides that he does want to present a case,

12   then when he's done with everybody other than potentially

13   you, I'll come back to you and to him and ask that question

14   again, and the reason I do that is there are certainly times

15   during the course of a defense case where a defendant

16   changes their mind, and that's fine.  I don't care one way

17   or the other, but you need to know that just because you

18   have had that discussion with me doesn't mean that up until

19   a certain point in time that, if you wish, you can change

20   your mind.

21           Do you understand that, sir?

22           MR. LESH:  Yes.

23           THE COURT:  Okay.  Mr. Faddis, in terms of a

24   defense case?

25           MR. FADDIS:  Yes, Your Honor.  We do have two

211

 1    witnesses whom we intend to call.  If I may have just a

 2    moment to tell them to log into the system?

 3              THE COURT:  Okay.  Probably one at a time, I'm

 4    guessing?

 5              MR. FADDIS:  Of course, yes.

 6              THE COURT:  Mr. Hautzinger?

 7              MR. HAUTZINGER:  Could I have a moment to talk to

 8    Mr. Faddis?

 9              THE COURT:  Sure.

10              MR. FADDIS:  Yes.

11              (Pause.)

12              MR. FADDIS:  And, your Honor, if I may direct the

13    first witness to log in now?

14              THE COURT:  Oh, absolutely.  Please do.

15              MR. FADDIS:  Thank you.  And Your Honor, while

16    we're waiting, if I may just appraise the Court of

17    something?

18              THE COURT:  Sure.

19              MR. FADDIS:  So both witnesses have work

20    commitments, and so they may be joining the virtual court

21    via a phone, which I believe should be perfectly adequate,

22    but if there's any background noise or something like that,

23    I just wanted to apologize in advance.

24              THE COURT:  Well, do you anticipate that we will

25    physically -- I mean, it may be a phone, but are they going

212

1    to be using some kind of a video so we can see them?

2              MR. FADDIS:  Yes, sir.

3              THE COURT:  Okay, that's fine.  That's fine.

4              Ms. Barnes, can we make it a bit cooler in here,

5    or is that -- oh, okay.  You get that -- okay.  Thanks.

6              (Pause until 4:08 p.m.)

7              (Inaudible discussion.)

8              MR. FADDIS:  And Your Honor, if I may have a

9    moment to just give the witness a call?

10             THE COURT:  Sure.

11             MR. FADDIS:  Thank you.

12             (Inaudible discussion.)

13             MR. FADDIS:  Apparently his screen says he is

14   joining right now.

15             THE COURT:  No problem.  We are used to delays

16   related to technology.

17             MR. FADDIS:  I appreciate the Court's patience.

18             (Inaudible discussion.)

19             MR. FADDIS:  Your Honor, while Mr. Devine is

20   experiencing some technical difficulties, I may just request

21   that the other witness call in.

22             THE COURT:  Your case, whatever.  I'm happy to

23   wait if you would rather plug another witness in first, but

24   I'm not telling you you need to do that either if it's not

25   sensical for what you need to do, so . . .

213

1          MR. FADDIS:  Thank you, Your Honor.

2          (Inaudible discussion.)

3          (Pause until 4:15.)

4          THE COURT:  Did somebody pop on there or was there

5     -- all right.

6          All right.  Sir, I'm going to need to have you

7     point the camera at you so we can see who you are, please.

8     We see, I think, your right arm.  Well, not seeing you yet.

9     We're seeing your right shoulder, but we need to see your

10    face.

11         Is there still somebody in the system that we're

12    just not seeing?

13         MS. BARNES:  (Inaudible).  There he is.

14         MR. DEVINE:  Hello?

15         THE COURT:  All right.  Well, we see somebody.  I

16    would say the Court is not going to proceed with that kind

17    of picture for testimony.  Well, maybe it's irrelevant.

18         MS. BARNES:  (Inaudible).

19         THE COURT:  All right.  Can you hear me, sir?  No.

20         All right.  I'm going to step out, because I have

21    things I can -- well, can you hear me, sir?  Hello?  Can you

22    hear me?

23         All right.  So Angela, in terms of things, we'll

24    need essentially a fairly seamless ability to talk with the

25    individual back and forth so that, particularly,

1    cross-examination is effective when it gets to Mr.

2    Hautzinger.

3                Can you hear me, sir?

4                Okay.  I guess when we get to that point, let me

5    know.  If not, I can come back in in a moment.

6                MS. BARNES:  Yes.  Hello?

7                MR. FADDIS:  Your Honor, he did say, Hello.

8                THE COURT:  Can you hear me, sir?  Okay.  I'm

9    going to step out.  We'll just go off the record, but we can

10   keep plugging at it.

11               MR. HAUTZINGER:  While we're still on the record,

12   I had very much hoped to finish this today, but it's already

13   4:20.  I'm wondering if we came back tomorrow, if the

14   defense thinks they might be able to have their witnesses in

15   a more robust --

16               THE COURT:  Yeah.

17               MR. HAUTZINGER:  -- WiFi environment than sitting

18   and work from a phone, and I'm just inquiring.

19               THE COURT:  Here --

20               MR. HAUTZINGER:  I'd rather not come back

21   tomorrow.

22               THE COURT:  Right, and I don't know that we'll get

23   done today or not.  I'm -- can you hear me, sir?

24               I guess let me ask, Mr. Faddis:  Do you have some

25   idea of how long each potential witness is going to take?

1          MR. FADDIS:  I do, Your Honor.  I expect both of

2    them to be very brief.  Like, around 10 minutes or so.

3          THE COURT:  Okay.

4          MR. FADDIS:  And so if we --

5          THE COURT:  Okay.  Well, with that, I'm willing to

6    certainly -- you know, it's 4:20.  I'm happy to give it a

7    few more minutes and see if we can't get a connection that's

8    sufficient and stable for examination and cross-examination,

9    but I don't think we're at that point yet.

10          Can you hear me, sir?

11          Yeah, I mean, we're not at that point yet, so --

12          MR. FADDIS:  And I'm sorry to interrupt, but I

13    believe that there are two people that have checked in.

14          THE COURT:  And that shouldn't affect the ability.

15    So the gentleman with the dreadlocks, Can you hear me?

16          MR. DEVINE:  Yes, I can hear you.

17          THE COURT:  Okay.  Sorry, I don't know your name.

18    So -- actually, now I don't see a picture on the main

19    screen.  I see that -- I think you said maybe that's B -- B

20    as -- he is actually showing on Ms. Barnes' log-in screen,

21    but has not yet gotten onto our VTC screen, which we need

22    for ability to examine him, and I don't know that the other

23    individual ever heard me.

24          The gentleman -- is your name B, sir?

25          MR. DEVINE:  Yes, sir.

1           THE COURT:  Okay.  That's your first name?  I

2   don't mean to be rude, but I don't know -- I don't have yet

3   your last name.

4           MR. DEVINE:  Oh, no, yeah.

5           THE COURT:  What's your last name?

6           MR. DEVINE:  Devine.

7           THE COURT:  Okay.  Mr. Devine, hold on.  Can we --

8   is -- do we know why Mr. Devine's not on the big screen?

9           MS. BARNES:  I do not.

10          THE COURT:  Okay.  Well, I'm --

11          MS. BARNES:  Probably because he has a WiFi

12   connection --

13          THE COURT:  Okay.

14          MS. BARNES:  -- (inaudible) --

15          MR. FADDIS:  This is --

16          THE COURT:  All right, we got the gentleman in the

17   green shirt.  Is that James?

18          MR. FADDIS:  It is, Your Honor.

19          THE COURT:  James didn't hear --

20          MR. HAUTZINGER:  (Inaudible).

21          THE COURT:  All right.  Well, I'm going to step

22   out.  I'll let you all handle that, and I'll come back when

23   --

24          MR. FADDIS:  Thank you, Your Honor.

25          (Recess was taken.)

```
 1              THE COURT:  All right.  We're back on the record

 2   in Mr. Lesh's case, and the gentleman on the video in the

 3   light green shirt, can you identify yourself for me, sir?

 4              MR. EMME:  James Emme.

 5              THE COURT:  And Mr. Emme, let me have you spell

 6   both your first and your last name for me.

 7              MR. EMME:  First name is J-A-M-E-S, last name

 8   Emme, E-M-M-E.

 9              THE COURT:  All right.  Thank you, Mr. Emme.  Let

10   me have you raise your right hand.

11                        JAMES EMME,

12   called as a witness, having first been duly sworn, testified

13   as follows:

14              THE COURT:  Okay.  Thank you.  Your witness, Mr.

15   Faddis.

16              MR. FADDIS:  Thank you, Your Honor.

17                     DIRECT EXAMINATION

18   BY MR. FADDIS:

19       Q    Mr. Emme, this is attorney Eric Faddis, attorney

20   for David Lesh.  Can you hear me all right?

21       A    Yes, sir.

22       Q    I just have a few questions for you.  Do you know

23   Mr. Lesh?

24       A    Yes.

25       Q    Generally speaking, how do you know him?
```

1        A    I met him through a mutual friends around 2014, I

2   think, at a barbecue.

3        Q    Okay.  And do you recall me e-mailing you a

4   photograph?

5        A    Yes.

6        Q    Did you review that photograph?

7        A    Yes, sir.

8             MR. FADDIS:  Your Honor, I'd like to show the

9   witness, via the Epson device, what's been previously marked

10  as Defendant's Exhibit A.

11            THE COURT:  You may.

12       Q    (By Mr. Faddis)  So Mr. Emme, I'm -- I'm showing

13  you what's been marked as Defendant's Exhibit A.  Can you

14  see that all right?

15       A    Yes.

16       Q    Okay.  And have you seen that photograph before?

17       A    Yes.

18       Q    What is it?

19       A    It's a picture of me making a turn in the powder

20  on my snowmobile.

21       Q    How do you know that that's you?

22       A    It's my coat and my goggles and my snowmobile.

23       Q    Got it.  To whose Instagram was this picture

24  posted?

25       A    Say that again, please.

1      Q     Sure.  To whose Instagram account was this picture

2   posted?

3      A     David posted that on his account.

4      Q     And does the picture fairly and accurately

5   represent you snowmobiling that day?

6            THE COURT:  We --

7      A     You cut out again.  You just asked if that picture

8   represented me snowmobiling?

9      Q     (By Mr. Faddis)  If it is a fair and accurate

10   representation of you snowmobiling.

11      A     Yes, sir.

12            MR. FADDIS:  At this point, Your Honor, defendant

13   would move to admit Defendant's Exhibit A.

14            THE COURT:  Mr. Hautzinger?

15            MR. HAUTZINGER:  No objection.

16            THE COURT:  Defendant's Exhibit A is admitted.

17            (Defendant's Exhibit A admitted.)

18      Q     (By Mr. Faddis)  And sir, can you please read the

19   caption to the photograph?

20      A     Are you talking to me?

21      Q     Oh, yes -- yes.  Mr. Emme, are you able to read

22   the caption to this photograph?

23      A     It's not showing up on my screen.

24      Q     That's okay.  The photograph -- the caption will

25   speak for itself.  What -- do you remember where you were

220

1    snowmobiling when this photo was taken?

2        A    I mean it was 2016.  It was at Breckenridge, I

3    believe.

4            MR. FADDIS:  Okay, no further questions.  Thank

5    you, sir.

6            MR. EMME:  Thank you.

7            MR. FADDIS:  Oh, and Mr. Emme, stay on the line

8    though.  The prosecutor may have some questions.

9            THE COURT:  Mr. Hautzinger?

10           MR. HAUTZINGER:  I -- based on that, Your Honor, I

11   have no cross-examination.

12           THE COURT:  Okay, thank you.  Mr. Emme, you are

13   excused.  Thank you.

14           MR. EMME:  Thank you.  Bye-bye.

15           THE COURT:  All right.  And --

16           MR. FADDIS:  We are contacting our other witness

17   now.

18           THE COURT:  Okay.

19           MR. FADDIS:  We hope he will be able to get on

20   very promptly.  We appreciate the Court's patience and

21   apologize for the delay.

22           THE COURT:  That's no problem.

23           All right.  Sir, can you hear me?  Can you hear

24   me, sir?  I think it was Mr. Devine.  Mr. Devine, this is

25   Gordon Gallagher.  Can you hear me?

1             MR. DEVINE:  Yes.

2             THE COURT:  You can hear me?

3             MR. DEVINE:  Yes, sir.  Can you hear me?

4             THE COURT:  Great.  We can hear you now.

5         All right.  Mr. Devine, let me have you state your

6    first and last name for me and spell both of them.

7             MR. DEVINE:  My first name is B, and the letter B,

8    and my last name is Devine, D-E-V-I-N-E.

9             THE COURT:  All right.  Mr. Devine, let me have

10   you raise your right hand, please.

11                        B DEVINE,

12   called as a witness, having first been duly sworn, testified

13   as follows:

14            THE COURT:  All right.  Your witness, Mr. Faddis.

15            MR. FADDIS:  Thank you, Your Honor.

16                     DIRECT EXAMINATION

17   BY MR. FADDIS:

18       Q    Mr. Devine, this is attorney Eric Faddis, attorney

19   for David Lesh.  Can you hear me all right?

20       A    Yes, I can hear you.

21       Q    Okay.  How do you know Mr. Lesh, just generally?

22       A    I just met him skiing a long time ago and just

23   been friends through skiing and outdoor activities, and

24   since then, he's started a very successful company and he's

25   done very well for himself being a self-made business man.

1       Q     And Mr. Devine, do you remember when I e-mailed

2   you a photograph -- or two photographs, rather?

3       A     (Inaudible) of me skiing --

4            THE COURT:  We may have to have you --

5       Q     (By Mr. Faddis)  And I'm sorry, if you could

6   please repeat that, Mr. Devine?

7       A     There -- there is a -- one photo of me skiing and

8   then there was one photo of me sitting on the snowmobile.

9            MR. FADDIS:  Your Honor, I'm going to show the

10  witness what's previously been marked as Defendant's Exhibit

11  B.

12      Q     (By Mr. Faddis)  Mr. Devine, I am showing you

13  what's previously been marked as Defendant's Exhibit B.

14  Have you seen that photograph before?

15      A     Yes, that's -- that's a photograph of me

16  snowmobiling.

17      Q     How -- how do you know that it's you?

18      A     I just remember my skis and stuff on the sled, but

19  yeah, I mean, it's hard to say if you didn't know me, but

20  yeah.  I just would recognize my clothes and skis and

21  snowmobile.  Just how --

22      Q     Do you remember where this was taken?

23      A     I think that's at (indiscernible) Rabbit Ears Pass

24  Steamboat.

25      Q     Is it possible that it was taken at Uinta

223

1     Mountains in Utah?

2        A     It very well could be.  It's hard to tell trees

3     and it's old.

4        Q     Sure.

5        A     But yeah, it's possible.

6        Q     Okay.

7        A     I have snowmobiled in the Uintas before.

8        Q     Okay.  To what Instagram account was this picture

9     posted?

10       A     I think this was on David Lesh's Instagram

11    account, it looks like.

12       Q     And is it a fair and accurate representation of

13    you sitting on a snowmobile in Utah?

14       A     Yeah.

15             MR. FADDIS:  Your Honor, at this time I would move

16    to admit Defendant's Exhibit B.

17             THE COURT:  Mr. Hautzinger?

18             MR. HAUTZINGER:  No objection.

19             THE COURT:  B is admitted.

20             (Defendant's Exhibit B admitted.)

21       Q     (By Mr. Faddis)  Lastly, Mr. Devine, I'm going to

22    show you what's previously been marked as Defendant's

23    Exhibit C.  Can you see that all right?

24       A     Yep.

25       Q     Have you seen that photo before?

224

1      A    Yeah, that's -- that's me skiing in Utah, Grizzly

2  Gulch are by Alta Ski Resort.

3      Q    Okay.  To whose Instagram was this photo posted?

4      A    David posted this on his Instagram.

5      Q    Okay.  And is it a fair and accurate

6  representation of you skiing in Utah?

7      A    Yeah.

8           MR. FADDIS:  Your Honor, at this time I would move

9  to admit Defendant's Exhibit C.

10          THE COURT:  Mr. Hautzinger?

11          MR. HAUTZINGER:  No objection.

12          THE COURT:  Admitted.

13          (Defendant's Exhibit C admitted.)

14          MR. FADDIS:  Those are all of my questions.  Thank

15  you, sir.  The prosecutor may have some questions for you.

16          THE COURT:  Mr. Hautzinger?

17          MR. HAUTZINGER:  No questions based on that, Your

18  Honor.

19          THE COURT:  All right.  Mr. Devine, thank you, and

20  you are done.  You can log off.

21          MR. DEVINE:  Okay, thank you.

22          THE COURT:  All right.  Mr. Faddis, your next

23  witness.

24          MR. FADDIS:  Your Honor, at this time the defense

25  rests.

1          THE COURT:  Okay.  As I told you, I would come

2     back to you essentially for the last word, Mr. Lesh.

3     Essentially, the same discussion that we had before, that

4     your attorney tells me he wants to rest.  You have the

5     opportunity, if you want, to testify.  Do you need any time

6     to think about that anymore?

7          MR. LESH:  (Inaudible).

8          THE COURT:  Okay.  Given the more -- the recency

9     of the rest of the discussion, I don't find that there is

10    any further reason to belabor that, and Mr. Lesh has

11    determined not to testify, and of course, that will be

12    honored by the Court, and the defense has rested.

13         Mr. Hautzinger, do you intend to present any

14    rebuttal case?

15         MR. HAUTZINGER:  I think I would like to briefly

16    call Agent Leach in rebuttal, Your Honor.

17         THE COURT:  Okay.  Agent Leach, you are still

18    under oath.  Come on back up.

19                    REDIRECT EXAMINATION

20    BY MR. HAUTZINGER:

21         Q    Good afternoon, sir.

22         A    Good afternoon.

23         Q    You testified earlier that you had spent some time

24    looking at the defendant's Instagram accounts and viewing

25    various photos there, correct?

1          A     That's correct.

2          Q     Now, obviously you were more focused on photos

3    that were specifically of the defendant or related to this

4    case, correct?

5          A     That's correct.

6          Q     But is there anything unusual about -- is it fair

7    to say that defendant regularly posted photos of other

8    people to his Instagram account as well?

9          A     Yes, there were lots of other folks that I

10   witnessed on that Instagram account.

11         Q     Partaking in various outdoor activities?

12         A     Just all kinds of different activities.

13         Q     And that's not unusual or surprising, is it?

14         A     No.

15               MR. HAUTZINGER:  I have nothing further, Your

16   Honor.

17               THE COURT:  All right.  Any cross-examination off

18   of that?

19               MR. FADDIS:  No, thank you, Your Honor.

20               THE COURT:  All right.  Special Agent, you may

21   step down.  Mr. Hautzinger, any other further evidence?

22               MR. HAUTZINGER:  No, thank you, Your Honor.

23               THE COURT:  All right.  Do the parties want to

24   close this afternoon or in the morning?

25               MR. FADDIS:  Well, Mr. Hautzinger?

227

| | |
|---|---|
| 1 | THE COURT:  Mr. Hautzinger. |
| 2 | MR. HAUTZINGER:  I'm ready to go. |
| 3 | THE COURT:  Mr. Faddis? |
| 4 | MR. FADDIS:  I'm ready as well.  If possible, it |

4    MR. FADDIS:  I'm ready as well.  If possible, it

5    would be great to finish this today, but of course, if we

6    need to go into tomorrow, defense is prepared for that.

7         THE COURT:  I mean, I'm happy to do it, if -- to

8    keep rolling today if the parties would like to.  I just

9    didn't want to push things on at 20 to 5:00 if the parties

10   were ready to break or needed some time to gather their

11   thoughts, but if everybody's ready to close -- anybody want

12   a break before we close?

13        MR. FADDIS:  I'm prepared, Your Honor.

14        THE COURT:  Okay.  Mr. Hautzinger, your closing

15   argument.

16        MR. HAUTZINGER:  Your Honor, as I said in opening,

17   I think you know this case as well as I do, if not better.

18   What I argue doesn't really matter here.  You're the finder

19   of fact, and it matters how you interpret the evidence and

20   what inferences you're willing to draw from the evidence.

21        I submit the prosecution has proven both counts

22   beyond a reasonable doubt.  I'm going to submit it on the

23   evidence and reserve rebuttal.

24        THE COURT:  All right.  So submitted.

25        Mr. Faddis?

228

1          MR. FADDIS:  Yes.  Thank you, Your Honor.

2          So during opening statement, I mentioned that the

3    Government is going to present some photos that no human

4    being could possibly identify who was depicted within those

5    photos, and that's what's happened, and they know that

6    that's not proof beyond a reasonable doubt.

7          So they have tried to find other evidence, and

8    some of that evidence is ambiguous statements that could be

9    interpreted multiple ways.  The reliability of those

10   statements has not been firmly established, the veracity and

11   accuracy of those statements has not been established.

12         Many of those statements on which the Government

13   relies are from the pen of a New Yorker journalist, and

14   reflect his interpretations and his opinions and his

15   observations of this case.  I'm going to get to those in a

16   moment.

17         The Government has also, I believe, tried to

18   present evidence to essentially indicate that Mr. Lesh is a

19   bad guy and this Court should convict him.  Of course, none

20   of that is adequate to meet their burden of proof beyond a

21   reasonable doubt.  And so I want to talk about some of the

22   evidentiary requirements, and then also some of the evidence

23   that has come out.

24         With respect to Count 1:  As mentioned, 36 CFR

25   261.14 has an absolute elemental requirement that there be

1    designations that reflect an over-snow vehicle use map, and

2    that those -- that map has to be made available at public

3    headquarters of corresponding administrative units and

4    ranger districts of the National Forest System, and has to

5    be posted to their website as soon as practical.

6         That is an element that cannot be ignored, and it

7    -- the statute is expressed -- it's very clear as to what is

8    required.  Signage is not designation in an over-snow use

9    map.  It's just not, nor is anything to which Mr. Ingham

10   testified, or Special Agent Lynch -- Leach, excuse me.  None

11   of that meets that requirement.

12        I understand the Court's ruling for purposes of

13   Rule 29, when the evidence has to be viewed in the light

14   most favorable to the plaintiff -- or to the prosecution,

15   but for purposes of determining guilt or innocence, the

16   Government has to prove beyond a reasonable doubt that that

17   element has been met.  Simple signage 100 feet -- with

18   100-feet spacing is not what is required by the statute.

19        And so in addition, Your Honor, you know there are

20   several issues the Court has to decide.  One is that the

21   Government -- it has to decide whether the Government has

22   proven beyond a reasonable doubt that on or about April 24,

23   2020, Mr. Lesh was, one, physically present at the Keystone

24   Ski Area and whether they can prove that beyond a reasonable

25   doubt, because Count 1 and Count 2 both require that some

1    act be committed upon lands administered by the United

2    States Forest Service, and even if they were to surpass that

3    hurdle, the second requirement for Count 1 is that Mr. Lesh

4    was in possession of or operating a snowmobile.  And I'm

5    going to talk about how there is simply insufficient

6    evidence as to both of those issues.

7            I want to talk a little bit about the date range

8    here in terms of when these alleged acts were committed.  I

9    think Mr. Ingham was quite clear that he had no idea when

10   this snowmobile was on the Keystone Ski Area.  He did go and

11   he observed tracks on the 25th, but he was clear in his

12   testimony that he did not know and could not say with any

13   reasonable degree of certainty when these acts occurred.

14           He is not an expert, and I think one thing that is

15   significant is, you know, Mr. Ingham knows the Keystone Ski

16   Area.  He's a manager there.  He's worked there for two

17   years, and he was physically present at the scene.  He went

18   to go investigate, and so he is in the best position to tell

19   this Court whether he has a lay opinion as to when this

20   snowmobile was supposedly on the Keystone Ski Area.  He

21   couldn't do that.

22           What the Government tried to do after they

23   realized that, is they called Mr. -- Special Agent Leach and

24   showed him some photographs.  Now, these photographs, Your

25   Honor can see these, and they're Government's Exhibits, I

231

1  believe, 4 through 6.  Those are not clear photographs, and

2  there is no way to ascertain from those photographs, with

3  any degree of reliability, when those tracks were made.

4  There just isn't, and Mr. -- excuse me, Special Agent Leach

5  testified that he didn't -- he really couldn't say when they

6  were made.

7          He knows when those photographs were taken and he

8  opined on direct about what he thought was the recency of

9  those tracks, but then on cross-examination, he was rather

10  (indiscernible) and rather non-committal with respect to

11  when this alleged act occurred.  That's a very serious

12  problem for the Government's case.

13          So further, the -- as I mentioned, the Government

14  has to prove that Mr. Lesh was physically present at the

15  Keystone Ski Area.  So what is the evidence on that?  It

16  seems that the Government may have a fundamental

17  misunderstanding of how Instagram works.  The Government, I

18  believe -- it contends that because the photo was posted

19  from Mr. Lesh's Instagram account, he must have been there,

20  and it must be depicting him.  That is flaw, that is

21  fallacious.

22          We've presented two witnesses who are depicted,

23  both snowmobiling, in Mr. Lesh's -- and posted to Mr. Lesh's

24  account, but it depicts those individuals and not Mr. Lesh,

25  and so how can one possibly say with any reasonable degree

232

1    of certainty that it is Mr. Lesh in that photograph?

2           The Government has -- or excuse me, the Court has,

3    of course, seen Government's Exhibits 1 through 3.  It's

4    impossible to ascertain who is in there, and so I think

5    that's something that the Court certainly will consider.

6           Also, there's no physical evidence of Mr. Lesh

7    ever being there.  There was nothing left behind that is

8    traced back to him, there is no GPS evidence of him being

9    there, there's no cellphone locational evidence of him being

10   there.  There are several items depicted in those

11   photographs, including a very distinctive snowmobile, and

12   the evidence was that neither the snowmobile, nor the pants,

13   nor the jacket, nor the camera, nor any item depicted in

14   Government's 1 through 3 was found in Mr. Lesh's possession,

15   or at his warehouse, or anything like that.

16          There are no other photos, videos, or witness

17   testimony and evidence of Mr. Lesh in this clothing or

18   operating this distinctive snowmobile.  There are zero

19   witnesses who place him at the scene.

20          What the Government's case really boils down to is

21   an Instagram post that they assumed depicted the posting,

22   and that is invalid logic.

23          So I want to talk about some of the other evidence

24   as well.  So the Government does make a big deal about some

25   statements in the New Yorker.  So I want to discuss those

1    briefly.

2           So in that article, Mr. Lesh says, I want to be

3    able to post fake things on the internet.  There is also a

4    statement that the Government really hangs their hat on

5    about -- and it essentially states, He posted a couple of

6    photos of him snowmobiling off of a jump in a closed terrain

7    park, at a Keystone Ski Area which, like Breckenridge, is

8    operated by the company that owns Vail Ski Resorts on land

9    belonging to the Forest Service.

10          This is an observation or an opinion of the

11   author.  It is absolutely not something that Mr. Lesh has

12   ever said.  And I understand the legal basis for the Vance

13   Pro podcast meeting the authenticity threshold for the

14   evidence to be admitted, but my gosh, in that podcast, Mr.

15   Lesh essentially says that the article was one-sided, and I

16   -- he says at the end of the one-minute clip that this

17   obviously doesn't reflect who I am, or what I do, or my

18   life.  That is not an adoption of this statement that this

19   author made in his article.

20          There is also a ton of paraphrasing within that

21   article.  We have no idea what the actual statements were.

22   The Government hasn't presented them.  They're just relying

23   on what is within this article without knowing what was

24   said, or in what form, or in what context, or if there was

25   more to the statement that was left out.  We have no idea.

234

1   That is not grounds on which to convict someone of a federal

2   offense.

3          Also, the Government does make a significant issue

4   of the Maroon Lake and the Hanging Lake posts, but in the

5   same breath, the Government concedes, essentially, that

6   those posts were of such dubious reliability, such dubious

7   authenticity, that they were not able to bring charges on

8   those posts, but yet that they somehow contend that Mr. Lesh

9   was still upon lands serviced by the National Forest Service

10  within those posts, even though they essentially concede

11  they're fake?  That is not, again, grounds to convict anyone

12  of a federal offense beyond a reasonable doubt.

13         I think one thing that's significant as well is

14  that when you look at Government's Exhibit 1, I believe --

15  it's the one that depicts the snowmobiler and then another

16  individual -- the Government has zero clue who the other

17  individual is, but they swear up and down that the

18  snowmobiler must be David Lesh.  That's so arbitrary.  There

19  is no reasonable basis for that differentiation.

20         Even if they think he was there, they can't

21  possibly differentiate between who is whom within that

22  photo, and so that's something for the Court to consider as

23  well.

24         Also Special Agent Leach, while he was on the

25  stand -- you know, I was asking him, you know, so you firmly

1   believe that Mr. Lesh is depicted in People's -- or excuse

2   me, the Government's 1 through 3, and he was very equivocal

3   about that.  This is their lead witness.  This is the lead

4   investigator, and he is essentially saying:  You know, it's

5   my opinion that he's in there, but I don't know for sure,

6   but you know -- we don't know.

7           That is not -- there is no resolution there, there

8   is no certainty or commitment to that contention, and that's

9   from the lead investigator in the case, and so also

10  something for the Court to consider.

11          So in summation, with respect to Count 1, you

12  know, there is that designations requirement that is

13  absolute and it's extremely clear.  It's unequivocal.  It

14  says what it says, and it requires what it requires, and so

15  Count 1 must fail on those grounds.  But even if the Court

16  does not find that, there is not proof beyond a reasonable

17  doubt that Mr. Lesh was ever there.  The only thing they

18  have is this Instagram post and then some statement by a New

19  Yorker reporter.  We don't even know if that statement is

20  based on something Mr. Lesh told him, or his own research,

21  or something someone else told him --

22          THE COURT:  Hold on just a second, Mr. Faddis.

23          MS. BARNES:  Because they turned that off, Kaitlin

24  lost audio which she can call into the 888 number.

25          THE COURT:  Okay, I don't think we need to at this

236

1   point.  That's fine.

2          MS. BARNES:  (Inaudible).

3          THE COURT:  Okay.  Go ahead, Mr. Faddis.

4          MR. FADDIS:  Thank you, Your Honor.

5          So, you know, as stated, just because it's posted

6   from his Instagram doesn't mean he's in it.  We've presented

7   two witnesses who are depicted in snowmobiling photos on Mr.

8   Lesh's Instagram.  That fact is absolutely not weighty

9   enough to carry a burden of proof beyond a reasonable doubt.

10          And so moving on to Count 2.  The same identity

11   issues exists for Count 2, of course, but there's also

12   another issue that the Government failed to present adequate

13   evidence on.  So Count 2 is very clear in how it reads.  It

14   says, Upon lands administered by the United States Forest

15   Service, namely the Keystone Ski Area, and elsewhere, David

16   Lesh sold, or offered for sale any merchandise or conducted

17   any kind of work activity or service without authorization.

18          So as such, again, there is not -- there is

19   completely inadequate proof that Mr. Lesh was ever at the

20   Keystone Ski Area, but also the Government is trying to use

21   these fictitious posts from Hanging Lake and from Maroon

22   Lake to somehow meet their burden on Count 2, and that must

23   fail, because there is not evidence before this Court that

24   Mr. Lesh was ever upon lands of Maroon Lake or ever upon

25   lands of Hanging Lake.  It's simply an argument that

1    sometimes when he posts stuff, he references his business.

2    And I think what is absolutely critical is that in this post

3    there is no reference to Virtika.  There is no tag to

4    Virtika.  It doesn't say, Hey, look at this cool jacket,

5    please buy it.  It's nothing like that.  It's simply a post

6    to his personal Instagram.

7              And if we were to set a precedent whereby

8    influencers in social media, who have a broad reach and a

9    brand, simply do a post that doesn't even reference their

10   business, that has nothing to do with their business, that

11   still can trigger federal prosecution and a federal offense,

12   and that is unconscionable.  That is an untenable precedent

13   to be set.  There are First Amendment concerns with that.

14   It is extremely problematic.

15             On top of that, there's simply no evidence that

16   any business activity was ever conducted on April 24, 2020

17   at the Keystone Ski Area.

18             There is no -- there was no evidence of a

19   transaction that happened, there's no evidence of offering

20   anything for sale.  There's no evidence that Virtika made

21   any money because of that post.  And there is one comment in

22   the New Yorker article, which is a paraphrase, which -- you

23   know, who knows if it's accurate or reliable, but it says

24   something like -- or no, it says, Lesh declined to reveal

25   Virtika's annual sales, though he claimed they were up 30

238

1    percent since he posted the photo at Hanging Lake.

2          That's a separate issue.  That is not saying

3    Virtika's sales are up 30 percent after the Keystone Ski

4    Area post.  And for Hanging Lake to form the grounds for a

5    conviction, he would have had to have been upon lands

6    serviced by the United States Forest Service.  It can't be a

7    picture of those lands and using those to sell merchandise.

8    That's not adequate.  He needs to be upon those lands, and

9    that is not something this -- Government has proven in this

10   trial.

11         And, you know, in looking at Count 2 and the

12   statute more closely, you know, that appears to prohibit me

13   going to Keystone and setting up a stand and offering for

14   sale some gloves, and saying, Hey, buy these gloves.  That's

15   what it appears to prohibit.

16         The Government is using a twisted construction of

17   that statute to try and pin something on Mr. Lesh, and it

18   seems clear that at least part of that motivation is because

19   they just don't like him.  He's a controversial figure.  He

20   is somewhat of a provocateur, but that is not grounds to go

21   after someone -- for the Federal Government to target an

22   individual like that on those grounds is, I think,

23   problematic, especially when there is insufficient evidence,

24   like there was in this case.

25         Special Agent Leach conceded that there was no

239

1   evidence of any commercial activity that took place upon US

2   Forest Service lands.  That's what's critical.  The

3   commercial activity had to take place -- there was no

4   merchandise offered for sale, there was no money made by

5   Virtika based on something like that, and I think that that

6   is important for the Court to consider.

7           You know, I think lastly, Your Honor, I would just

8   state that if people can be convicted of federal offenses

9   for just posting on their personal page some activity that

10  doesn't even depict their line of business, that -- it

11  depicts snowmobiling and Virtika is not a snowmobiling

12  company, and there's no reference to it.  There's no tags on

13  it for Virtika or anything like that.  And if we allow our

14  system to convict someone of a federal offense for that,

15  that's extremely problematic, and I think that that would be

16  something that could be widely used by the Federal

17  Government to target influencers and folks whom they choose

18  to target, and I think that that is something that the Court

19  should consider as well.

20          We certainly appreciate the Court's time here and

21  -- in listening to us, and thank you for your thoughtful

22  consideration in this case.

23          THE COURT:  Thank you, Mr. Faddis.  Mr.

24  Hautzinger?

25          MR. HAUTZINGER:  Thank you, Judge.  I want to

1   start with the first thing that Mr. Faddis said in his

2   closing argument and then he circled back to finish with it,

3   the allegation that this case was just based on the

4   Government thinking Mr. Lesh is a bad guy, and that

5   therefore, you should convict him.

6          I categorically dispute that statement, Your

7   Honor.  Actually, I think Mr. Lesh is a very interesting

8   guy.  If you watch the whole video, he has a compelling life

9   story and is very articulate and intelligent.  He also

10  created this situation.  He's the one who put us in the

11  position where we had to bring federal charges against him

12  and he created it by posting, repeatedly, himself doing

13  outrageous things on federal lands, or pretending to be on

14  federal lands.

15         I didn't do that, James Leach didn't do it.  David

16  Lesh did that, and that's what we're asking you to hold him

17  accountable for.

18         As to the designation of route argument, Mr.

19  Faddis is standing here and frantically demanding --

20  claiming that that's an element doesn't make it an element.

21  The element is, off of designated route.  In addition to the

22  fact that the entire area was closed down with ample

23  signage, we also have direct testimony -- undisputed

24  testimony from Chris Ingham that the A51 Terrain Park is not

25  designed for snowmobiles.  It's designed for skiers and

1   snowboarders.

2          Snowmobiles aren't allowed in that terrain park.

3   By definition, it is not a designated route.  So if the

4   defendant was, in fact, in that snow park on a snowmobile,

5   he was off a designated route and he's guilty of Count 1.

6          I understand the defense trying very hard to hang

7   their hat on the lack of positive identification, and it's

8   -- I concede, that's been a stumbling block all along and

9   gave me pause about the case, right up until Mr. Lesh, in

10   seeking more publicity, granted the interview to the New

11   Yorker magazine.

12          Let's put the full context of the statement that

13   the defendant made about the Keystone jumps to the reporter.

14   In its entirety, the paragraph reads:  The charges at hand

15   had to do with two other Instagram incidents.  Last April,

16   with the Independence Pass charges still pending --

17          MR. FADDIS:  And I would object.  My apologies, I

18   don't mean to interrupt, but the Court -- the prosecution

19   asking the Court to consider a portion of this article that

20   I thought the Court had indicated that it's not going to

21   consider, that it's 404(b) evidence, and I don't think that

22   that's something the Court can consider.

23          THE COURT:  Mr. Hautzinger?

24          MR. HAUTZINGER:  It's not 404(b) evidence.  It's

25   in the article and it has to do with the context of the

1    statement.  He wants to cherrypick things and say there's no

2    support for them.  I'm giving you the context of the entire

3    statement.  The fact that the Independence Pass charges were

4    still pending is a fact of life.  It's not prejudicial

5    against the defendant.  It's the way the reporter wrote the

6    article.

7             THE COURT:  Yeah.  The objection's overruled.  I

8    will allow the argument and take it for what it's worth.

9             MR. HAUTZINGER:  Last April, with the Independence

10   Pass charges still pending, and with the State's ski hills

11   and public lands shutdown because of COVID, Lesh decided to

12   poke the bear.  He posted a couple of photos of him

13   snowmobiling off a jump in a closed terrain park at the

14   Keystone Ski Area, which, like Breckenridge, is operated by

15   the company that owns Vail Ski Resort on land belonging to

16   the US Forest Service.

17            Lesh wrote, quote, Solid park sesh, no lift ticket

18   needed, #fuckvailresorts.  This was trespassing, not

19   trolling.

20            It's a pretty strong statement, Your Honor.  There

21   are a lot of positive allegations made there.  The writer

22   says it was David Lesh who -- it was photos of him going off

23   the jump, in the closed terrain, admitting to be there

24   personally.  A lot of very direct and salient facts.

25            And then we get to the YouTube video.  I submit

1   that anyone in their right mind who had been

2   mischaracterized, or misquoted, or so horribly falsely

3   portrayed in a newspaper or a magazine article would

4   certainly have not said everything he said was true and

5   fair.

6          MR. FADDIS:  I would object to burden shifting.

7   Mr. Lesh was under advisement from his counsel not to speak

8   about that matter.

9          MR. HAUTZINGER:  It's not burdensome.  I think I'm

10   talking commonsense, Your Honor.

11          THE COURT:  Okay.  Let me issue a ruling here.  It

12   isn't burden shifting, because the defendant made the

13   statement.  He didn't say, when the reporter asked him -- or

14   the YouTube interviewer, I'm not going to talk about that in

15   some fashion.  So that statement is admissible, and Mr.

16   Hautzinger's arguments as to that statement are admissible

17   as well.

18          MR. FADDIS:  I understand that, but just to

19   clarify the record, in that video, the interviewer doesn't

20   ask him about, you know, did you do the Keystone Ski Area

21   thing, or anything like that.  That wasn't the question.

22          THE COURT:  Oh --

23          MR. FADDIS:  But I understand the question.

24          THE COURT:  All right.  The objection is made and

25   overruled.  Mr. Hautzinger?

1            MR. HAUTZINGER:  I repeat, the author wrote very

2     specifically that it was -- that David Lesh had posted

3     photos of himself going off a jump in a closed area in the

4     Keystone Terrain Park, and yet when given an opportunity by

5     the interviewer -- the reporter of the YouTube video to

6     dispute that, or walk anything back, or say there was

7     anything wrong with what was written in the article, his

8     response was, Nothing he said was untrue, or unfair.

9            I submit, again, anyone in their right mind who

10    had been falsely accused would have taken advantage of it

11    right there.  Well, he got it wrong about it being me on the

12    snowmobile.

13           I think that's commonsense, Your Honor.  I think

14    it's something the Court can certainly take into account.

15           Defense counsel appears to try to argue that my

16    intent in introducing the Hanging Lake photo and the Maroon

17    Lake photo is to say, He's a bad guy and you should convict

18    him.  On the contrary, Your Honor, the purpose of those

19    photos is to show the defendant's business model; that he

20    has a business model of posting photos of him doing

21    outrageous, or crazy, or attention-getting things, sometimes

22    on public lands, sometimes on closed areas, sometimes in

23    legitimate areas.  I don't know.

24           The photos introduced by the defense in the Uinta

25    Mountains and the Breckenridge backcountry may well be

1  perfectly legal to be there.  That's what he does.  It's how

2  he promotes his business.

3          The purpose of the Hanging Lake and Maroon Lake

4  photos is to show that this business plan of using the

5  public lands and photos taken of himself on the public lands

6  was an ongoing enterprise and it was meant to increase

7  Virtika's sales.  On that note, I have to go back again to

8  the article.

9          Lesh declined to reveal Virtika's annual sales,

10  though he claimed they were up 30 percent since he posted

11  the photo at Hanging Lake.  Again, I submit that if that

12  were not true, he wouldn't have told the interviewer,

13  Everything he said was true, nothing was unfair.  It was the

14  defendant himself who linked the Hanging Lake photo to the

15  increase in Virtika's sales.  I think that is clear evidence

16  that the Court can take into account in looking at Count 2,

17  looking at the fact that at least -- we don't know for sure,

18  and I haven't tried to prove beyond a reasonable doubt that

19  the defendant was physically on a log at Hanging Lake, or

20  was actually defecating into Maroon Lake.

21          I submit we do know for sure that he was on a

22  snowmobile going off a jump at the closed Keystone Terrain

23  Park, which is National Forest lands.  The other incidents

24  are corroboration of his business plan.  He was doing work

25  there at Keystone, because he was promoting his business,

1    and that's what he did when he posted the photos.

2         Finally, defense counsel makes a sort of

3    apocalyptic argument about the terrible nature of the

4    Federal Government abusing its power to prosecute

5    influencers who simply post photos of themselves on federal

6    lands.  I submit that is completely overblown and

7    exaggerated, and the fact of the matter is this is sort of a

8    perfect storm created somewhat by COVID, because that's what

9    created -- the fact that Keystone was closed on or about

10   April 24 was because of COVID, and that's what gave the

11   defendant the opportunity to go in there illegally and drive

12   his snowmobile off of the jumps, at least twice if not more

13   times.  But this situation, again, wasn't created by the

14   Federal Government and it's not about the Federal Government

15   going out and looking to persecute influencers who post

16   photos of themselves.

17        It's a situation created by David Lesh and his

18   pattern of posting photos to promote his business, and I

19   submit that the case has been proven beyond a reasonable

20   doubt.  I would ask the Court to so find --

21        Oh, one more point about the recency of the

22   tracks.  The Court can rely on its own good judgment and

23   commonsense that has been in Colorado a long time and takes

24   part in lots of backcountry activities.  Take a look at

25   those photos yourself, Your Honor.  I submit they are clear

1    evidence that tracks have been recently laid.  And, in fact,

2    Mr. Ingham's testimony was he went out as soon as he knew

3    that the postings had -- as soon as he observed the

4    postings, he went out and took these photos.  They're

5    clearly recent and we're in the right timeframe here.

6              For all of those reasons, Your Honor, I submit the

7    Government has proven both Count 1 and Count 2 beyond a

8    reasonable doubt, and I would ask you to so find.

9              THE COURT:  All right.  Thank you, Mr. Hautzinger.

10             I am going to take this matter under advisement

11   and issue, ultimately, a written order on it.  It may be a

12   number of weeks, given the press of business and other

13   orders that are in the pipeline, but we will get to it as

14   quickly as we possibly can.

15             Ms. Barnes, let's go ahead and put a transcript

16   order in in the meantime so I don't forget that.

17             All right.  Mr. Faddis, anything further for us to

18   address today?

19             MR. FADDIS:  No.  Thank you, Your Honor.

20             THE COURT:  And Mr. Hautzinger, anything from the

21   Government?

22             MR. HAUTZINGER:  Nothing further.  Thank you,

23   Judge.

24             THE COURT:  Okay.  Thank you all for a good

25   presentation.  I wish everybody a good rest of the week, and

248

1   we will get an order out as quickly as we can on the matter.

2            MR. FADDIS:  Thank you, Your Honor.

3            THE COURT:  Thank you.

4            (Whereupon, the within hearing was then in

5   conclusion at 5:11 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

249

1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio

4    recording and based on the quality of the audio recording

5    from the above-entitled matter.

6

7    /s/ Dyann Labo                 September 8, 2021

8    Signature of Transcriber            Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25